Christopher SHAYS & Martin
Meehan, Plaintiffs,

v.

FEDERAL ELECTION COMMISSION,
Defendant.

No. CIV.A. 02–1984(CKK).

United States District Court,
District of Columbia.

Sept. 18, 2004.

Charles G. Curtis, Jr., Michelle M. Umberger, Michael M. Markman, Sarah E. Reindl, Heller, Ehrman, White & McAuliffe, L.L.P., Madison, WI, Brent Rushford, Carl S. Nadler, Heller, Ehrman, White & McAuliffe, L.L.P., Washington, DC, Roger M. Witten, David A. O'Neil, Wilmer, Cutler & Pickering, New York, NY, Randolph Moss, Stacy E. Beck, Wilmer, Cutler & Pickering, LLP, Washington, DC, Donald J. Simon, Sonosky, Chambers, Sachse, Endreson & Perry LLP, Washington, DC, Fred Wertheimer, Alexandra Edsall, Democracy 21, Washington, DC, for Plaintiffs.

Erin Kathleen Monaghan, Stephen E. Hershkowitz, Robert William Bonham, III, Federal Election Commission, Washington, DC, for Defendants.

Michael B. Trister, Lichtman, Trister, Singer & Ross, Trevor Potter, Caplin & Drysdale, Washington, DC, J. Gerald Hebert, Alexandria, VA, for Amicus.

## MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

On October 8, 2002, Christopher Shays ("Shays") and Martin Meehan ("Meehan") (collectively "Plaintiffs"), both members of the United States House of Representatives, filed the above-captioned action against the Federal Election Commission ("FEC" or "Commission" or "Defendant").[1] Through their Complaint, Plaintiffs challenge the FEC's regulations implementing Titles I and II of the Bipartisan Campaign Reform Act ("BCRA"). Plaintiffs contend that "[t]he FEC's new regulations, in multiple and interrelated ways, thwart and undermine the language and congressional purposes of Titles I and II of BCRA." Am. Compl. ¶ 6.

At the same time this case was filed, *McConnell v. Federal Election Commission* and ten related actions challenging the constitutionality of BCRA were pending before a three-judge panel of this District Court. The three-judge panel issued

---

1. Plaintiffs filed an Amended Complaint on January 21, 2003.

its decision on May 1, 2003, *see McConnell v. Federal Election Commission,* 251 F.Supp.2d 176 (D.D.C.2003), and the case was immediately appealed to the United States Supreme Court. On September 29, 2003, in response to motions by the two sides in this current case advocating different methods of proceeding, the Court stayed proceedings in this case pending the Supreme Court's decision in *McConnell v. Federal Election Commission.* The Supreme Court issued its decision on December 10, 2003, upholding almost all of Titles I and II of BCRA. *McConnell v. Federal Election Commission,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). This Court, after hearing the parties' views, set a briefing schedule for the pending cross-motions for summary judgment.[2] On February 27, 2004, the parties filed their respective Motions for Summary Judgment. Opposition briefs were filed on March 31, 2004.[3] The Court did not require the filing of Reply briefs, and the parties did not seek leave to file such briefs.

After considering the parties' briefing, the administrative record, and the relevant law, the Court shall grant-in-part and deny-in-part Plaintiffs' Motion for Summary Judgment and grant-in-part and deny-in-part Defendant's Motion for Summary Judgment.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court *strictly* adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h)). As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. In this instance, as the parties cross move for summary judgment, the Court looks to each party's statement to cull the relevant undisputed facts and to determine those facts that are conceded by the cross moving party. Having set forth these preliminaries, the Court moves to a discussion of the material facts not genuinely in dispute.

On February 13, 2002, the House of Representatives passed H.R. 2356.

2. The Court also issued an Order setting out guidelines for those wanting to participate in this lawsuit as *amicus curiae.* The Court has already granted motions for leave to file *amicus curiae* briefs to the following movants: the American Federation of Labor and Congress of Industrial Organizations and United States Senators John McCain and Russell Feingold. The Court in the accompanying Order grants motions for leave to file *amicus curiae* briefs from the following movants: OMB Watch, the Michigan Democratic Party and Michigan Republican Party, and Alliance for Justice.

3. Plaintiffs' Motion for Summary Judgment was accompanied by a Motion Regarding Consideration of Exhibits ("Pls.' Mot. Re: Exs."), anticipating objections by Defendant to some of their exhibits and asking the Court to consider them in deciding their Motion for Summary Judgment. Defendant filed a Motion to Strike Plaintiffs' Exhibits and Opposition to Plaintiffs' Motion Regarding Consideration of Exhibits ("Def.'s Mot. to Strike"), arguing that some of the materials were outside the administrative record and therefore should not be considered by this Court. With the filing of their Opposition brief, Plaintiffs filed a Supplemental Motion Regarding Consideration of Exhibits, to which Defendant filed an Opposition. A review of these filings reveals that the parties disagree on the appropriateness of the consideration of the following Plaintiffs' Exhibits: 109, 155–57, 164–78, 180–82, 185–86, 188–89. Def.'s Mot. to Strike at 24; Def.'s Opp'n to Pls.' Supplemental Mot. at 1. The Court elected to take the course of addressing the parties' disputes if the Court found the exhibits at issue to be relevant to the Court's decision making. The Court has found that only one of the disputed exhibits affects the Court's analysis and therefore shall grant-in-part Plaintiffs' Motion Regarding Consideration of Exhibits, deny Defendant's Motion to Strike, and deny Plaintiffs' Supplemental Motion Regarding Consideration of Exhibits. *See supra* note 38.

*McConnell,* 251 F.Supp.2d at 205 (per curiam). The bill was then adopted by the Senate on March 18 and 20, 2002. Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s Stmt.") ¶ 1. President George W. Bush signed H.R. 2356 into law on March 27, 2002. *Id.* ¶ 2. The Act is commonly referred to as the Bipartisan Campaign Reform Act or "BCRA." *Id.*[4] BCRA represents the most recent amendment to the Federal Election Campaign Act of 1971 (the "Act" or "FECA"). *Id.* ¶ 3.

The Federal Election Commission ("FEC" or "Commission" or "Defendant") is the independent agency of the United States government with exclusive jurisdiction to administer, interpret and civilly enforce FECA. *Id.* ¶ 4. Section 402(c)(2) of BCRA required the FEC to promulgate rules within 90 days of BCRA's enactment to carry out the provisions found in Title I of BCRA, which added new limitations on party, candidate, and officeholder solicitations and use of nonfederal funds.[5] *Id.* ¶ 6. On May 20, 2002, the Commission published its Notice of Proposed Rulemaking ("NPRM") on "Prohibited and Excessive Contributions; Non–Federal Funds or Soft Money." *Id.;* Pls.' Stmt. of Genuine Issues in Opp'n to Def.'s Stmt. ("Pls.' Opp'n Stmt.") ¶ 6. In its NPRM, the Commission solicited comments on its proposed rules, and in response received many public comments, and heard testimony on June 4 and 5, 2002. Def.'s Stmt. ¶ 7. The Commission held an open meeting on June 19, 20 and 22, 2002, and adopted its Title I regulations on June 22, 2002. Pls.' Statement of Material Facts as to Which Plaintiffs Contend There is No Genuine Issue ("Pls.' Stmt.") ¶ 4. On July 16, 2002, the FEC transmitted to Congress, and on

July 29, 2002, the Commission promulgated in the Federal Register, its final rules and Explanation and Justification ("E & J") on "Prohibited and Excessive Contributions: Non-federal Funds or Soft Money." Def.'s Stmt. ¶ 7. These regulations became effective on November 6, 2002. Pls.' Stmt. ¶ 4.

Section 402(c)(1) of BCRA required the FEC to promulgate within 270 days of its enactment the remaining regulations required to carry out BCRA. Def.'s Stmt. ¶ 8. On August 7, 2002, the Commission published its NPRM for Electioneering Communications in the Federal Register, which sought comments on its proposed rules. *Id.* In response, the Commission received many comments, and it heard testimony on its proposed rules on August 28 and 29, 2002. *Id.* ¶ 9. The Commission also conducted an open meeting, and on October 10, 2002, adopted the regulations. Pls.' Stmt. ¶ 5. On October 11, 2002, the Commission transmitted to Congress, and on October 23, 2002, the Commission promulgated in the Federal Register, its final rules and E & J on "Electioneering Communications." Def.'s Stmt. ¶ 9. These regulations became effective November 22, 2002. Pls.' Stmt. ¶ 5.

On August 22, 2002, the Commission published its NPRM on "Contribution Limitations and Prohibitions" in the Federal Register, which sought comments on proposed changes to the Commission's rules related to campaign contribution limitations and prohibitions under FECA as amended by BCRA. Def.'s Stmt. ¶ 10. In response, the Commission received many comments, and on November 8, 2002, the FEC transmitted to Congress, and on No-

---

**4.** BCRA is also known as the McCain–Feingold Act, after its Senate co-sponsors, Senators John McCain and Russell Feingold.

**5.** The Court explains the term "nonfederal" money or funds, commonly referred to as "soft money," *infra* at 72–73.

vember 19, 2002, the Commission promulgated in the Federal Register, its final rules and E & J on "Contribution Limitations and Prohibitions." *Id.* ¶ 11.

On September 24, 2002, the FEC published its NPRM on "Coordinated and Independent Expenditures" in the Federal Register, which sought comments on proposed changes to its rules relating to payments for communications that are coordinated with a candidate and independent expenditures under FECA as amended by BCRA. *Id.* ¶ 12. In response, the Commission received many comments, *id.* ¶ 13, and the Commission held a public hearing on its proposed rules on October 23 and 24, 2002, at which it heard testimony from various witnesses, Pls.' Stmt. ¶ 6. After conducting an open meeting, the Commission adopted the regulations on December 5, 2002. *Id.* On December 18, 2002, the FEC transmitted to Congress, and on January 3, 2003, promulgated in the Federal Register, its final rules on "Coordinated and Independent Expenditures." Def.'s Stmt. ¶ 13. These regulations became effective on February 3, 2003. Pls.' Stmt. ¶ 6.

Plaintiffs are both citizens of the United States, Members of Congress, candidates, voters, recipients of campaign contributions, fundraisers, and members of political parties. *Id.* ¶ 11. Plaintiff Christopher Shays is a Member of the United States House of Representatives from the Fourth Congressional District of the State of Connecticut. *Id.* ¶ 7. He was first elected in 1987, was re-elected in 1992, and has been re-elected every two years thereafter and is running for re-election in November 2004. *Id.* Plaintiff Martin Meehan is a Member of the United States House of Representatives from the Fifth Congres-

sional District of the Commonwealth of Massachusetts. *Id.* ¶ 8. He was first elected to Congress in 1988, and has been re-elected every two years thereafter and is running for re-election in November 2004. *Id.* Plaintiffs are subject to regulation under FECA, BCRA, and the Commission's implementing regulations. *Id.* ¶ 11.

Both Plaintiffs were principal sponsors in the House of Representatives of the legislation enacted as BCRA and spent many years seeking to promote its enactment. *Id.* ¶ 9. They, along with other co-sponsors of BCRA, submitted written comments on the FEC's proposed rules implementing BCRA's provisions. *Id.* ¶ 10. The Commission did not adopt some of their views in its final rules. *Id.*; Def.'s Resps. & Objections to Pls.' Stmt. ("Def.'s Resp. Stmt.") ¶ 10.[6]

## II: DISCUSSION

### A. *Justiciability Arguments*

Before the Court can address the merits of the pending motions, it must first resolve two justiciability issues raised by Defendant. Defendant asserts that Plaintiffs lack standing to bring their claims. Defendant also contends that Plaintiffs' claims are not ripe for review. The Court addresses each claim in turn.

#### 1. Standing

##### a. *Article III Standing*

As an Article III court, this Court's judicial power extends only to "Cases" and "Controversies." *National Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996) (quoting U.S. Const. art. III, § 2). "In an attempt to give meaning to Article III's case-or-con-

---

**6.** The parties dispute the sufficiency of Plaintiffs' allegation of harm arising from the regulations enacted by the FEC. *See* Pls.' Stmt. ¶ 11; Def.'s Resp. Stmt. ¶ 11. The Court addresses these matters in its justiciability analysis *infra.*

troversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). These doctrines incorporate both the prudential elements, which "Congress is free to override," *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C.Cir. 1994)), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III," *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted)).

 In order to satisfy the constitutional standing requirements, the party invoking federal jurisdiction must establish that he or she has (1) suffered an injury in fact, (2) which is fairly traceable to the challenged act, and (3) is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. The "injury in fact" requirement requires the plaintiff to have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted).

Defendant attacks Plaintiffs' standing to bring this suit, focusing on the injury prong of the analysis. *See* Def.'s Mem. in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") at 3–11. Plaintiffs contend that they do meet Article III's standing requirements. In so doing, Plaintiffs rely

predominantly on the three-judge *McConnell* panel's decision finding that they had standing to intervene in that case to defend the constitutionality of BCRA. Pls.' Mem. in Supp. of Pls.' Mot for Summ. J. ("Pls.' Mem.") at 84. There, the panel found the proposed defendant-intervenors' allegations that they were "among those whose conduct the Act regulates, and among those whom the Act seeks to insulate from the actual and apparent corrupting influence of special interest money," that "[t]hey want to run in elections, participate in a political system, and serve in a government in which all participants comply with the ... campaign finance regulations that the Act imposes in order to stop evasion and to prevent actual and apparent corruption," and that "[i]f any of the reforms embodied in the Act are struck down ... [the] movants will once again be forced to attempt to discharge their public responsibilities, raise money, and campaign in a system that [they believe to be] significantly corrupted by special-interest money," to be "sufficient to support Article III standing." *McConnell v. Federal Election Commission*, Civ. No. 02–582 slip op. at 6 (D.D.C. May 3, 2002) (Pls.' Ex. 163) ("*McConnell* Intervention Order"). The panel noted that "as opposed to members of the general public, the movants have a concrete, direct, and personal stake—as candidates and potential candidates—in the outcome of a constitutional challenge to a law regulating the processes by which they may attain office." *Id.* at 7 (citing *Buchanan v. Federal Election Commission*, 112 F.Supp.2d 58, 65 (D.D.C.2000); *Vote Choice Inc. v. DiStefano*, 4 F.3d 26, 37 (1st Cir.1993)).[7]

7. The FEC disputes the notion that the *McConnell* panel's decision that Plaintiffs had standing in that case is dispositive here. Def.'s Resp. in Supp. of its Mot. & in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") at 6–

8. The Court does not read Plaintiffs' arguments to say that because they had Article III standing to intervene as defendants in the case challenging the constitutionality of BCRA that they automatically have standing

Plaintiffs contend that just as they "had a 'concrete and particularized' personal interest in defending BCRA from constitutional attack, so too do they have a strong personal stake in seeking to overturn unlawful agency rules that threaten to subvert, erode, and circumvent the reforms enacted by BCRA." Pls.' Mem. at 84 (citation omitted); *see also* Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. (Pls.' Opp'n") at 15 (stating Plaintiffs are injured because "the challenged regulations authorize campaign finance activities that subvert, erode, and circumvent FECA and BCRA."). They make clear that they are not seeking to vindicate a sponsorship interest in the Act; rather, much like their interest in *McConnell v. Federal Election Commission*, they claim to have a "tangible stake in the outcome of an APA challenge to rules that" allegedly "threaten to undermine federal campaign finance law, that seek to *deregulate* conduct that Congress specifically ordered to be regulated, and that would perpetuate much of the corrupt soft-money system that BCRA was intended to eradicate root and branch." *Id.* at 85 (emphasis in original). In support of their contentions, both Shays and Meehan attest that they are subject to FECA and BCRA as candidates, voters, recipients of campaign contributions, fund-

raisers, and political party members. Decl. of Pl. Meehan ("Meehan Decl.") ¶ 3; Decl. of Pl. Shays ("Shays Decl.") ¶ 3. They state that in addition to being directly regulated by these laws and regulations, their "activities are also directly affected by the fact that others, including . . . potential contributors and supporters, . . . potential election opponents, contributors to and supporters of . . . opponents, and contributors to and supporters of both political parties are subject to the same regulation under FECA, BCRA, and the Commission's implementing rules." *Id.* They also specifically discuss the impact of the alleged deficiencies in the regulatory regime implementing BCRA:

> If any of the campaign finance reforms embodied in BCRA is subverted, eroded or circumvented by the Commission's implementing regulations, I will be forced once again to raise money, campaign, and attempt to discharge my important public responsibilities in a system that is widely perceived to be, and I believe in many respects will be, significantly corrupted by the influence of special-interest money. The FEC regulations that implement the soft-money provisions of Title I of BCRA directly affect me. If those regulations do not implement the soft-money ban, I face

---

to bring suit to challenge BCRA's regulations. Therefore, the Court does not address each of Defendant's arguments pointing out the differences between the two cases for the purposes of determining Article III standing. The Court will conduct the standing inquiry as it relates to this case and will not consider the *McConnell* Intervention Order as being dispositive in that inquiry.

The Court will, however, take this opportunity to address one argument made by the FEC with regard to the *McConnell* Intervention Order. The FEC contends that the *McConnell* panel's decision regarding the intervenors' standing did not address the court's jurisdiction because the FEC "was already a defendant and unquestionably had

standing to defend all aspects of BCRA." *Id.* at 6. The Commission also points out that the Supreme Court declined to address the intervenors' standing since the FEC had standing in that suit and intervenors' "position [there was] identical to the FEC's." *McConnell*, 124 S.Ct. at 711–12; Def.'s Opp'n at 6. The Commission states that these facts undermine the notion that the decision supports Plaintiffs' standing here. The Court finds that while the FEC's position is factually accurate, the facts they raise do not render null the panel's determination that the intervenors had Article III standing. *See McConnell* Intervention Order at 6 ("[T]he movants have satisfied [the Article III standing] requirements . . . .").

the strong risk that unregulated soft money contributions will again be used in an attempt to influence federal elections in which I am a candidate. The rules implementing the soft money ban also will affect the perception the public will form of me, my fellow office-holders, and fellow party members.

Likewise, the FEC regulations that implement the loophole-closing extension of the soft money provisions to the funding for certain state and local activities that affect federal elections ... will directly and personally impact me as a candidate who runs in elections that could be affected by those very state and local party activities, as well as in my capacity as a party member who might be expected to raise soft money directly or indirectly for use at the state and local party level.

The Commission's regulations implementing the sham issue ad provisions in Title II–A of BCRA also directly affect me as a candidate. If those regulations do not faithfully implement Title II–A, I will be open to attack, during critical time periods just before primary and general elections, in broadcast advertising campaigns mounted by groups seeking to evade the contribution limits, source prohibitions, and disclosure requirements imposed by Congress.

Similarly, I will be directly affected as a candidate by the Commission's regulations regarding coordinated communications .... If those regulations do not faithfully implement Congressional intent, my election opponents will be able to interact and coordinate with their parties, their supporters, and interest groups in ways that evade the contribution limits, source prohibitions, and disclosure requirements of federal law.

Many FECA and BCRA provisions require the disclosure of campaign finance information by covered persons and entities. If the FEC regulations do not faithfully implement these disclosure provisions, I will be deprived of information to which I am entitled under FECA and BCRA.

*Id.* ¶¶ 4–9.

The FEC claims that Plaintiffs have not met their burden of establishing their standing to bring this suit. The FEC contends that Plaintiffs do not challenge the regulations as they affect their own actions, but rather allege that the regulations fail "to regulate the activities of *other people* more strictly." Def.'s Mem. at 4 (emphasis in the original). This fact, Defendant maintains, increases the burden Plaintiffs must meet to establish standing. *Id.* at 4–5. In addition, since this case is at the summary judgment stage, Defendant points out that Plaintiffs must support their standing arguments with evidence and argues that they have failed to do so. Def.'s Resp. in Supp. of its Mot. & in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") at 2 & n. 2, 7–8.

Defendant is correct that at the summary judgment stage, "the plaintiff [may not] rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for the purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quoting Fed. R.Civ.P. 56(e)); *see also id.* at 567, 112 S.Ct. 2130 (noting that at the summary judgment stage the standing inquiry demands "a factual showing of perceptible harm.").

As noted *supra*, Plaintiffs argue that the *McConnell* panel's decision finding that they had standing to defend the constitutionality of BCRA is instructive here. The *McConnell* panel found that the intervenors had a "direct, and personal stake—as candidates and potential candidates—in

the outcome of a constitutional challenge to a law regulating the processes by which they may attain office." *McConnell* Intervention Order at 7. The Court finds that the present case implicates the same interest. Just as Plaintiffs would have been affected—adversely in their view—from the striking down of BCRA on constitutional grounds, so are they affected by the regulations they claim improperly implement BCRA and "regulat[e] the processes by which they may attain office." *Id.* This finding, however, does not end the Court's inquiry, as Defendant notes that the *McConnell* panel's decision was made at the pleading stage and not revisited, whereas here the Court is faced with a standing challenge at the summary judgment stage.

As noted *supra,* Plaintiffs support their injury claims with declarations. These sworn statements appear to be the only factual basis presented in support of Plaintiffs' claim that they have standing. It is clear from these submissions that Plaintiffs are or will be affected by the campaign finance regime established by the current regulations. They claim that their campaign activities are affected by other participants in the political process who are subject to the same rules, and that the current regulations—by being, in their view, unfaithful to the terms of BCRA— force them to raise money in a system that is perceived to be and in their view is "corrupted by the influence of special-interest money." Meehan Decl. ¶¶ 3–4; Shays Decl. ¶¶ 3–4. Defendant dismisses the sufficiency of these statements, arguing that Plaintiffs

> have presented no facts suggesting that any identifiable party has any plans to engage in any of the activities they think should be prohibited in connection with their own election campaigns, and they have not offered any factual basis for thinking any such activities by third par-

ties that may materialize are more likely to oppose than to support their own reelection chances.

Def.'s Opp'n at 2. The Commission also cites to substantive areas of Plaintiffs' opening brief where they complain of loopholes and provisions unfaithful to BCRA and contends that these arguments are not supported by any evidence that entities are actually engaging in the actions to which Plaintiffs object. *Id.* at 2–3. The FEC states that "[i]n the absence of any factual showing that the activities [Plaintiffs] think should be prohibited are going to be used to help defeat them in their own elections, plaintiffs have failed to satisfy their threshold burden to demonstrate 'concrete' harm to themselves that is 'actual or imminent.'" *Id.* at 4 (quoting *McConnell,* 124 S.Ct. at 707).

The Court finds that Defendant's attacks on Plaintiffs' factual support for the injury-in-fact prong miss the point of Plaintiffs' alleged harm. Plaintiffs are undisputedly participants in the federal campaign finance system. They attest that their activities are affected not only by the manner in which they respond to the campaign finance rules, but also by the way in which other participants, both allies and adversaries, respond to the rules. Meehan Decl. ¶¶ 3–4; Shays Decl. ¶¶ 3–4. Whether or not they have alleged that some entity has in fact taken advantage of an alleged FEC-created loophole in BCRA, the fact that such a loophole exists affects the way these politicians, who face election in a matter of months, will run their campaigns. If the FEC has promulgated regulations unfaithful to BCRA, then Plaintiffs are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would

be barred.[8] The First Circuit has recognized that "an impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a kind sufficient to confer standing." *Becker v. Federal Election Commission*, 230 F.3d 381, 386 (1st Cir.2000) (quoting *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 37 (1st Cir. 1993)). In fact, the First Circuit has held such an injury to exist even when the change in strategy is speculative, and the planned-for circumstance fails to materialize. *Vote Choice, Inc.*, 4 F.3d at 31, 37; *see also Becker*, 230 F.3d at 387 ("We similarly granted credence in *Vote Choice* to plaintiff Leonard's claim that she had to adjust her campaign to account for the possibility of facing a publicly funded opponent, even though in the end that possibility did not materialize.").[9] The First Circuit has also found it improper "to second-guess a candidate's reasonable assessment of his own campaign." *Becker*, 230 F.3d at 387.[10] Therefore, contrary to De-

8. The Court is aware that Plaintiffs also claim to be harmed by being forced to participate "in a system that is widely perceived to be, and ... in many respects will be, significantly corrupted by the influence of special-interest money." Meehan Decl. ¶ 4; Shays Decl. ¶ 4. The Court declines to find standing for this alleged harm, although the *McConnell* panel did cite to allegations regarding corruption of the campaign finance system in making its standing determination. *McConnell* Intervention Order at 6. In *McConnell*, the three-judge panel was faced with a comprehensive Congressional response to perceived and actual corruption in the campaign finance system. Although the court did not revisit its standing decision, allegations of corruption and the appearance of corruption in the pre-BCRA system was well-documented in the record presented to the three-judge panel at the summary judgment stage of that case. *See generally McConnell*, 251 F.Supp.2d at 439–590 (Kollar–Kotelly, J.); *id.* at 815–918 (Leon, J.). This case comes to the Court in the post-BCRA world, and the allegation that the recently promulgated regulations have fostered corruption or the appearance of corruption is too speculative to establish standing and is made devoid of any evidence of corruption or the appearance of corruption emanating from the FEC's regulations. Accordingly, since this Court, unlike the *McConnell* panel, makes its standing inquiry at the summary judgment stage and faces a record devoid of the kind of evidence presented to the *McConnell* panel, the Court finds that Plaintiffs' alleged harms related to corruption and the appearance of corruption do not establish an injury in fact.

9. Although *Becker* and *Vote Choice* involved candidates alleging that election laws and regulations provided opponents with a competitive advantage, a claim Plaintiffs have not made here, the Court finds the First Circuit's analysis persuasive in the current context. *See* note 12 *infra* (discussing competitive standing as it relates to this case).

10. The FEC claims that Plaintiffs "have not even made the showing, made in *Becker*, of specific impending actions that could arguably affect their campaigns." Def.'s Opp'n at 4 n. 5. Again, the FEC has misunderstood the alleged harm alleged. It is not specific actions that are certain to befall Plaintiffs, but rather the fact that the regime as it has been established by the FEC requires Plaintiffs to account for such possibilities which they believe BCRA outlaws. In *Becker*, presidential candidate Ralph Nader argued that since he had pledged not to accept corporate contributions, and the FEC's regulations permitted corporate sponsorship of the presidential debates, he would have had to decline participation if invited to join in the debates. *Becker*, 230 F.3d at 386. The First Circuit determined that

> he is thus put at a potential disadvantage in the event he is invited and forced by his principles to decline the invitation; and he suffers a consequent present harm, in that he has been forced to structure his campaign to offset this potential disadvantage— e.g. by spending more on advertising than he would if there remained a chance that he could appear in the debates.

*Id.* Plaintiffs are clearly candidates in the upcoming election and they and the other political actors who will participate in their election contests are subject to the FEC's rules and regulations. Unlike Nader who may or may not have been invited to the debates, Plaintiffs will be participants in the upcoming election and therefore they have established

fendant's assertion, the current case does not represent a situation "when the plaintiff is not himself the object of the government action or inaction he challenges," in which case "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish," *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130. Rather, Plaintiffs are directly regulated by the rules they challenge in that the regulations shape the environment in which Plaintiffs must operate.

Defendant maintains that this conclusion is foreclosed by the Supreme Court and the three judge panel's decisions in *McConnell v. Federal Election Commission.* Def.'s Mem. at 8–10; Def.'s Opp'n at 4–5. The Commission notes that the Supreme Court determined that Senator Mitch McConnell lacked standing to challenge Section 305 of BCRA. Def.'s Opp'n at 4–5 ("After all, Senator McConnell is, like plaintiffs, an officeholder and candidate whose activities in those roles are subject to the campaign finance statutes, but he lacked standing to litigate over BCRA § 305 because he could not show that then provision would cause *him* any direct personal injury that was imminent.") (emphasis in original) (citing *McConnell,* 124 S.Ct. at 707–08, 124 S.Ct. 619). A review of the *McConnell* opinion, however, shows that the Supreme Court's decision

that Senator McConnell lacked standing to challenge the provision was based on the fact that Senator McConnell could not be affected by the challenged provision until "45 days before the Republican primary election in 2008." *McConnell,* 124 S.Ct. at 708, 124 S.Ct. 619. This fact led the Supreme Court to conclude that Senator McConnell's "alleged injury in fact is too remote temporally to satisfy *Article III* standing." *Id.* (emphasis in original). By contrast, Plaintiffs here are in the midst of general election contests. Accordingly, the Court finds that the Supreme Court's decision on Senator McConnell's standing to challenge Section 305 of BCRA does not control the present inquiry.

The FEC argues that the Supreme Court's determination that another group of *McConnell* plaintiffs lacked standing also forecloses finding that Plaintiffs have standing in the present suit. Def.'s Opp'n at 5 ("Similarly, the Adams plaintiffs, who were candidates, lacked standing to litigate the validity of BCRA's new contribution limits that would govern their own election campaigns and those of their opponents because they were unable to show that they suffered a personal injury from that provision, regardless of their general 'stake' in the electoral system as candi-

an injury at least as concrete and imminent as that alleged by Nader.

Defendant also contends that *Becker* is "off point." The Commission argues that *Becker* involved a candidate "who, unlike plaintiffs here, provided evidence of specific actions by identified parties having a direct impact on [his] campaign[ ]," and erroneously describes the case as one where the "presidential candidate [was] excluded from television debates." Def.'s Opp'n at 7 n. 9. As noted *supra,* Nader did not challenge exclusion from the debate. *Becker,* 230 F.3d at 385 ("Nader is not challenging his exclusion from the debates."). Nader challenged the FEC regulation permitting corporate sponsorship of the debates which would have required him to withdraw

from the debate had he been invited. *Id.* at 385. A review of *Becker* reveals that the only "specific actions by identified parties having a direct impact" on his campaign were the FEC's regulation permitting corporate sponsorship, and presumably agreements to have corporations sponsor the debates. Although it is true that Plaintiffs do not allege a specific action by other entities that has affected their campaigns, the Court does not find this distinction material. As the First Circuit found in *Vote Choice,* relied upon heavily by the *Becker* court, just having to "plan for the possibility" that someone would act in accordance with regulations constitutes an injury sufficient to establish standing. *Vote Choice,* 4 F.3d at 37.

dates."). The Adams plaintiffs [11] challenged the constitutionality of Section 307 of BCRA, which raised FECA's contribution limits. *McConnell*, 124 S.Ct. at 708. In attempting to establish their Article III standing, the Adams plaintiffs argued that increases in "hard money" contribution limits "deprive[d] them of an equal ability to participate in the election process based on their economic status." *Id.* The Supreme Court determined that since its precedent holds that "political 'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources," the Adams plaintiffs' alleged injury of "a curtailment of the scope of their participation in the electoral process" did not constitute an injury "to a legally cognizable right." *Id.* at 708–09 (quoting *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)). Here Plaintiffs contend that they are harmed by the FEC's regulations' failure to faithfully adhere to the terms Congress mandated in BCRA. Accordingly the rights they seek to vindicate—in essence, to campaign in a regime that reflects Congress's mandate as articulated in BCRA—are legally cognizable. [12]

The FEC also argues that Plaintiffs have the burden of establishing "that they will suffer a personal injury in fact from *each* of the regulations they challenge here; demonstrating such an injury from one regulation would not suffice to establish their standing to contest any other regulations." Def.'s Mem. at 6 (emphasis in original). This implicates the second prong of the standing inquiry, causation. Plaintiffs do not contest Defendant's articulation of the state of the law; rather, they note that the Supreme Court has recognized that BCRA and the changes it made

---

11. The Adams plaintiffs were "a group consisting of voters, organizations representing voters, and candidates ...." *McConnell*, 124 S.Ct. at 708.

12. The Adams plaintiffs also argued that they "suffered a competitive injury" from the provision. *McConnell*, 124 S.Ct. at 709. They asserted that their candidates did "not wish to solicit or accept large campaign contributions as permitted by BCRA" because such contributions, in their view, "create the appearance of unequal access and influence." *Id.* This situation placed them "at a fundraising disadvantage, making it more difficult for them to compete in elections." *Id.* (internal quotation marks omitted). The Supreme Court denied standing for this alleged injury as well, but did so finding that plaintiffs had failed to "show that their alleged injury is 'fairly traceable' to BCRA § 307. Their alleged inability to compete stems not from the operation of § 307, but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice." *Id.* (citation omitted).

The Court does not read Plaintiffs' declarations—the only evidence submitted in support of their claim to have standing to bring this suit—to allege any competitive injury from the regulations implemented by the FEC. Nowhere do they attest that they will be put at a competitive disadvantage by the state of the FEC's regulations, although arguably if they decide to adhere to their concept of what BCRA permits, rather than the FEC regulations' implementation of BCRA, they could be placed at a disadvantage. Rather, they state what they believe the impact will be of leaving the regulations in place in terms of actions that will be taken, not in terms of the adverse impact those actions will have on their campaigns. *See supra* at 40–41. Plaintiffs do, however, in their Opposition brief, respond to Defendant's contention that competitive standing does not extend to the political realm and even if it did Plaintiffs have failed to allege facts supporting such an injury. *See* Pls.' Opp'n at 4–9; Def.'s Mem. at 6–8. The Court does not view the injury Plaintiffs have demonstrated through their affidavits—namely, having to account for practices that are permitted by the FEC's regulations but should be barred pursuant to BCRA—to be a competitive injury, and does not see any factual support cited for such a contention. Therefore, the Court need not address the parties' arguments related to this theory of standing.

to FECA, created a "delicate and interconnected regulatory scheme." Pls.' Opp'n at 8 (quoting *McConnell*, 124 S.Ct. at 677). While this is true,[13] the Court does not find this fact to be dispositive. It is correct, as Defendants have noted, that Article III "standing requires an injury with a nexus to the substantive character of the statute or regulation at issue." *Diamond v. Charles*, 476 U.S. 54, 70, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). The harm that Plaintiffs have alleged, having to adjust their campaigns to account for activities that they maintain should be banned but are permitted by the regulations, is connected to all of the regulations they challenge. The Court therefore finds that Plaintiffs' harm is "fairly traceable to the challenged" regulations, and they have established the causation prong of the standing inquiry.

In terms of the redressability prong, Defendant does not argue that Plaintiffs have failed to meet this standing requirement. Plaintiffs maintain that their injury "plainly would be redressed by a judicial decree plugging the loopholes and ordering that the rules be corrected to comply with the statute." Pls.' Opp'n at 15–16. Although the Court disagrees with the appropriateness of the relief Plaintiffs request, *see infra* at 129, the Court agrees that favorable rulings for Plaintiffs will result in changes to the regulations they challenge that the Court finds to be improper. Therefore, the Court finds that Plaintiffs have satisfied the redressability prong of the standing analysis.

Accordingly, the Court is satisfied that Plaintiffs have alleged, and supported with evidence, a concrete and actual harm constituting an injury in fact for purposes of the Article III standing inquiry, that this harm is connected to the contested regulations and would be redressed by a favorable decision by this Court.

### b. Prudential Standing

 Plaintiffs note that Defendant does not argue that they fail to meet the prudential standing requirement found in Section 10(a) of the APA. Pls.' Opp'n at 3. The provision provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted this provision "to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury-in-fact." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). To establish prudential standing under the APA, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (quoting *Association of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)); *see also Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C.Cir. 2004).

[I]n applying the "zone of interests" test, [a court does] not ask whether, in enacting the statutory provision at issue,

---

**13.** Indeed, the Supreme Court has recognized that Title I of BCRA (BCRA Section 323), was enacted by Congress "as an integrated whole to vindicate the Government's important interest in preventing corruption and the appearance of corruption." *McConnell*, 124 S.Ct. at 659. This Court has recognized that BCRA was "designed by Congress as a comprehensive approach to the abuses of FECA that legislators and candidates were acutely aware of in their capacity as political actors." *McConnell*, 251 F.Supp.2d at 435 (Kollar-Kotelly, J.).

Congress specifically intended to benefit the plaintiff. Instead, [the court] first discern[s] the interests "arguably ... to be protected" by the statutory provision at issue; [the court] then inquire[s] whether the plaintiff's interests affected by the agency action in question are among them.

*Nat'l Credit Union Admin.*, 522 U.S. at 492, 118 S.Ct. 927. The "zone of interests" test "is not meant to be especially demanding." *Amgen, Inc.*, 357 F.3d at 108 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396–97, 107 S.Ct. 750, 93 L.Ed.2d 757(1987)).

Plaintiffs contend that they "are directly regulated by FECA and BCRA, and fall within several of the classes intended to be protected—they are elected officials, candidates, fundraisers, party members, and voters." Pls.' Opp'n at 3–4; Pls.' Mem. at 87 n. 146.[14] Since it strikes the Court as self-evident that Plaintiffs meet the "zone of interests" test, and given that Defendant has not responded to Plaintiffs' argument on the matter, *see* Def.'s Opp'n at 2–8, the Court finds that Plaintiffs meet the APA's prudential standing requirement.

## 2. Ripeness

■ Defendant also contends that Plaintiffs' claims are not ripe for review. Def.'s Mem. at 11. A Court may not entertain a suit that is not ripe for review. The basic rationale behind the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Supreme Court has cautioned against premature litigation over regulatory actions:

Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately. Such agency action is "ripe" for review at once, whether or not explicit

14. Both Plaintiffs declare the following:
 I am a citizen of the United States, a member of Congress, a candidate, a voter, a recipient of campaign contributions, a fundraiser, and a political party member. In those capacities I am subject to regulation under the Federal Election Campaign Act, BCRA, and the Commission's implementing rules, and my activities are also directly affected by the fact that others, including my potential contributors and supporters, my potential election opponents, contributors to and supporters of my opponents, and contributors to and supporters of both political parties are subject to the same regulation under FECA, BCRA, and the Commission's implementing rules.
 Pls.' Ex. 2 (Meehan Decl.) ¶ 3; Pls.' Ex. 3 (Shays Decl.) ¶ 3.

statutory review apart from the APA is provided. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 152–154, 87 S.Ct. 1507, 1517–1518, 18 L.Ed.2d 681 (1967); *Gardner v. Toilet Goods Ass'n, Inc.,* 387 U.S. 167, 171–173, 87 S.Ct. 1526, 1528–1530, 18 L.Ed.2d 704 (1967). *Cf. Toilet Goods Assn., Inc. v. Gardner,* 387 U.S. 158, 164–166, 87 S.Ct. 1520, 1524–1526, 18 L.Ed.2d 697 (1967).) *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).[15] Therefore, Plaintiffs' suit is of a type "ordinarily" considered unripe for review. However, a court may find such challenges ripe for review after evaluating "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003) ("*NPHA* ") (citing *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507). This Circuit has characterized the ripeness inquiry as a balancing test, where the court "balance[s] the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subject to review and the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *AT&T Corp. v. Federal Communications Commission,* 349 F.3d 692, 699 (D.C.Cir.2003) (quoting *City of Houston v. Dep't of Housing & Urban Dev.,* 24 F.3d 1421, 1430 (D.C.Cir. 1994)) (internal quotation marks omitted). Therefore, under *AT&T* 's guidance, the fitness for review prong actually consists of two considerations: (1) "whether the disputed claims [are] presumptively suitable for judicial review;" and (2) "whether

the court or the agency would benefit from postponing review until the policy in question has sufficiently crystallized by taking a more definite form." *Id.* at 699–700 (internal quotation marks and citations omitted).

The Court considers the "fitness for review" and "hardship" prongs in turn.

#### a. Fitness for Review

■ "Among other things, the fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Atlantic States Legal Found. v. Environmental Protection Agency,* 325 F.3d 281, 284 (D.C.Cir.2003) (quoting *Clean Air Implementation Project v. Environmental Protection Agency,* 150 F.3d 1200, 1204 (D.C.Cir.1998)). "Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues. But even purely legal issues may be unfit for review." *Id.* (citation omitted); *see also NPHA,* 123 S.Ct. at 2032 (finding issue unfit for review, even though the issue was "a purely legal one" and "constitute[d] 'final agency action' within the meaning of § 10 of the APA").

Plaintiffs contend that their challenge is ripe for review. Pls.' Mem. at 87. They note that "the BCRA rules clearly constitute 'final agency action' within the meaning of 5 U.S.C. § 704, and have the force and effect of law." *Id.* Moreover, they contend that "the issues in this facial challenge involve purely legal questions of statutory construction and compliance with the APA." *Id.* Defendant does not dispute

---

**15.** Neither FECA nor BCRA contain provisions providing for direct review of the FEC's regulations.

these assertions. Def.'s Opp'n at 9.[16] Nor does the Commission suggest any institutional considerations weighing against review at this time. Rather, the Commission contends that this action involves purely legal issues that are not ripe for review because "plaintiffs' arguments are grounded largely on their own speculation about how the Commission would construe and apply the general language of the regulations in specific factual circumstances.... They ask this Court to review the legality of possible constructions of the regulations that the Commission itself has not adopted." *Id.* at 11. This, the FEC contends, demonstrates that the Court needs to wait to see how the rules will be applied in order to know what their effects truly are. *Id.*

The Court has reviewed Plaintiffs' challenges and finds that none of them rely on speculation as to how the regulations will be applied.[17] Plaintiffs' challenges are limited to arguments claiming that the FEC has not followed Congress's instructions in promulgating the regulations implementing BCRA. As these challenges are purely legal, and the Court observes no judicial or agency considerations warranting delay in reviewing the regulations, Plaintiffs have satisfied the "fitness for review" prong of the ripeness analysis.

### b. Hardship to the Plaintiffs of Withholding Court Consideration

■ Plaintiffs contend that since this case presents purely legal issues, this Court need not decide the hardship prong of the *Abbott Laboratories* test. Pls.' Mem. at 89 n. 149. In this Circuit, "[t]he 'hardship' prong of the *Abbott Laboratories* test is not an independent requirement divorced from the consideration of the institutional interests of the court and agency. Thus, where there are no institutional interests favoring postponement of review, a petitioner need not satisfy the hardship prong." *AT&T Corp.*, 349 F.3d at 700 (citation omitted).[18] Defendant at-

---

**16.** Defendant notes, in a footnote related to its point that Plaintiffs can challenge the regulations by petitioning the Commission to modify its rules, that it is "still in the process of completing its BCRA rulemakings." Def.'s Opp'n at 12 n. 18. Defendant cites to its March 11, 2004, NPRM, which, it notes, "consider[s] the impact of the *McConnell* decision." *Id.* Defendant does not elaborate on this point and does not suggest that this fact affects the ripeness of Plaintiffs' suit. *See id.* The March 11, 2004, NPRM focuses on "whether or how the Commission should amend its regulations defining whether an entity is a nonconnected political committee and what constitutes an 'expenditure' under 11 CFR 100.5(a) or 11 CFR part 100, subparts D and E." NPRM: Political Committee Status, 69 Fed.Reg. 11,736 (Mar. 11, 2004) (footnote omitted). As far as the Court can tell, these provisions are not connected to those challenged by Plaintiffs, and Defendant has not suggested that they are. Accordingly, the Court finds that the additional rulemaking does not affect the ripeness of this suit.

**17.** Occasionally Plaintiffs proffer arguments that call for speculation as to how the regulations will be applied and the consequential potential effects. The Court has noted such unripe arguments in its analysis and declined to entertain them. The Court finds no challenge that relies solely on speculative arguments.

**18.** *See also Am. Petroleum Inst. v. United States Environmental Protection Agency*, 906 F.2d 729, 739 n. 13 (D.C.Cir.1990) ("A secondary concern under the ripeness doctrine is the hardship to the parties of withholding court consideration. We reach the issue of hardship, however, only if the fitness of the issue for judicial resolution is in doubt.") (citation and internal quotation marks omitted); *Consolidated Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C.Cir.1990) ("If we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay. Where, however, 'there are no significant agency or judicial interests militat-

tempts to distinguish this precedent from the case at bar, noting that *AT&T* was a case brought pursuant to the "specific statutory authorization of pre-enforcement review" of the Federal Communications Act. Def.'s Opp'n at 9–10 n. 13. Defendant then cursorily surmises that "when review is sought under the APA, the hardship test is the first and most important factor." *Id.* at 10 n. 13. In support of this latter argument, Defendant cites to *NPHA*, a case brought pursuant to the APA, where the Supreme Court in making its ripeness determination, began by examining "the hardship inquiry." *NPHA*, 123 S.Ct. at 2030. The Court finds both of these arguments lack merit.

First, nowhere in *NPHA* does the Supreme Court state that "the hardship test is the first and most important factor," and the Court does not impute that principle from the fact that the *NPHA* Court elected to take the *Abbott Laboratories* factors out of turn. *See id.* Second, there is nothing in *AT&T* or any other case the Court has reviewed that suggests that its holding is limited to challenges to regulations brought under statutes authorizing pre-enforcement review, rather than those brought pursuant to the APA, and Defendant has not cited to one. *See, e.g., AT&T*, 349 F.3d at 700. It is clear that the *Abbott Laboratories* test applies to cases brought pursuant to the APA as the test itself was first applied in a case brought under the APA. *Abbott Labs.*, 387 U.S. at 148, 153, 87 S.Ct. 1507. Moreover, this Circuit has dispensed with the hardship prong in a case brought under the APA where it found the legal issues were fit for review. *Air Transport Ass'n of America v. Dep't of Transp.*, 900 F.2d 369, 374 (D.C.Cir.1990), *judgment vacated on other grounds*, 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), *vacated by* 933 F.2d 1043 (D.C.Cir. 1991).[19] Accordingly, the Court finds that under this Circuit's precedent, once a plaintiff has established that no institutional considerations caution in favor of postponing review, the Court need not address the "hardship" prong of the ripeness analysis.[20] The Court therefore finds that Plaintiffs' suit is ripe for review.

---

ing in favor of delay, [lack of] "hardship" cannot tip the balance against judicial review.' ") (quoting *Askins v. District of Columbia*, 877 F.2d 94, 98 (D.C.Cir.1989)).

**19.** The Court does not find the fact that the *Air Transport Association* opinion was vacated bars the Court from noting how the Circuit approached the ripeness question in that case.

**20.** In the alternative, the Court finds that Plaintiffs have alleged sufficient harm to meet the "hardship" prong of the *Abbott Laboratories* analysis. This Circuit has held that

[t]he "prospect" of hardship is sufficient to make a claim fit for judicial review. Moreover, the focus of the second prong of the ripeness inquiry—"hardship" to the parties from withholding review—is not whether they have suffered any "direct hardship," but rather whether *postponing* judicial review would impose an undue burden on them or would benefit the court.

*Harris v. Federal Aviation Administration*, 353 F.3d 1006, 1012 (D.C.Cir.2004) (citation omitted, emphasis in original). Defendants do not address *Harris* in their ripeness briefing. *See* Def.'s Mem. at 11–14; Def.'s Opp'n at 8–13. The Court has already stated that there appears to be no reason why delaying this case would assist the Court in deciding the case. Moreover, there is definitely the "prospect" that Plaintiffs would be harmed by a delay in review. They are currently campaigning in an regulatory environment they believe permits activities that Congress has barred. As noted *supra*, Plaintiffs, by being candidates for office, must adjust their campaigns to account for these activities. A delay in reviewing these regulations means additional time that they must account for these practices. Moreover, there is certainly the prospect that Plaintiffs could be harmed by their competitors in the ongoing election campaign who could engage in the activities the FEC has deemed proper but which Plaintiffs claim are barred by BCRA.

## B. Legal Standards

### 1. Summary Judgment

Summary judgment is appropriate only if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994); Fed.R.Civ.P. 56(c). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Similarly, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975); *Long v. Gaines*, 167 F.Supp.2d 75, 85 (D.D.C.2001). Each moving party discharges its burden to support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

### 2. Standards for Administrative Agency Review

■ Plaintiffs' central challenge to the FEC's regulations is that they are contrary to the statutory instructions given by Congress when it enacted BCRA. The standard for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C.Cir.1995) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Under the *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *see also id.* at 843 n. 9, 104 S.Ct. 2778 ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). "When performing this first step, [courts] employ traditional tools of statutory construction." *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C.Cir.2000) (citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Among these tools is a statute's legislative history. *See American Fed'n of Labor & Congress of Indus. Orgs. v. Federal Election Commission*, 333 F.3d 168, 172 (D.C.Cir.2003) (*"AFL–CIO"*); *American Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.Supp.2d 114, 134 (D.D.C.1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127 (D.C.Cir.1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'") (quot-

ing *American Scholastic TV Programming Found. v. Federal Communications Commission*, 46 F.3d 1173, 1178 (D.C.Cir. 1995)). However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C.Cir.1989) (emphasis in original). In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL–CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. "A statute is considered ambiguous if it can be read more than one way." *AFL–CIO*, 333 F.3d at 173. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778. Therefore

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case,

federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Id.* at 866, 104 S.Ct. 2778 (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). However, "[i]f the FEC's interpretation unduly compromises the Act's purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Federal Election Commission*, 795 F.2d 156, 164 (D.C.Cir.1986) (quoting *Chevron*, 467 U.S. at 845, 104 S.Ct. 2778); *see also Chevron*, 467 U.S. at 845, 104 S.Ct. 2778 (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)); *Common Cause v. Federal Election Commission*, 692 F.Supp. 1391, 1396 (D.D.C.1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may—indeed must—intervene and correct the agency.").[21]

---

**21.** Plaintiffs suggest that "weighty reasons in this 'extraordinary' case" warrant the Court "giving scant deference to the Commission's views." Pls.' Mem. at 5. Plaintiffs assert that typical deference is not warranted here because "[o]ne of the conclusions animating both BCRA and *McConnell* is that the FEC persistently erred in executing Congress's will regarding the very topics that are the subjects of the challenged regulations," and that "[t]he

control group of [FEC] Commissioners that adopted the challenged regulations took an exceedingly narrow and unfriendly view of Congress's authority under the First Amendment." *Id.* at 5–6. It is true that the "soft money" loophole that provided the main impetus for Congress's enactment of BCRA was a creation of the FEC's regulatory regime. As the Supreme Court observed, BCRA's ban on

■ In addition to their *Chevron* challenge, Plaintiffs also claim that the Commission, in promulgating the challenged regulations, failed to engage in the "reasoned analysis" required in order for a regulation not to be rendered "arbitrary and capricious." The Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an expla-

national political parties' involvement with "soft" or nonfederal money

simply effects a return to the scheme that was approved in *Buckley* [*v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)] and that was subverted by the creation of the FEC's allocation regime, which permitted the political parties to fund federal electioneering efforts with a combination of hard and soft money.... The fact that the post–1990 explosion in soft-money spending on federal electioneering was accompanied by a series of efforts in Congress to clamp down on such uses of soft money (culminating, of course, in BCRA) underscores the fact that the FEC regulations permitted more than Congress, in enacting FECA, had ever intended.

*McConnell*, 124 S.Ct. at 660 & n. 44. The Commission asks the Court to ignore as *dicta* the Supreme Court's attribution of the non-federal money problem to its regulations, and notes that while its Commissioners may have personal views on legal and constitutional issues that run contrary to those articulated by the Supreme Court, they are able to follow binding precedent "even when they have doubts about its validity." Def.'s Opp'n at 16–17 & n. 32.

Whatever complaints Plaintiffs may have with the FEC's enforcement of FECA, it appears that some of their colleagues do not share their concern. The FEC is the agency charged by Congress with enforcing FECA, and Congress in enacting BCRA did not change the FEC's mandate or reform its structure. Moreover, the Commission's members are all appointed by the President and confirmed by the Senate, which suggests that their views have been reviewed and deemed acceptable by two branches of government. And most importantly for purposes of the current matter, Plaintiffs provide no legal support for their view that the Commission is entitled to less or no deference due to its members' hostility to the campaign finance laws. This Circuit has flatly rejected this argument in the past, explaining:

If an agency's "hostility" leads it to adopt an unreasonable interpretation of a statute, the interpretation will, if challenged, be rejected by the courts.... It is a far different thing to suggest that a court withhold deference to an agency's interpretation of a statute it administers on the basis of some sort of judicial "vote of no confidence" regarding the agency's actions on related matters. If Congress views [the agency] as "unremittingly hostile" to [a statutory provision], it is free to decrease the agency's discretion in administering [that provision] or remove [the provision] from the agency's purview entirely. Absent such congressional intervention, administration of the provision at issue is entrusted to [the agency], and our review is that prescribed by *Chevron*.

*North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 94 (D.C.Cir.), *cert. denied*, 528 U.S. 1022, 120 S.Ct. 532, 145 L.Ed.2d 413 (1999). Accordingly, the Court will review the FEC's regulations with the standard level of deference.

nation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citations and quotation marks omitted); *see also Cellco P'ship v. Federal Communications Commission,* 357 F.3d 88, 93–94 (D.C.Cir.2004) (noting "arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis" requirement is "not 'particularly demanding,' " and "is satisfied if the agency 'enables us to see what major issues of policy were ventilated and why the agency reacted to them as it did.' " *Republican Nat'l Comm. v. Federal Election Commission,* 76 F.3d 400, 407 (D.C.Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting *Public Citizen, Inc. v. Federal Aviation Admin.,* 988 F.2d 186, 197 (D.C.Cir.1993) (internal punctuation omitted)). Moreover, the Court "must affirm if a rational basis for the agency's decision exists." *Appeal of Bolden,* 848 F.2d 201, 205 (D.C.Cir.1988). The degree of deference a court should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." *Federal Election Commission v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). Moreover, this Circuit has noted that "a permissible statutory construction under *Chevron* is not always reasonable under *State Farm:* 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.' " *Republican Nat'l Comm.,* 76 F.3d at 407 (quoting *Arent v. Shalala,* 70 F.3d 610, 620 (D.C.Cir.1995) (Wald, J., concurring in the judgment)).

Finally, since Plaintiffs are mounting a facial challenge to the FEC's regulations, to prevail they "must establish that no set of circumstances exists under which the regulation would be valid." *Reno v. Flores,* 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also Amfac Resorts, L.L.C. v. United States Dep't of the Interior,* 282 F.3d 818, 826–28 (D.C.Cir. 2002) (acknowledging the *Reno* holding, but noting potential problems in its application), *vacated, sub nom. National Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003); *but cf. Mineral Policy Ctr. v. Norton,* 292 F.Supp.2d 30, 39 (D.D.C.2003) (Kennedy, J.) (noting confusion in the wake of the *Reno* decision).

### C. Challenged Regulations

The Court now turns to the merits of this case. Plaintiffs have challenged numerous regulations promulgated by the FEC pursuant to Congress's enactment of BCRA. The Court addresses each in turn.[22]

---

22. Plaintiffs have withdrawn their challenges to the following: regulations regarding "leadership PACs," Am. Compl. ¶¶ 43–47, Pls.' Mem. at 54 n. 89; 11 C.F.R. § 100.24(a)(1)'s

### 1. Regulations Governing Coordinated Communications

In the modern era of campaign finance, Congress and the courts have acknowledged the distinction between those expenditures that are independent and those that are made in coordination with a campaign. *McConnell*, 124 S.Ct. at 704 ("Ever since our decision in *Buckley*, it has been settled that expenditures by a noncandidate that are 'controlled by or coordinated with the candidate and his campaign' may be treated as indirect contributions subject to FECA's source and amount limitations.") (quoting *Buckley*, 424 U.S. at 46, 96 S.Ct. 612). Those expenditures [23] that are made in coordination with certain political entities and candidates for federal office [24] are deemed to be "contributions" under campaign finance law. *See* 2 U.S.C. § 441a(a)(7)(B)(i) ("[E]xpenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate"); *Buckley v. Valeo*, 424 U.S. 1, 46–47, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (noting that "coordinated expenditures are treated as contributions rather than expenditures under [FECA]. [FECA's] contribution ceilings rather than [its] independent expenditure limitation prevent attempts to circumvent [FECA] through prearranged or coordinated expenditures amounting to disguised contributions."). While conceptually cogent, this formulation created practical concerns for courts forced to determine the line that separates an independent expenditure from a coordinated one, especially when the expenditure in question is an expressive one that implicates First Amendment considerations. *See McConnell*, 251 F.Supp.2d at 255–57 (per curiam) (discussing *Federal Election Commission v. Christian Coalition*, 52 F.Supp.2d 45 (D.D.C.1999) & *Federal Election Commission v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001)).

Prior to the passage of BCRA, the then-existing regulation on coordinated communications "placed significant weight on whether a communication had resulted from a 'substantial discussion or negotiation . . . the result of which is collaboration or agreement' between the candidate and outside spender . . . ." Pls.' Mem. at 8 n. 15 (quoting 11 C.F.R. § 100.23(c)(2)(iii) (2001) *(repealed )*).[25] Section 214 of BCRA re-

---

time restriction on "Federal election activity," Am. Compl. ¶¶ 63–64, Pls.' Mem. at 65 n. 114; and the FEC's regulation relating to "state party building funds," Am. Compl. ¶ 71d, Pls.' Mem. at 72 n. 125.

**23.** FECA defines "expenditure" to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i). FECA defines "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." *Id.* § 431(8)(A)(i).

**24.** The United States Code provides that expenditures made in coordination with candidates, their authorized political committees and agents, as well as those made in coordination with national, state or local committees of political parties (by someone who is not a candidate or a representative of a candidate's authorized committee), constitute contributions to those political entities. 2 U.S.C. § 441a(a)(7)(B).

**25.** The provision provided in part:

(c) Coordination with candidates and party committees. An expenditure for a general public political communication is considered to be coordinated with a candidate or party committee if the communication—
(1) Is paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, and
(2) Is created, produced or distributed—

pealed this regulation and instructed the FEC to

promulgate new regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees. The regulations shall not require agreement or formal collaboration to establish coordination. In addition to any subject determined by the Commission, the regulations shall address—

(1) payments for the republication of campaign materials;

(2) payments for the use of a common vendor;

(3) payments for communications directed or made by persons who previously served as an employee of a candidate or a political party; and

(4) payments for communications made by a person after substantial discussion about the communication with a candidate or a political party.

2 U.S.C. § 441a note; BCRA § 214(b)-(c). On January 3, 2003, the FEC issued its Final Rules on coordinated communications in response to BCRA, which included a repeal of 11 C.F.R. § 100.23. Coordinated & Independent Expenditures, 68 Fed. Reg. 421 (Jan. 3, 2003). Plaintiffs challenge three aspects of these regulations. The Court addresses each in turn.

*a. Content Standards*

■ The FEC explains that under its new regulations,

[a] communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when the communication:

(1) Is paid for by a person other than that candidate, authorized committee, political party committee, or agent of any of the foregoing;

(2) Satisfies at least one of the content standards in paragraph (c) of this section; and

(3) Satisfies at least one of the conduct standards in paragraph (d) of this section.

Coordinated & Independent Expenditures, 68 Fed.Reg. at 453. Plaintiffs argue that the content standards promulgated by the FEC for coordinated communications should be invalidated. The content standards are as follows:

(c) Content standards. Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(i) At the request or suggestion of the candidate, the candidate's authorized committee, a party committee, or the *agent of any of the foregoing;*
(ii) After the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication; or
(iii) After substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election.

General Public Political Communications Coordinated With Candidates and Party Committees; Independent Expenditures, 65 Fed. Reg. 76,138, 76,146 (Dec. 6, 2000); 11 C.F.R. § 100.23(c)(2)(iii) (2001) (*repealed*).

(1) A communication that is an electioneering communication under 11 CFR 100.29.

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing . . . .

(3) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A communication that is a public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section are true.

(i) The communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

11 C.F.R. § 109.21(c)(1)-(4). Plaintiffs object to the fact that under this regulation, unless the communication constitutes "express advocacy" [26] or is a republication of a candidate's own materials, the regulation only bars coordinated communications within 120 days of an election, primary or convention.[27] Pls.' Mem. at 10. They contend that

under the plain language of the new rules, a candidate will now be able to

**26.** "Express advocacy" is a test that emerged out of *Buckley*, where the Supreme Court interpreted vague provisions involving limits on individual or group expenditures related to a clearly identified candidate and disclosure of expenditures to cover only "communications that include explicit words of advocacy of election or defeat of a candidate." *McConnell*, 124 S.Ct. at 687–88 (quoting *Buckley*, 424 U.S. at 43, 96 S.Ct. 612); *see also McConnell*, 251 F.Supp.2d at 594–97 (Kollar–Kotelly, J.) (discussing the *Buckley* Court's formulation of the "express advocacy" test). The *Buckley* Court provided that examples of such express advocacy included words "such as 'vote for,' 'elect,' 'support,' . . . 'defeat,' [and] 'reject.'" *McConnell*, 124 S.Ct. at 687 (quoting *Buckley*, 424 U.S. at 44). These terms became known as the *Buckley* "magic words," as their presence or absence determined whether a communication constituted "express advocacy" and consequently subject to FECA's strictures. *See McConnell*, 251 F.Supp.2d at 591–92 (Kollar–Kotelly, J.). For years, some courts construed the *Buckley* express advocacy test as a constitutional limit on the government's ability to regulate campaign-related speech. *See id.* at 600–603 (discussing case law construing express advocacy as a constitutional test); *see also id.* at 597–600 (finding that express advocacy does not constitute a constitutional test). The Supreme Court in *McConnell* rejected the argument that it had drawn "a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech," and expressly declared that the First Amendment does not "erect[ ] a rigid barrier between express advocacy and so-called issue advocacy." *McConnell*, 124 S.Ct. at 688–89. The *McConnell* Court also observed that "the unmistakable lesson from the record in this litigation . . . is that *Buckley*'s magic-words requirement is functionally meaningless." *Id.* at 689.

**27.** "Electioneering communication" is a term defined by BCRA to include only those advertisements broadcast within 60 days of a general election or within 30 days of a primary election." 2 U.S.C. 434(f)(3). *See also infra* at 124 (discussing "electioneering communications").

help create an advertisement touting his virtues or attacking his opponent's, and then persuade a corporation or union to sponsor it using treasury funds, so long as the advertisement is run more than 120 days before any primary, convention, or general election and avoids any "express advocacy" or republication of campaign materials.

*Id.* at 10–11. Furthermore, Plaintiffs note that under the regulations, if the coordinated communication does not refer to a candidate or political party by name then the communication may be broadcast at any time. *Id.* at 12. Defendant does not dispute Plaintiffs' reading of its regulations. *See* Def.'s Opp'n at 53–58; *see also* Def.'s Mem. at 79 ("[D]uring the last 120 days before an election, a communication that is not a republication of a candidate's own campaign materials will not be treated as a 'coordinated expenditure' if it does not at least mention a candidate or political party."). In fact, in its publication of the rule, the Commission noted that "[i]n effect, the content standard of paragraph (c)(4)(ii) operates as a 'safe harbor' in that communications that are publicly disseminated or distributed more than 120 days before the primary or general election will

not be deemed to be 'coordinated' under this particular content standard *under any circumstances*." Coordinated & Independent Expenditures, 68 Fed.Reg. at 430 n. 2 (emphasis added). However, the Commission does contend that the universe of permissible coordinated communications under the rule is narrower than Plaintiffs suggest. Def.'s Opp'n at 57. It points out that "express advocacy"[28] and "the dissemination of a candidate's own campaign materials," are barred year-round. *Id.* at 58. The Commission also notes that the 120–day window applies to numerous political events which occur at different time periods, and that "these multiple 120–day windows will usually include a majority of the days in even-numbered years preceding the November election." *Id.*[29]

Applying the *Chevron* analysis, the Court first inquires as to whether or not "Congress has directly spoken on the precise question at issue." *Chevron* 467 U.S. at 842, 104 S.Ct. 2778. The Court does so "using traditional tools of statutory construction and legislative history." *AFL–CIO*, 333 F.3d at 172. Plaintiffs contend that the fact that Congress included a 120–day window in a separate provision of BCRA[30] suggests, "[u]nder the canon *ex-*

---

**28.** The Court takes this opportunity to note that "express advocacy" has been found to not only be "functionally meaningless," but also an ineffective campaign strategy. *McConnell,* 124 S.Ct. at 689. As the Supreme Court noted, even those involved in political advertising pre-BCRA "would seldom choose to use ["express advocacy"] words even if permitted." *Id.* at 689 & n. 77; *see also McConnell* 251 F.Supp.2d at 303 (Henderson, J.) ("Few candidate or party advertisements use words of express advocacy"); *id.* at 608–09 (Kollar–Kotelly, J.) (discussing how "express advocacy" is rarely used in modern political advertising and the advantages of using "issue advocacy" instead); *id.* at 875–79 (Leon, J.).

**29.** Plaintiffs acknowledge that the regulations provide for the possibility that multiple 120–

day windows will bar coordinated communications in a given election year. Pls.' Mem. at 11. They note, however, that the differences in the states's primary schedules means that in some states (c)(4) communications will be permitted until May of an election year (if the primaries are held in mid-September), whereas in others where primaries are held in March, such communications would be barred from the previous November through March, and then permitted through July when they would be barred again under the general election. Pls.' Mem. at 11.

**30.** BCRA defines regulated "Federal election activity" as including "voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and

*pressio unius est exclusio alterius*" that Congress "intended for no temporal restrictions to apply to provisions it did not similarly limit." Pls.' Mem. at 14. Defendant rejects this conclusion, arguing that "under *Chevron* the 'contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion.'" Def.'s Opp'n at 23 (quoting *Amax Land Co. v. Quarterman,* 181 F.3d 1356, 1365 (D.C.Cir.1999) (omitting citations) (emphasis in original)). Indeed, this Circuit has noted the academic criticism of the canon, and has held that

> [w]hatever its general force, we think it an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved. Here the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion. Such a contrast (standing alone) can rarely if ever be the "direct[ ]" congressional answer required by *Chevron.*

*Cheney R.R. Co. v. Interstate Commerce Comm'n,* 902 F.2d 66, 69 (D.C.Cir.1990) (emphasis in original). However, this general rule is not without its exceptions. As Plaintiffs point out, this Circuit recently found an agency regulation to be contrary to Congress's express intent relying in part on the canon of *expressio unius est exclusio alterius.* Pls.' Mem. at 14 n. 24. In *Independent Insurance Agents of America v. Hawke,* the D.C. Circuit acknowledged that it had "rejected the canon in some administrative law cases, but only

where the logic of the maxim—that the special mention of one thing indicates an intent for another thing not be included elsewhere—did not hold up in the statutory context." 211 F.3d 638, 644 (D.C.Cir. 2000) (citing *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 694 (D.C.Cir.1991); *Clinchfield Coal Co. v. FMSHRC,* 895 F.2d 773, 779 (D.C.Cir. 1990); *Cheney R.R. Co.,* 902 F.2d at 68–69). The *Hawke* court noted further that "if there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool." *Id.* "But, where the context shows that the 'draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives,' the canon is a useful aid." *Id.* (quoting *Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.,* 132 F.3d 775, 782 (D.C.Cir.1998)).

A review of the provision in question reveals that the *expressio unius* canon does not demonstrate that Congress has spoken directly on the question of time limits. Indeed, BCRA Section 214 expressly provides the Commission with the authority to promulgate new regulations addressing coordinated communications, with some guidance regarding what matters should be covered by the regulations and a single prohibition against equating coordination with "agreement or formal collaboration." 2 U.S.C. § 441a note (quoted *supra* at 56). Otherwise, the regulation is silent on the parameters of this delegation of authority. The Court does not find persuasive the argument that the inclusion of a 120–day period in a separate and unrelated section of BCRA, but not in Section 214, means that Congress has spoken clearly on whether or not such a requirement may be included in the

ends on the date of the election." 2 U.S.C. § 431(20)(A)(i).

coordinated communications regulations. Accordingly, the Court rejects Plaintiffs' argument that the *expressio unius* canon of statutory construction reveals Congress's specific intent on this matter.

Plaintiffs also appear to make an argument under the legislative reenactment doctrine, although they do not invoke the doctrine by name. Noting that the FEC had consistently treated the content of communications as irrelevant for purposes of determining whether or not they were coordinated under FECA, Plaintiffs argue that the "Commission was not at liberty to depart from [this] long-standing construction relied upon by Congress as it fine-tuned the campaign finance laws." Pls.' Mem. at 16–17; *see also id.* at 17 n. 31 (citing legislative reenactment doctrine cases). Defendant contends that the doc-

trine is inapplicable to the current case. Def.'s Opp'n at 15 n. 26, 55–56 n. 83.

The legislative reenactment doctrine provides that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change[.]" *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). This Circuit has noted that while "courts have stated this general proposition, usually as a defense to a later attack against the same interpretation, *no* case has rested on this presumption alone as a basis for holding that the statute required that interpretation." *American Fed'n of Labor & Congress of Indus. Orgs. v. Brock*, 835 F.2d 912, 916 n. 6 (1987) (emphasis in original) (listing cases including *Lorillard* ).[31] The *Brock* court observed that

**31.** A review of the cases Plaintiffs cite in support of their legislative reenactment argument bears this point out. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143–44, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (noting that Congress had enacted "six separate pieces of legislation . . . addressing the problem of tobacco use and human health," acting "against the backdrop of the [Food and Drug Administration's] consistent and repeated statements that it lacked authority under the [Food, Drug, and Cosmetics Act] to regulate tobacco," and that Congress had rejected bills that would have expressly granted the Food and Drug Administration ("FDA") such authority, in finding that Congress had "effectively ratified" the FDA's position on the matter); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845–46, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (relying not only on "congressional 'silence' to find approval of the CFTC's position in the subsequent amendments to the" statute, noting that "Congress explicitly affirmed the CFTC's authority" in the statute); *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437, 106 S.Ct. 1931, 90 L.Ed.2d 428 (noting that Congressional committees in both Houses of Congress stated that the amended definition of "deposit" included the FDIC's regulation's definitions of the term);

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–35, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (noting the limited authority of "post-enactment developments," but finding that subsequent legislative history that did not effect changes on existing regulations to "lend credence" to the lower court's interpretation of the law as "additional evidence of the intended scope of the" statute); *Lorillard*, 434 U.S. at 581, 98 S.Ct. 866 (noting that Congress in passing the Age Discrimination in Employment Act ("ADEA") included a "directive that the ADEA be enforced in accordance with the 'powers, remedies and *procedures* '. of the" Fair Labor Standards Act, thereby finding Congressional intent to permit individuals to bring private actions with a right to a jury trial under the ADEA) (emphasis in original); *NLRB v. Bell Aerospace Co. Division of Textron Inc.*, 416 U.S. 267, 275, 289, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (noting that the legislative reenactment doctrine permits a court to "accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration, but relying on the NLRB's "early decisions, the purpose and legislative history of the Taft–Hartley Act of 1947, the Board's subsequent and consistent construction of the Act for more than two decades, and the decisions of the courts of appeals," in concluding

[t]he authority to whom the Supreme Court as well as lower courts refer for this rule of statutory construction makes this qualification explicit: "[The rule of implied adoption of an agency interpretation on reenactment] does not apply where nothing indicates that the legislature had its attention directed to the administrative interpretation upon reenactment." C. Sands, Sutherland on Statutory Construction § 49.09, at 400 (footnote omitted) (4th ed.1984). *Id.* Therefore, the *Brock* court held that [t]o freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place." *Id.* at 916; *see also* 2B Norman J. Singer, Sutherland Statutes & Statutory Construction § 49.9 (6th ed.2004) (noting that the doctrine "does not apply where nothing indicates that the legislature had its attention directed to the administrative interpretation upon reenactment."); Pls.' Mem. at 17 n. 31 (citing same).

In support of their legislative reenactment argument, Plaintiffs point the Court to Senator Russell Feingold's statement on the Senate floor noting that "[e]xisting law provides that a campaign-related communication that is coordinated with a candidate or party is a contribution to the candidate or party, regardless of whether the communication contains 'express advocacy.'" Pls.' Mem. at 17 (quoting 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold)). The Court finds that while this statement does shed some light on Congress's understanding of the FEC's approach to coordinated communications, and does provide some indication of an expectation that this approach would continue after the passage of BCRA, the Court does not find that it meets the *Brock* test of constituting a "a strong affirmative indication that [Congress] wishe[d] the present interpretation to remain in place." *Brock*, 835 F.2d at 916. The statement is devoid of any reference to maintaining the same approach to coordinated communications. Moreover, the other cases cited by Plaintiffs that discuss the legislative reenactment doctrine contain substantially stronger affirmative indications of Congress's intention to retain the agency's interpretation. *See supra* note 31. Accordingly, Plaintiffs' legislative reenactment argument is unavailing.

Plaintiffs also make numerous arguments about the legislative history of Section 214, and Congress's purposes and objectives in passing the provision, claiming that these factors demonstrate Congress's clear intent and that the Commission's regulations have run afoul of that intent. Pls.' Mem. at 15–18. It is true that when deciding *Chevron* step one, a court looks to see "whether Congress has directly spoken to the precise question at issue … through the statute's purposes;" however, this analysis is not done "in a vacuum; rather [courts] look to how th[o]se purposes are expressed through the statutory language. 'The invocation of disembodied purposes, reasons cut loose from the language is a sure way to frustrate rather than to implement the statute.'" *Orloski*, 795 F.2d at 163–64 (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986)). Looking at the statutory language, it is clear that Congress ordered the FEC to promulgate new regulations and provided some guidance. *See* 2 U.S.C. § 441a note. However, Congress provided no express guidance on the matter of content restrictions, and therefore the Court finds that the statute is "silent … with respect to the specific

that certain types of employees were exempt from the Act and the NLRB was not free "to

read a new and more restrictive meaning into the Act").

issue." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Accordingly, the Court, following the D.C. Circuit's model in *Orloski*, turns to the second prong of the *Chevron* analysis. *See Orloski*, 795 F.2d at 164.[32]

Under *Chevron* step two, since the Court has found that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778. Like the situation the *Orloski* court faced, here it is

> readily apparent that ... Congress left a large gap between the obviously impermissible and the obviously permissible. This gap creates the potential for a broad range of differing interpretations of the Act, the legitimacy of each being heavily dependent upon the degree to which it undercuts the statutory purposes.... If the FEC's interpretation unduly compromises the Act's purposes, it is not a reasonable accommodation under the Act, and it would· therefore not be entitled to deference.

*Orloski*, 795 F.2d at 164 (internal quotation marks omitted). Given the vast discretion Congress delegated to the FEC in enacting BCRA Section 214, the Court finds that its construction of the statute is facially permissible. The Court now turns to

Plaintiffs' argument that the agency's regulations undercuts FECA's purposes.

As explained *supra*, it has been a tenet of campaign finance law since *Buckley* that FECA, in an effort to prevent circumvention of campaign finance regulations, treats expenditures coordinated with candidates or political parties as contributions to those with whom the expenditures were coordinated. *McConnell*, 124 S.Ct. at 705 ("Congress has always treated expenditures made 'at the request or suggestion of' a candidate as coordinated.") (quoting 2 U.S.C. § 441a(a)(7)(B)(i)). The basic premise of coordinated expenditure restrictions is that if political campaigns and outside entities are able to coordinate the outside entity's political expenditures, then the campaign finance contribution and expenditure regulations could be eviscerated. FECA, in an effort to prevent circumvention, provides that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i); *see also id.* § 441a(a)(7)(B)(ii) (same for political parties). BCRA Section 214 did nothing to change this requirement; it merely ordered the FEC to promulgate new regulations regarding coordinated communications, and provided some guidance. Nor did Congress evince any intent to qualify the reach of this provision of FECA, or to exclude from its reach any particular type of "coordination." Such a move would run counter to the basic notion that a coordinated expenditure, by virtue of its coordi-

---

**32.** Plaintiffs make a number of legislative history and legislative purpose arguments under *Chevron* step one. These arguments, however, do not address whether Congress has spoken directly on the issue at hand; rather, the arguments suggest that the FEC's regulations are incongruent with Congress's purposes in enacting BCRA. As *Orloski* makes clear, these sorts of arguments are more appropriately addressed under *Chevron* step two. *Orloski*, 795 F.2d at 164.

nation (not its content), is valuable to the political entity with which it is coordinated. As the *Buckley* Court observed, "prearranged or coordinated expenditures" circumvent campaign finance laws because they "amount[ ] to disguised contributions." *Buckley*, 424 U.S. at 47, 96 S.Ct. 612. Such expenditures differ from truly independent expenditures because "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that the expenditures will be given as a quid pro quo for improper commitments from the candidates." *Id.* The *McConnell* Court reiterated this rationale, noting that "[i]ndependent expenditures are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view. By contrast, expenditures made after a 'wink or nod' often will be as useful to the candidate as cash." *McConnell*, 124 S.Ct. at 705 (internal quotation marks and citations omitted). If an outside entity or individual makes a coordinated communication, that communication presumably has value to the political entity it is coordinated with, regardless of when it is broadcast or its contents. *See Federal Election Commission v. Christian Coalition*, 52 F.Supp.2d 45, 92 (D.D.C.1999) ("The fact that the candidate has requested or suggested that a spender engage in certain speech indicates that the speech is valuable to the candidate, giving such expenditures sufficient contribution-like qualities to fall within [FECA's] prohibition on contribu-

tions."). To exempt certain types of communications runs completely afoul of this basic tenet of campaign finance law, thereby undercutting FECA's statutory purpose of regulating campaign finance and preventing circumvention of the campaign finance rules, and therefore the regulation is entitled to no deference.

The text and legislative history of Section 214 demonstrate that Congress had no intention of modifying this fundamental understanding of campaign finance law. Plaintiffs' citations to the floor statements of BCRA co-sponsors Senators John McCain and Russell Feingold bear this out.[33] The Commission notes that these statements "when read in context, [make it] clear that the Senators were discussing the requirement that the new regulations must not require an agreement or formal collaboration, not the issues raised in the regulation's *content* provisions." Def.'s Opp'n at 55 n. 82 (emphasis in original). A review of the statements reveals that the Commission is correct that the focus of the sponsors' comments is on defining what constitutes coordination, not on content restrictions. The regulation Congress repealed provided that an otherwise independent political communication would be deemed coordinated if

[a]fter substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the content, timing, location, mode, intended audience, vol-

---

**33.** The Supreme Court has instructed that "[a]lthough the statements of one legislator made during debate may not be controlling, ... those of the sponsor of the language ultimately enacted[ ] are an authoritative guide to the statute's construction." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27, 102

S.Ct. 1912, 72 L.Ed.2d 299 (1982); *see also Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976) ("As a statement of one of the legislation's sponsors, this explanation deserves to be accorded substantial weight in interpreting the statute.").

ume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election. 11 C.F.R. § 100.23(c)(2)(iii) (2001) (*repealed*). Senator Feingold commented that the "[a]fter substantial discussion" and the "the result of which is collaboration or agreement" language "set[ ] too high a bar to the finding of 'coordination.' This standard would miss many cases of coordination that result from de facto understandings. Accordingly, section 214 states that the Commission's new regulations 'shall not require agreement or formal collaboration to establish coordination.'" 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold). Senator McCain echoed Senator Feingold's comments, noting that

> [i]nformal understandings and de facto arrangements can result in actual coordination as effectively as explicit agreement or formal collaboration. In drafting new regulations to implement the existing statutory standard for coordination—an expenditure made "in cooperation, consultation or concert, with, or at the request or suggestion of" a candidate—we expect the FEC to cover "coordination" whenever it occurs, not simply when there has been an agreement or formal collaboration.

*Id.* (statement of Sen. McCain).

While it is true that these statements are silent on the matter of content restrictions, it is clear that this omission was not the result of a desire to allow the Commis-

sion freedom to create whatever content rules it wanted, but rather from the basic understanding that established campaign finance law treats coordinated communications expenditures as contributions regardless of their content or when they are broadcast. This is evident from Senator McCain's statement that the sponsors of BCRA "expect[ed] the FEC to cover 'coordination' *whenever it occurs,* not simply when there has been an agreement or formal collaboration." *Id.* (emphasis added).

Given the state of the law, it is not surprising that the repealed regulation included no guidance on content restrictions and that the sponsors focused their comments on what was troublesome about the previous regulation, not what provisions would have been troublesome had they been included in the provision. Clearly, the statements by Senators McCain and Feingold make clear that the purpose of passing Section 214 of BCRA was not to exempt certain acts of coordination, but rather to enlarge the concept of what constitutes "coordination" under campaign finance law. *See* 148 Cong. Rec. S2145 (statement of Sen. Feingold) (Section 214 "does not change the basic statutory standard for coordination, which defines and sets parameters for the FEC's authority to develop rules describing the circumstances in which coordination is deemed to exist.").[34]

The Court therefore concludes that pursuant to step two of the *Chevron* analysis, the FEC's exclusion of coordinated communications made more than 120 days before a political convention, general or primary election, as well as any that do not refer to a candidate for federal office or a

---

**34.** The FEC provides the Court with numerous justifications for why its content restrictions are appropriate. Def.'s Opp'n at 55–58. The Court finds none of these to be meritori-

ous in light of its determination that the content restrictions undermine the purposes of FECA.

political party and any not aimed at a particular candidate's electorate or electorate where a named political party has a candidate in the race, undercuts FECA's statutory purposes and therefore these aspects of the regulations are entitled to no deference. A communication that is coordinated with a candidate or political party has value to the political actor. To exclude certain types of communications regardless of whether or not they are coordinated would create an immense loophole that would facilitate the circumvention of the Act's contribution limits, thereby creating "the potential for gross abuse." *Orloski,* 795 F.2d at 165. The FEC's regulation therefore is "not a reasonable accommodation under the Act," *Orloski,* 795 F.2d at 164 (internal quotation marks omitted), and fails *Chevron* step two.

*b. Exclusion of the Internet*

■ The coordinated communication regulation, excerpted *supra,* applies only to "public communications" unless the communication constitutes an "electioneering communication." 11 C.F.R. § 109.21(c)(4). Congress defined "public communication" in BCRA to mean "a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising." 2 U.S.C. § 431(22). The FEC promulgated a regulation defining "public communication" as "a communication by means of any broadcast, cable or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising. The

term public communication shall not include communications over the Internet." 11 C.F.R. § 100.26. Therefore, Internet communications, no matter how closely they are coordinated with political parties or a candidate's campaign, cannot be considered "coordinated" under the FEC's regulations. This exclusion marks a contrast from the Commission's prior rule, which deemed all "general public political communication[s]" that met certain conduct requirements to be "coordinated." 11 C.F.R. § 100.23(c)(2)(iii) (2001) (*repealed*); *see also supra* note 25 (quoting 11 C.F.R. § 100.23(c)(2)(iii)). "General public communications" were defined to "include those made through a broadcasting station (including a cable television operator), newspaper, magazine, outdoor advertising facility, mailing *or any electronic medium, including the Internet or on a web site,* with an intended audience of over one hundred people." 11 C.F.R. § 100.23(e)(1) (2001)(*repealed*) (emphasis added). Plaintiffs claim that the new regulation's exclusion of all Internet communications from treatment as "coordinated communications" runs contrary to Congress's intent.[35] Pls.' Mem. at 20. Defendant disagrees, but devotes much of its discussion about 11 C.F.R. § 100.26 to the "context of the 'soft money' rulemaking." Def.'s Opp'n at 42–48, 43 n. 64.

Applying *Chevron* step one, the Court asks whether "Congress has directly spoken on the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Plaintiffs claim that the regulation fails *Chevron* step one. Pls.' Mem. at 21–23. To assess this argument, the Court begins by examining the FEC's explanation for excluding the Internet from the definition of "public communication."

---

**35.** Plaintiffs also challenge "the *per se* exclusion of Internet communications from regulation under the "Federal election activity"

rules." Pls.' Mem. at 21 n. 37. The Court addresses these arguments *infra* at 108.

In its Explanation and Justification ("E & J"), the Commission explained that it applied its definition of "public communication" promulgated for its regulations related to "Federal election activity" to its regulations on coordinated communications in order to "provide[ ] consistency within the regulations and [to] distinguish[ ] covered communications from, for example, private correspondence and internal communications between a corporation or labor organization and its restricted class." Coordinated & Independent Expenditures, 68 Fed.Reg. at 430. In its separate E & J issued for its definition of "public communication," the FEC began by noting that its rulemaking was guided by BCRA's amendment of 2 U.S.C. § 431,[36] to include a definition for "public communication." Prohibited & Excessive Contributions: Non–Federal Funds or Soft Money, 67 Fed.Reg. 49,064, 49,071 (July 29, 2002). FECA, as amended by BCRA, provides that "[t]he term 'public communication' means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising." 2 U.S.C. § 431(22). The FEC decided not to include the Internet in its definition of "public communication" concluding that the exclusion "is consistent with the plain meaning of the statute, consistent with Congress' decision not to include the Internet in the statutory definition of 'public communication,' and is the best policy decision with regard to implementation of BCRA." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,072. The Commission explained that its

statutory construction was based on the fact that Congress "excluded [the Internet] from the list of media that constitute public communication under the statute. BCRA does not reference the 'Internet' or 'electronic mail' in this section, although Congress used the terms 'Internet,' 'website,' and 'World Wide Web address' in other sections of BCRA." Id. (citing 2 U.S.C. §§ 434 note, 438a).[37] The Commission also pointed out that "Congress has also used the terms 'Internet' and 'electronic mail' in other statutes and distinguished them from 'telecommunications services.'" Id. Acknowledging that BCRA does include the phrase "any other form of general political advertising" in the definition of "public communication," the Commission explained that

> [g]eneral language following a listing of specific terms, however, does not evidence Congressional intent to include a separate and distinct term that is not listed, such as the Internet. See Sutherland Statutes and Statutory Construction, section 47; 17 Ejusdem generis, Vol. 2A (6th ed.2000). It is also noted that there is no indication in the legislative history that Congress contemplated including the Internet in the definition of public communication.

Id. The Commission then explained the "significant policy reasons" for excluding the Internet from the definition.

Plaintiffs argue that

> [o]n its face, the phrase "any other form of general political advertising" plainly includes at least certain communications over the Internet. There can be no question that 'political advertising' takes place on the Internet (in exponentially

---

**36.** The term first appears in 2 U.S.C. § 431(20), a provision of BCRA which delineates what constitutes "Federal election activity," a term used to circumscribe activities under BCRA Title I.

**37.** Defendant does not raise an *expressio unius* argument in its briefing. *See supra* at 59–

increasing amounts), and that there are various mechanisms by which such advertising over the Internet is targeted at the "general public." Pls.' Mem. at 22. Defendant counters that this argument "amounts to a concession that BCRA does not speak to the precise question at issue under *Chevron* step one." Def.'s Opp'n at 43; *see also* Def.'s Mem. at 36 ("Since the Internet is not one of the eight types of mass communication Congress listed in 2 U.S.C. § 431(22), it is not even arguable that the statute speaks directly to the precise question at issue.") (internal quotation marks omitted).

As already noted, Congress did not expressly include the term "Internet" in its statutory definition of "public communication," but it did include the phrase "any other form of general public political advertising." 2 U.S.C. § 431(22). While all Internet communications do not fall within this descriptive phrase, some clearly do. Consequently, it is difficult to argue that the statutory terms evidence Congressional intent for the Internet, or any other forms of communications that constitute "general public political advertising," to be excluded wholesale from its definition of "public communication."

However, the Commission contends, as noted *supra,* that as a matter of statutory construction its position is correct. It explained in its E & J that the doctrine of *ejusdem generis* supports its position that Congress did not intend for the Internet to be included in the definition of "public communications." *See also* Def.'s Mem. at 37–38. The doctrine provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:17 (6th ed.2004). The Court finds that the doctrine of *ejusdem generis* is inapplicable to the case at bar. The Supreme Court has explained that the doctrine "is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (quoting *United States v. Powell,* 423 U.S. 87, 91, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975)). In *Harrison,* the Supreme Court addressed a provision of the Clean Air Act which granted "direct review in a federal court of appeals of certain locally and regionally applicable actions taken by the Administrator of the Environmental Protection Agency (EPA) under specifically enumerated provisions of the Act, and of '*any other final action* of the Administrator under [the Act] ... which is locally or regionally applicable.'" *Id.* at 579, 100 S.Ct. 1889 (emphasis added by Supreme Court) (quoting Section 307(b)(1) of the Clean Air Act). The *Harrison* Court "discern[ed] no uncertainty in the meaning of the phrase 'any other final action,'" finding that "[t]his expansive language offers no indication whatever that Congress intended the limiting construction ... that the respondents now urge," and that "in the absence of legislative history to the contrary, [the provision] must be construed to mean exactly what it says, namely *any other* final action." *Id.* at 588–89, 100 S.Ct. 1889 (emphasis in original). This reasoning is no less applicable here.[38] Congress, by the plain terms of

60 (discussing the doctrine and its limitations).

**38.** Defendant's entire response to Plaintiffs' discussion of *Harrison* is as follows:

Plaintiffs cite *Harrison* ... but it is inapposite because the Court there found no un-

certainty in the phrase "any other final action" and refused to apply the *ejusdem generis* doctrine. In the rulemaking plaintiffs themselves urged the Commission to "proceed carefully" in light of the "com-

plexities" involved in delineating BCRA's applicability to the Internet.

Def.'s Opp'n at 44 n. 65. This argument is unavailing. First, even taking the FEC's characterization of Plaintiffs' comments at face value, and even considering these post-BCRA enactment comments as expressions of legislative intent, such comments do not suggest that the Commission should simply disregard the plain reading of the statute and exempt all Internet communications. The more obvious and rational reading of their comments is that the Commission should be careful in defining what constitutes "general public political advertising" that is dispersed through the Internet given its distinct characteristics and the fact that it is a new technology. Accordingly, the Court does not find that these comments establish uncertainty as to Congressional intent that Internet communications be deemed capable of constituting "public communication[s]."

Second, the FEC's characterization of Plaintiffs' comments is misleading. BCRA's co-sponsors submitted joint comments to the FEC to address its BCRA-related rulemakings. Def.'s Mem. Attach. 5 (Comments of BCRA co-sponsors to FEC, May 29, 2002). With regard to the FEC's proposed 11 C.F.R. § 100.26, they commented that

> [i]n response to the question posed in the Commission's commentary concerning the Internet and e-mail, we note that BCRA contains no *per se* exclusion from the definition of a "public communication" for political party Internet or widely distributed e-mail communications. A broad *per se* exclusion of that nature would be problematic, permitting state and local party entities to exploit rapidly developing technology and new communications media to re-create or prolong the current soft money system. In light of the complexities of this area, we urge the Commission to proceed carefully in delineating the scope of FECA's and BCRA's coverage with respect to Internet and e-mail communications, so that appropriate disclosure requirements and funding restrictions apply to public communications by political party committees via electronic means.

*Id.* at 10. It is clear that BCRA's co-sponsors made evident their opposition to a *per se* exclusion of the Internet from the definition in their comments to the FEC. And while this comment does not, as the FEC notes, "claim that an Internet exclusion would be an impermissible construction of the Act," the Court does not find this omission to constitute an endorsement of the FEC's position on this matter.

Defendant also points to a statement made by Plaintiff Shays, in an article published on Forbes.com, an excerpt of which was provided to the FEC by a commenter, in which he stated "The Internet is not really the problem right now. There's a general feeling that, if in doubt, stay away from putting on any restrictions." Def.'s Mem. at 39; *id.* Attach. 6 at 2 (Comments of Mindshare Internet Campaigns to the FEC, May 29, 2002). Defendant claims that this statement "is significant because it runs counter to plaintiffs' own contention here that the 11 CFR [§ ] 100.26 Internet exclusion contravenes BCRA." Defs.' Mem. at 39. Plaintiffs claim that this statement was taken out of context. Pls.' Mem. at 27 n. 48. They provide that Plaintiff Shays made the comment in the context of explaining why the Internet was not included in BCRA's definition of "electioneering communications" in BCRA Title II, which governs independent expenditures regarding certain communications, not in the context of the definition of "public communication" under 2 U.S.C. § 431(22). *Id.* Plaintiffs provide the Court with the entire article, but Defendant objects to the Court's consideration of the document as it was "published ... before the Commission accepted comments on its proposed rulemakings, but [was] not submitted to the Commission by plaintiffs or anyone else." Def.'s Mot. to Strike at 5. While Defendant is correct that "[j]udicial review of administrative action *should normally be based on the 'full administrative record' that was before a decisionmaker at the time challenged action was taken* and not on a *de novo* review of the facts in the District Court," *Community for Creative Non–Violence v. Lujan*, 908 F.2d 992, 998 (D.C.Cir.1990) (internal quotation marks omitted), here the document is not introduced by Plaintiffs to challenge the Commission's regulation, but rather to refute the Commission's characterization of Plaintiff Shays's statement. Moreover, putting aside the absurdity of the FEC's position that the Court should not be permitted to consider this comment in context, when determining Congress's intent under *Chevron* step one, the Court "giv[es] no deference to the agency's interpretation." *AFL–CIO*, 333 F.3d at 173. Accordingly, the Court is permitted to look beyond the administrative record to discern Congressional intent. A review of the Forbes.com article reveals that Plaintiffs' position is accurate. *See* Pls.' Ex. 164 (Ian Zack, Con-

the statute, clearly intended for the term "public communication" to capture all forms of "general public political advertising" and the FEC has provided no legislative history that persuades the Court to ignore the plain meaning of the statute. *See Cole v. Harris*, 571 F.2d 590, 597

gress' Gift to the Internet, Forbes.com, Feb. 26, 2002). Accordingly, the Court finds Defendant's citation to these comments does not undermine its finding of Congressional intent with regard to 2 U.S.C. § 431(22).

Finally, Defendant has not addressed how the Supreme Court's interpretation of the plain meaning of the words "any other" is inapplicable to the present case. As this Circuit has noted, "the plainer the language, the more convincing contrary legislative history must be." *Cole v. Harris*, 571 F.2d 590, 597 (D.C.Cir.1977) (quoting *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.1973)). Since the "clause is clear on its face, and its common sense meaning is consonant with the purposes of the Act," Defendant's interpretation would be acceptable "only if supported by clear and convincing evidence from the legislative history." *Id.* Defendant has not come close to meeting this standard.

**39.** The FEC devotes a sentence to its argument that the *noscitur a sociis* canon (a word is known by the company it keeps) supports its view of Congressional intent. Def.'s Opp'n at 44. The Commission argues that the Court should read the final general term of the statute in a limited fashion in order "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). The Court's reading of the term "other form of general public political advertising" is in fact limited. The Court has merely determined that Congress did not intend for the Internet to be excluded *per se* from the definition of public communication. "[U]nderstood against the background of what Congress was attempting to accomplish in enacting" BCRA, *id.* at 1070 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 63, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)), the

(D.C.Cir.1977) ("[T]he plainer the language [of the statute], the more convincing contrary legislative history must be" for the Court to read the statute in a manner that contradicts its plain language) (quoting *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.1973)).[39] Ac-

Court's interpretation is the correct reading of the statute.

Moreover, the Court notes that even if it found that the *ejusdem generis* doctrine applied here, it would still find that the FEC's construction violated Congress's intent. While the FEC argues that cost, openness, decentralization, novelty, technological diversity and fluidity, differentiate the Internet from the other enumerated forms of communication in 2 U.S.C. § 431(22), Def.'s Opp'n at 44–45, it does not explain how these differences are material here. The Internet may have differences from the other enumerated forms of communications, but it is "similar in nature" to those other forms of communication in that it is capable of being used to convey "general public political advertising." *See* 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:17. The Commission admits as much when it acknowledges that it "could have attempted to craft some standard that would include certain Internet communications, and it may do so if future circumstances indicate that is appropriate." *Id.* at 45. In other words, the FEC acknowledges that Internet communications are capable of constituting "general public political advertising," it just does not view them as a significant problem at this time.

Finally, the parties both cite to a letter written by FEC Chairman David M. Mason and Commissioner Bradley A. Smith, to support their respective positions. The letter, placed in the Senate record by Senator McConnell, informs Congress that its definition of "public communication," combined with the then-existing FEC regulation which "treated Internet web pages available to the public and widely distributed e-mail as forms of 'general public political communication[s],'" "could command regulation of Internet and e-mail communications," and asks for clarification as to whether or not this was Congress's intent. 148 Cong. Rec. S2340 (daily ed. Mar. 22, 2002). Plaintiff characterizes the letter as "a last minute lobbying attempt"

cordingly, the Court finds that under *Chevron* step one, Congress intended all other forms of "general public political advertising" to be covered by the term "public communication." What constitutes "general public political advertising" in the world of the Internet is a matter for the FEC to determine.

The Court finds in the alternative, that even if 11 C.F.R. § 100.26 met the requirements of *Chevron* step one, it would still fail *Chevron* step two, for the same reasons the Court articulated above for the Commission's coordination regulations. *See supra* at 62–65. The Commission's exclusion of Internet communications from the coordinated communications regulation severely undermines FECA's purposes and therefore violates the second prong of *Chevron.* As discussed *supra,* when Congress repealed the coordination regulations, it did so out of concern that the definition of "coordination" in the then-existing rules was too limited in the types of *conduct* necessary to render a communication to be "coordinated." The fact that the legislative history contains no discussion about the content of such communications is not surprising, since, as explained *supra,* under the existing campaign finance law and judicial precedent interpreting that law, a communication's content was irrelevant to the determination of whether or not a communication was coordinated. Indeed, the whole rationale behind the distinction made for coordinated expenditures is that if a candidate or political party coordinates an expenditure with an outside person or entity, that expenditure is presumed to be aimed at assisting that candidate or political party. To allow such expenditures to be made unregulated would permit rampant circumvention of the campaign finance laws and foster corruption or the appearance of corruption. *Christian Coalition,* 52 F.Supp.2d at 88.[40] FECA clearly declares that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i); *see also id.* § 441a(a)(7)(B)(ii) (same for political parties). To permit an entire class of political communications to be completely unregulated irrespective of the level of coordination between the communication's publisher and a political party or federal candidate, would permit an evasion of campaign finance laws, thus "unduly compromis[ing] the Act's purposes," and "creat[ing] the potential for gross abuse." *Orloski,* 795 F.2d at 164, 165. Accordingly, in the alternative, the Court finds that

to have the statute rewritten to exempt the Internet from the definition of "public communication," which Congress ignored, demonstrating Congress's intention to have the Internet regulated by the statutory provision. Pls.' Opp'n at 29 n. 45; Pl.'s Mem. at 26. Defendant claims that the letter alerted Congress that the statutory provision was "susceptible to different interpretations," and that Congress's silence in response to the Commission's request for guidance "highlights the interpretative authority granted to the Commission." Def.'s Opp'n at 46–47 n. 69; *see also* Def.'s Mem. at 39. The Court notes that even if it were to accept the Commission's view of the meaning of the Mason/Smith letter to Senator McConnell, Defendant still

would not meet its burden of providing the clear and convincing legislative history required to overcome the statute's plain text. *Cole,* 571 F.2d at 597 (D.C.Cir.1977); *Avco Corp. v. United States Dep't of Justice,* 884 F.2d 621, 625 (D.C.Cir.1989).

**40.** As Judge Joyce Hens Green of this District Court observed, many times coordinated communications that are negative in tone are "more valuable than dollar-equivalent contributions because they come with an 'anonymity premium' of great value to a candidate running a positive campaign." *Christian Coalition,* 52 F.Supp.2d at 88.

the Commission's regulation, as it applies to coordinated communications, fails *Chevron* step two.

### c. Definition of "Agent"

█ Plaintiffs also object to the FEC's definition of "agent" as it relates to the coordinated communication regulations. Pls. Mem. at 9 n. 17.[41] They object to the fact that the FEC limited the definition of "agent" to persons who have "actual authority, express or implied, to engage" in certain activities on behalf of certain political entities. 11 C.F.R. § 109.3; Pls.' Mem. at 9 n. 17. Plaintiffs contend that the definition should include those acting with apparent authority as well. Pls. Mem. at 9 n. 17, 41, 42 n. 71. Defendant relies on the arguments it set forth in their discussion of "agent" under the nonfederal money regulations. *See* Def.'s Mem. at 77 n. 26.

Plaintiffs' arguments regarding 11 C.F.R. § 109.3 are relegated to two footnotes, essentially directing the Court to their analysis of 11 C.F.R. § 300.2, which defines "agent" in the context of the Commission's nonfederal money regulations. Plaintiffs provide no separate analysis for Section 109.3. *See id.* at 9 n. 17, 41–48; Pls.' Opp'n at 33–36 (focusing on the definition promulgated to apply to the "soft money" regulations).

As an initial matter, it is clear that Section 214 of BCRA does not mention the word "agent" or provide any guidance for how the term should be read in the context of the coordination communications regulations. Plaintiffs do not provide the Court with any legislative history or cite to another provision in the statute that manifests clear Congressional intent with regard to the definition of this term as it relates to the coordinated communication

regulations. *Id.* Accordingly, the Court cannot find that under *Chevron* step one that Congress has clearly spoken on this issue.

Moving to *Chevron* step two, the Court is provided no basis for concluding that the agency's construction of the term is impermissible. *See Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778. The Commission in promulgating the definition recognized "the Congressional determination that a spender can effectively coordinate a communication by acting in cooperation, consultation, or concert with, or at the request or suggestion of, an agent. . . ." Coordinated & Independent Expenditures, 68 Fed. Reg. at 424 (citing 2 U.S.C. § 431(17) & 2 U.S.C. § 441a(a)(7)(B)(i)). As the Court finds *infra* at 84–86, there is nothing that demonstrates that the Commission has taken an impermissible construction of the term, and it would appear that this challenge "really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within the gap left open by Congress . . . ." *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778 (quoting *TVA,* 437 U.S. at 195, 98 S.Ct. 2279). The only remaining avenue for voiding the regulation under *Chevron* review is if the regulation "unduly compromises the Act's purposes." *Orloski,* 795 F.2d at 164. There is nothing in the record that suggests that this interpretation "unduly compromises" FECA, and Plaintiffs have not specifically explained why or if they believe the regulation has such an effect on the coordinated communications regulation. *See* Pls. Mem. at 9 n. 17. To be sure, as Plaintiffs' citations to comments submitted during the Commission's rulemaking demonstrate, *see* Pls.' Mem. at 9 n. 17, there are concerns that

---

**41.** Plaintiffs also object to the definition of the term "agent" in the FEC's regulations pertaining to nonfederal money. *See* Pls.' Mem. at 9 n. 17. The Court addresses that provision separately, *infra* at 80.

the decision to exclude those acting with apparent authority from the definition of "agent" may lead to circumvention of the coordination regulations. However, the Court has been provided no basis for determining whether or not such instances would "*unduly* compromise[ ]" the Act or "create the potential for *gross* abuse." *Orloski*, 795 F.2d at 164, 165 (emphasis added). The Court does not disagree that the definition may compromise the Act or create the potential for abuse, just that the dangers of these effects are not, on the record presented or on their face, sufficiently great to meet the *Orloski* standard. In this way, the definition of "agent" in this context differs from the content provisions of the coordinated communication regulations that the Court found unduly compromise the Act's purposes. Accordingly, the Court finds that 11 C.F.R. § 109.3 survives *Chevron* review.

■ Finally, turning to the question of whether or not the Commission violated the APA's reasoned analysis requirement, the Court finds, as it does *infra* at 87, that the Commission did not adequately explain its decision to exclude "apparent authority" from the scope of its definition of "agent." Examining the Commission's E & J, the Commission explains that it

> intentionally avoided promulgating a regulation based on apparent authority, which is the authority of an actor as perceived by a third party, because such authority is often difficult to discern and

would place the definition of 'agent' in the hands of a third party. Therefore, in the Commission's judgment, apparent authority is not a sufficient basis for agency for the purposes of revised 11 CFR part 109. The commenter's suggested approach would necessitate a determination of agency solely on the basis of apparent authority and is therefore inconsistent with the structure and purpose of the regulations.

Coordinated & Independent Expenditures, 68 Fed.Reg. at 424–25. This explanation provides no indication that the Commission considered how their decision might facilitate circumvention or perpetuate the appearance of corruption, two policies Congress definitely sought to advance in passing BCRA. In this manner, the Commission has "entirely failed to consider an important aspect of the problem," which renders the rule "arbitrary and capricious." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856.[42]

### 2. "Soft Money" Regulations

Widely regarded as the main impetus for the passage of BCRA was the pervasiveness of so-called "soft money" in the campaign finance system. *McConnell*, 124 S.Ct. at 654 ("BCRA's central provisions are designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections."); 147 Cong. Rec. S2696 (daily ed. Mar. 22, 2001) (statement of Sen. Feingold) ("The soft money ban is the centerpiece of this bill. Our legislation

---

**42.** Moreover, as explained in more detail *infra* at 86, the Commission's explanation does not provide "a rational basis" for its decision. *Bolden*, 848 F.2d at 205. The principles of "apparent authority" do not, as the Commission concluded, "place the definition of 'agent' in the hands of a third party." Rather, "[f]or there to be apparent authority ... the third party must not only believe that the individual acts on behalf of the principal but,

in addition, 'either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief.' " *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 266 (D.C.Cir.1998) (quoting Restatement (Second) of Agency § 27 cmt. a (1992)). *See also infra* at 81 (discussion of apparent authority).

shuts down the soft money system, prohibiting all soft money contributions to the national political parties from corporations, labor unions, and wealthy individuals."); 148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) (statement of Sen. McCain) ("It is a key purpose of the bill to stop the use of soft money as a means of buying influence and access with Federal officeholders and candidates."); Def.'s Opp'n at 32 n. 51 (noting that "increased use of soft money ... led to BCRA's enactment ....."); *see also McConnell,* 251 F.Supp.2d at 199–201 (per curiam) (describing the growth of "soft money" spending in political campaigns). "Soft money" refers to donations that "the FEC permitted national and state party committees to solicit and accept ... outside of FECA's source and amount limitations ... provided that these moneys were placed in separate accounts from federal funds." *McConnell,* 251 F.Supp.2d at 196 (per curiam) (footnote omitted). "Soft money" is also referred to as "nonfederal money." *See id.* at 196 & n. 9.[43]

Title I of BCRA represents Congress's attempt to address the nonfederal money problem. It was enacted "as an integrated whole to vindicate the Government's important interest in preventing corruption and the appearance of corruption." *McConnell,* 124 S.Ct. at 659. Plaintiffs attack numerous regulations promulgated to implement Title I's ban on nonfederal money. The Court addresses each in turn.

*a. Definitions of "Solicit" and "Direct"*

Included in Title I of BCRA is Section 323(a) which provides that a "national committee of a political party ... may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of" FECA. 2 U.S.C. § 441i(a)(1). As the Supreme Court observed,

> [t]he main goal of § 323(a) is modest. In large part, it simply effects a return to the scheme that was approved in *Buckley* and that was subverted by the creation of the FEC's allocation regime, which permitted the political parties to fund federal electioneering efforts with a combination of hard and soft money.

*McConnell,* 124 S.Ct. at 660. In addition, BCRA § 323(d), provides that political party committees "shall not solicit any funds for, or make or direct any donations to" certain organizations falling under Sections 501(c) and 527 of the Internal Revenue Code. 2 U.S.C. § 441i(d). BCRA also provides that candidates and federal officeholders "shall not solicit, receive, direct, transfer, or spend funds" that do not comport with FECA's requirements. *Id.* § 441i(e). These two latter provisions aim "to plug the soft-money loophole." *McConnell,* 124 S.Ct. at 681, 683.

██ Plaintiffs challenge the FEC's regulations defining the terms "solicit" and "direct." Pls.' Mem. at 30. These terms are used in the provisions of BCRA discussed *supra* related to the elimination of nonfederal money from the federal campaign finance regime in setting out prohibitions on various political actors' involvement with nonfederal money. 2 U.S.C. §§ 441i(a), (d), (e). The FEC promulgated the following regulations defining these terms as they relate to its nonfederal money regulations:

> (m) To solicit. For the purposes of part 300, to solicit means to ask that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value, whether the contribu-

---

**43.** The Court refers to such funds as "nonfederal" money in this opinion.

tion, donation, transfer of funds, or thing of value, is to be made or provided directly, or through a conduit or intermediary. A solicitation does not include merely providing information or guidance as to the requirement of particular law.

(n) To direct. For the purposes of part 300, to direct means to ask a person who has expressed an intent to make a contribution, donation, or transfer of funds, or to provide anything of value, to make that contribution, donation, or transfer of funds, or to provide that thing of value, including through a conduit or intermediary. Direction does not include merely providing information or guidance as to the requirement of particular law.

11 C.F.R. §§ 300.2(m)-(n). The Commission explained that its definition of "solicit" was informed by concerns "that the ability to impute intent could lead to finding a violation when the individual who made the comment may have had no intention whatever of soliciting a contribution. Such a result is not dictated by BCRA's statutory language, and would raise constitutional concerns." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,087. Defendant therefore rejected comments concerning "whether the concept of soliciting should apply to a series of conversations which, when taken together, constitute a request for contributions or donations." *Id.* The Commission also explained that it wanted to "avoid ambiguity, vagueness and confusion as to what activities or conversations would constitute solicitations." Contribution Limitations & Prohibitions, 67 Fed.Reg. 69,928, 69,942 (Nov. 19, 2002). "By using the term 'ask,' the Commission defined 'solicit' to require some affirmative

verbalization or writing, thereby providing members of Congress, candidates and committees with an understandable standard." *Id.; see also id.* (noting that the term "suggest" is too vague, and that the Commission "believes" the term "ask" "capture[s]" "more direct verbalizations or writings captured by terms such as 'demand,' 'instruct,' or 'tell[.]' "). As for the definition of "direct," the Commission explained that its definition of the term derived from its conclusion "that a precise definition in this context is necessary to avoid vague and overbroad application of the term." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,087.

Plaintiffs argue that the definitions of these terms run contrary to Congress's intent as demonstrated in the express terms of BCRA. Pls.' Mem. at 32. They contend that the "plain meaning of both 'solicit' and 'direct' is far broader" than the definitions promulgated by the Commission. *Id.* Citing to dictionaries, Plaintiffs argue that

[t]he common understanding of "solicit" is not only to "ask," but also more generally "to seek eagerly or actively," "to seek to affect," "to make petition to," and to "strongly urge." "Ask" by contrast, is commonly understood to be more limited, encompassing only those communications in which the speaker "call[s] upon for an answer" or "put[s] a question about."

Pl.'s Mem. at 32 (quoting Webster's Third New International Dictionary 2169, 128 (1981) [44]) (footnote omitted). *Chevron*'s step one requires this Court to ask if "Congress has directly spoken on the precise question at issue," because courts and agencies "must give effect to the unambiguously expressed intent of Congress."

44. Plaintiffs cite to this dictionary as having been published in 2002. A review of their submission of the relevant pages from the

dictionary reveals that the dictionary they cite to was published in 1981. *See* Pls.' Ex. 110.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. "A statute is considered ambiguous if it can be read more than one way." *AFL–CIO,* 333 F.3d at 173. Since Plaintiffs acknowledge that one "common understanding of 'solicit' is . . . to 'ask,' " they have acknowledged that the term has more than one meaning and is therefore ambiguous.[45] As this Circuit has noted, the term " 'solicit' can, of course, mean a variety of things." *Martin Tractor Co. v. Federal Election Commission,* 627 F.2d 375, 383 (D.C.Cir.1980).[46] Therefore, the FEC's definition of solicit survives *Chevron* step one.

■ As for the term "direct," Plaintiffs argue that

the common understanding of the term "direct" bears little relationship to that of "ask." To "direct" means to "show or point out the way for," "to assist by giving advice, instruction, or supervision," or "to point out, prescribe, or determine a course or procedure." One thus "directs" a particular result by telling another to do an act or by showing him or her how to do so. Under the FEC's definition of "direct," however, such communication would not constitute "direction" because it would not "call for an answer" or "put a question

about" the contemplated act. Indeed, under the FEC's definition of "direct," a speaker could literally state, "I direct you to make a contribution" without being deemed to have "direct[ed]" a contribution within the meaning of BCRA. Plainly this was not Congress's intent, nor was it Congress's intent to exempt more likely statements such as "X is a fine organization; you should consider giving it $10,000."

Pls.' Mem. at 33–34 (quoting Webster's Third New International Dictionary 640 (1981)) (footnote omitted). The Commission's position is that the term was not defined by Congress, and instead was left to the agency to define. Def.'s Mem. at 47. The FEC claims its

definition of "to solicit" as "to ask" is . . . entirely consistent with its common definition. *See e.g.,* Random House Dictionary of the English Language (unabridged ed.1983) at 1354 ("1. to seek for by entreaty, earnest or respectful request, formal application, etc.") The Commission's decision to define "direct" in a similar manner properly reflects its placement in the statute in close association with "solicit," and is also consistent with the word's normal definition. *See id.* at 407 ("4. to give authoritative in-

---

**45.** Defendant points out that Webster's Third New International Dictionary, relied on by Plaintiffs, lists "ask" as a synonym of "solicit." Def.'s Opp'n at 38 (quoting Webster's Third New International Dictionary 2169 (1981)); *see also* Pls.' Ex. 110.

**46.** Plaintiffs rely on the case of *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992) ("*Wrigley*"), in support of their argument that the term "solicit" on its face means more than merely to "ask." Pls.' Mem. at 32–33. There, the Supreme Court was faced with the task of interpreting the term "solicitation." *Wrigley,* 505 U.S. at 223, 112 S.Ct. 2447. The Supreme Court found that " '[s]olicitation,' commonly under-

stood, means '[a]sking' for or 'enticing' to, something...." *Id.* (quoting Black's Law Dictionary 1393 (6th ed.1990)). However, the Supreme Court, not engaged in *Chevron* analysis, then determined it to be "evident that in this statute the term includes, not just explicit verbal requests for orders, but also any speech or conduct that implicitly invites an order." *Id.* Although the *Wrigley* Court reached the result Plaintiffs seek here, it did so without the constraints of *Chevron* analysis. Moreover, applied to the present case, the *Wrigley* opinion supports Defendant's view not only that the term is susceptible to different meanings, but that defining "solicit" as "to ask" is an acceptable construction of the term. *Id.*

structions to; commend; order or ordain (something): *I directed him to leave the room.*").

*Id.* at 48 (emphasis in original). Defendant also notes that because the terms "are used in the statute to regulate the content of speech, these terms should be precisely defined." *Id.; see also* Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,087 (quoted *supra* at 63).

Defendant has provided no dictionary definition that supports equating the term "direct" with "ask." The Commission has cited to the Random House Dictionary of the English Language's definition of "direct" as "to give authoritative instructions to; command; order or ordain (something): *I directed him to leave the room.*" Def.'s Mem. at 48 (citing Random House Dictionary of the English Language 1354 (unabridged ed.1983)). Defendant also cites to Webster's Third New International Dictionary, relied on by Plaintiffs, contending that it provides that "direct" can mean "to request or enjoin . . . ." Def.'s Opp'n at 38. A review of that dictionary definition reveals that the definition states in full:

> 5 a: to request or enjoin esp. with authority <the judge ~*ed* the clerk to pass him the paper> <the resolution ~*ed* the commission to prepare proposals> <I ~ my executors to present my library intact to my alma matter>; *also:* to issue an order to <Lee ~*ed* Jackson to make a wide march to the southwest.

Webster's Third New International Dictionary 640 (1981) (Pls.' Ex. 110). It is clear from a full reading of this definition that "direct" means more than merely to "request" or to "ask;" rather, this definition defines the term to mean a request that is expected to be followed due to a power relationship between the person asking and the person being asked.

However, this Court's task at *Chevron* step one, is to determine whether "Congress has directly spoken on the precise question at issue . . . . for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. The Court finds that the word "direct," like most words in the English language, can be read in more than one way. For example, the word can mean "[t]o guide (something or someone)," as in to inform someone of where they can make a donation. Black's Law Dictionary 471 (7th ed.1999). The word can also mean "[t]o instruct (someone) with authority," as in to order someone to make a donation. *Id.* Given these different meanings, the Court must find that the FEC's definition of "direct" survives *Chevron* step one. *See AFL–CIO,* 333 F.3d at 173.

Turning to *Chevron* step two, the Court first addresses the Commission's definition of "direct." At this stage of the analysis, the Court inquires whether the "agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. The Court finds that the FEC's definition of "direct" is not a permissible construction of the term as it is found in BCRA. First, as discussed *supra,* the FEC's definition of the term "direct" as meaning "to ask" is a definition foreign to every dictionary brought before this Court. It is difficult to deem a construction permissible when it does not comport with any definition of the statutory term.

Defendant contends that its definition of "direct" is similar to that it ascribed to the term "solicit," which "properly reflects its placement in the statute in close association with 'solicit' . . . ." Def.'s Mem. at 48. The Commission, however, provides no support for this proposed canon of statutory construction which would purportedly permit an agency to ascribe a foreign meaning to a term by virtue of its place-

ment in relation to other terms. *See id.* Plaintiffs respond that the FEC's definition of "direct" is subsumed by its definition of "solicit," which renders the term superfluous, violating another canon of statutory interpretation. Pls.' Opp'n at 32; Pls.' Mem. at 34–35. A "cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant." *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). However, as Defendant notes, any work that a phrase or term is construed to perform, even if slight, is "enough to bar the rule against redundancy from disqualifying an otherwise sensible reading." *Gutierrez v. Ada,* 528 U.S. 250, 258, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000); Def.'s Opp'n at 38 n. 58. The problem for Defendant is that here "direct," as defined by Defendant, does absolutely no work. Defendant argues that "[a]lthough [the terms 'solicit' and 'direct'] are broadly defined and may overlap in certain situations,

the Commission was careful to make clear that 'direct' includes a request to give funds to a third party when the potential contributor has already expressed an intent to make a contribution." Def.'s Opp'n at 38 n. 58. However, a request for funds made to someone who has expressed such an intent is covered by the definition of "solicit." The Commission's definition of "solicit" covers all requests, regardless of what expressions a requestee may or may not have made. *See* 11 C.F.R. § 300.2(m) (quoted *supra* at 74). Irrespective of the merit of Defendant's position that the definition of the term "direct" should be influenced by its proximity to the term "solicit," it is clear that such a construction is not only out of line with the dictionary definition and common understanding of "direct," but also renders the term superfluous, providing another reason for finding that the Commission's construction is impermissible and entitled to no deference under the *Chevron* analysis.[47]

47. The FEC also claims that the Supreme Court's decision *McConnell* supports its definition of the disputed terms. Def.'s Mem. at 49. It contends that the *McConnell* Court relied on "the narrowly tailored definitions of 'solicit' and 'direct'" in the regulations "in upholding" the constitutionality of 2 U.S.C. § 441i(a) "against a claim of overbreadth." Def.'s Mem. at 49 (citing *McConnell,* 124 S.Ct. at 670). A review of the *McConnell* decision demonstrates that, as Plaintiffs contend, the Supreme Court's "passing reference [was] not an endorsement or an expression of approval" of the Commission's regulations. Pls.' Opp'n at 33.

In deciding the constitutionality of 2 U.S.C. § 441i(a), the *McConnell* Court addressed the argument that 2 U.S.C. § 441i(a) was "unconstitutional because it impermissibly interferes with the ability of national committees to associate with state and local committees." *McConnell,* 124 S.Ct. at 670. The *McConnell* plaintiffs pointed to the Republican Party's "Victory Plans," "whereby the [Republican National Committee ("RNC")] acts in concert with state and local committees of a given

State to plan and implement joint, full-ticket fundraising and electioneering programs." *Id.* The Supreme Court responded to the *McConnell* plaintiffs' contention that the provision "outlaws *any* participation in Victory Plans by RNC officers, including merely sitting down at a table and engaging in collective decisionmaking about how soft money will be solicited, received and spent," thereby violating their First Amendment rights to associate. *Id.* (emphasis in original). The Supreme Court deemed this argument to constitute

> an unnaturally broad reading of the terms "spend," "receive," "direct," and "solicit." Nothing on the face of [2 U.S.C. § 441i(a)] prohibits national party officers ... from sitting down with state and local party committees or candidates to plan and advise how to raise and spend soft money. As long as the national party officer does not personally spend, receive, direct, or solicit soft money, [2 U.S.C. § 441i(a)] permits a wide range of joint planning and electioneering activity.... [T]he principal drafters and proponents of the legislation[ ] concede as much.

Turning to the word "solicit," as the Court noted *supra*, one of the dictionary definitions of the word is "to ask," which makes the Commission's construction permissible on its face under *Chevron* step two. However, the Court also asks at this stage whether "the Commission's interpretation of ["solicit"] is reasonable 'in light of the language, legislative history, and policies of the statute.'" *Republican Nat'l Comm. v. Federal Election Commission*, 76 F.3d 400, 406 (D.C.Cir.1996), *cert. denied*, 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting *Natural Res. Def. Council v. United States Environmental Protection Agency*, 822 F.2d 104, 111 (D.C.Cir.1987)); *see also Orloski*, 795 F.2d at 164 ("If the FEC's interpretation unduly compromises the Act's purposes, it is not a reasonable accommodation under the Act, and it would therefore not be entitled to deference.") (internal quotation marks omitted).

The *McConnell* Court observed that "Title I [of BCRA] is Congress' effort to plug the soft-money loophole." *McConnell*, 124 S.Ct. at 654. The purpose behind 2 U.S.C. § 441i(a), "[t]he core of Title I" of BCRA, was "to put a stop to" the practice of national parties "us[ing] vast amounts of soft money in their efforts to elect federal candidates," *id.* at 660, or, in other words, to "take[ ] national parties out of the soft-money business," *id.* at 654. "The remaining provisions of [2 U.S.C. § 441i] largely reinforce the restrictions of" 2 U.S.C. § 441i(a)." *Id.* The Supreme Court found that the provision was justified by the governmental interests of preventing corruption and the appearance of corruption, finding that "[b]oth common sense and the ample record in these cases confirm Congress' belief that" "large *soft-money* contributions to national party committees have a corrupting influence or give rise to the appearance of corruption." *Id.* at 661 (emphasis in original); *see also id.* at 661–66 (detailing the evidence supporting "Congress' determination that large soft-money contributions to national political parties give rise to corruption and the appearance of corruption."). Given that the aim of the statutory provision is "to put a stop" to the national political parties' involvement with nonfederal money, as well as the danger of corruption and the appearance of corruption that arose from that interaction in the past, it is clear to the Court that Congress intended that the term "solicit" would cover conduct beyond "ask[ing]" for nonfederal donations to be given to other entities.[48] The Commission's definition of "solicit" "require[s] some affirmative verbalization or writing,"

---

*Id.* (citation omitted). The Supreme Court then noted that

> [t]he FEC's current definitions of [2 U.S.C. § 441i(a)'s] terms are consistent with that view. *See, e.g.*, 11 C.F.R. § 300.2(m) (2002) (defining "solicit" as "to *ask* ... another person" (emphasis added)); § 300.2(n) (defining "direct" as "to *ask* a person who has expressed an intent to make a contribution ... to make that contribution ... including through a conduit or intermediary" (emphasis added)). . . .

*Id.* While the Supreme Court did mention the FEC's regulations to buttress its conclusion that the provision did not violate plaintiffs' associational rights, the regulations were not the basis of its decision, nor did the *McCon-* *nell* Court purport to conduct a *Chevron* analysis of the regulations. What the Supreme Court's opinion does provide, however, is a definite area of conduct that it has declared 2 U.S.C. § 441i(a) does not affect and was not intended to affect. Nowhere do the current Plaintiffs argue that the regulations should be changed to capture Victory Plan-like conduct, and a plain reading of the statute does not encompass such conduct. Accordingly, the Court rejects this argument.

**48.** The Court observes that if Congress had intended to cover only express requests for nonfederal donations, it could have used the word "ask" in the statute.

in order to "provid[e] members of Congress, candidates and committees with an understandable standard." Contribution Limitations & Prohibitions, 67 Fed.Reg. at 69,942. The purpose of Title I of BCRA is to divorce national political parties, as well as candidates for federal office and federal officeholders, from the nonfederal money business. To permit such individuals and entities to funnel nonfederal money into different organizations by simply not "asking" the donors to do so, but using more nuanced forms of solicitation, would permit conduct that would render the statute largely meaningless. Such a regime would not be unlike that under pre-BCRA FECA, where the "express advocacy" rule permitted labor unions and corporations to avoid regulation by simply avoiding *Buckley*'s magic words, which effectively permitted such groups to sidestep FECA's prohibitions. *See McConnell*, 124 S.Ct. at 689. By avoiding direct "verbalizations or writings," national political party committees, candidates for federal office and federal officeholders could effectively and legally, under the current FEC regime, solicit nonfederal money. These facts make it is clear that Congress intended for "solicit" to encompass more than just affirmative oral or written requests for nonfederal donations, and that to permit the term "solicit" to be limited by the Commission's definition would "unduly compromise[ ] the Act's purposes" and "create the potential for gross abuse." *Orloski*, 795 F.2d at 164, 165.[49]

In making this determination, the Court is not insensitive to the constitutional and practical difficulties the FEC faces in promulgating such regulations. The Commission maintains that its "construction takes into consideration First Amendment values by adopting a bright-line test to minimize concerns 'that the ability to impute intent could lead to finding a violation when the individual who made the comment may have had no intention whatever of soliciting a contribution.'" Def.'s Opp'n at 39 (quoting Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,087). While it is true that "an administrative agency may be influenced by constitutional considerations in the way it interprets or applies statutes," *Branch v. Federal Communications Commission*, 824 F.2d 37, 47 (D.C.Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), the FEC's duty to "allow the maximum of first amendment freedom of expression in political campaigns" must be exercised in a manner "commensurate with Congress' regulatory aims," *Common Cause v. Federal Election Commission*, 842 F.2d 436, 448 (D.C.Cir.1988). The Court has already found that the FEC's definition of the word "solicit" is incongruent with Congress's legislative purpose in enacting BCRA.

Moreover, as Plaintiffs point out, the Commission has already addressed the word "solicit" in other provisions of BCRA in a broader manner. Pls.' Mem. at 36. For example, FECA provides that it is illegal for unions and corporations, or a separate segregated fund established by a corporation or a union, "to solicit contributions to such a fund" from any person other than, in the case of the corporation, its "stockholders and their families and its executive or administrative personnel and their families," and in the case of the union, from "any person other than its members and their families." 2 U.S.C. § 441b(b)(4)(A)(i)-(ii). In its 2001 Campaign Guide for Corporations and Labor

---

49. The Court notes that this rationale also serves as an alternative holding to the challenge to the regulation defining "direct."

Organizations, the FEC instructed that certain forms of communications could constitute solicitations even though they were not "straightforward request[s] for contributions ...." FEC, Campaign Guide for Corporations and Labor Organizations 24 (2001) (Pls.' Ex. 158). Plaintiffs also cite to numerous FEC Advisory Opinions where "the FEC has consistently held that 'solicitation' occurs when the corporation or union informs individuals from whom it may not solicit funds that the PAC may accept *unsolicited* contributions from them, encourages support for the PAC, facilitates contributions, or praises those who have contributed in a communication that is broadly distributed." Pls.' Mem. at 36 & n. 61.[50] Defendant does not address this point in its Opposition brief, except to argue that its past practices do not support Plaintiffs' legislative reenactment doctrine arguments. *See* Def.'s Opp'n at 14–15 & n. 26, 37–39. Nowhere does the Commission explain, either in its comments in the Federal Register, or its briefing before this Court, why constitutional concerns demand such a narrow definition of "solicit" under the nonfederal money regulations, but not under the corporate/union PAC regulations. Given this silence and the Commission's apparent ability to define the word "solicit" in a broader way without creating vagueness concerns, the Court is confident that it can do so with regard to the nonfederal money regulations without running afoul of the Constitution.

The Court therefore finds that the Commission's regulations defining the terms "solicit" and "direct" fail *Chevron* review.

### b. Definition of "Agent"

■■■ BCRA's prohibition on national political party committees' involvement with nonfederal money extends to "agent[s] acting on behalf of such a national committee." 2 U.S.C. § 441i(a)(2), (d). BCRA also prohibits "State, district, or local committee[s] of a political party (including an ... agent acting on behalf of such committee ...)" from expending or disbursing nonfederal funds on "Federal election activit[ies]." *Id.* § 441i(b)(1). "[A]gent[s] of a candidate or an individual holding Federal office," are also generally barred from involvement with nonfederal money, and "agent[s]" of candidates for state or local office or individuals holding state or local office are also subject to restrictions regarding involvement with nonfederal money related to certain political communications. *Id.* §§ 441i(e)(1), (f)(1). BCRA did not define the term "agent," Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082, but the FEC's new regulations apply a definition for the term as it applies to the Commission's nonfederal money regulations, 11 C.F.R. § 300.2(b). The regulation begins by stating that "[f]or purposes of part 300 of chapter I, agent means any person who has actual authority, either express or implied, to engage in any of the following activities on behalf of the specified persons ...." *Id.* In promulgating the new definition, the Commission made clear "that the definition of 'agent' is limited to those individuals who have actual authority, express or implied, to act on behalf of their principals and does not apply to individuals who do not have any actual authority to act on

---

50. *See, e.g.,* Pls. Ex. 119 (FEC Advisory Op.2000–07 at 5 (May 31, 2000)) ("'[T]he Commission concluded that solicitation would occur where a newsletter stated the amounts raised and spent by the [separate segregated fund ("SSF")], the methods used

by the SSF to determine its contribution recipients, and the number of employees participating in the past year, and contained a quotation from the fund's chairman commending the enthusiasm of those employees.'").

their behalf, but only 'apparent authority' to do so." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082. The FEC justified its exclusion of apparent authority from the definition, noting that

"[A]pparent authority to do an act is created as to a third party by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third party to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency, 27. As has been noted by commenters, apparent authority is largely a concept created to protect innocent third parties who have suffered monetary damages as a result of reasonably relying on the representations of individuals who purported to have, but did not actually have, authority to act on behalf of principals. Unlike other legislative areas, such as consumer protection and anti-fraud legislation, BCRA does not affect individuals who have been defrauded or have suffered economic loss due to their detrimental reliance on unauthorized representations. Rather, the Commission interprets Title I of BCRA to use agency concepts to prevent evasion·or avoidance of certain prohibitions and restrictions by individuals who have actual authority and who do act on behalf of their principals. In this light, apparent authority concepts are not necessary to give effect to BCRA.

*Id.*

The Restatement defines "apparent authority" as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1958). This concept is different from "authority," which the Restatement defines as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." *Id.* § 7.[51] This Circuit has explained that

"[a]pparent authority" exists where the principal engages in conduct that "reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1992). For there to be apparent authority, however, the third party must not only believe that the individual acts on behalf of the principal but, in addition, "either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." *Id.* at cmt. a.

*Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 266 (D.C.Cir.1998).

Plaintiffs contend that the exclusion of agents acting with apparent, but not actual, authority "opens a gaping new loophole and sharply departs from general agency principles, governing case law, and the Commission's own precedents." Pls.' Mem. at 42. Plaintiffs claim that the regulation violates *Chevron* step one, arguing that the definition runs contrary to Congress's intent and the purposes behind

---

**51.** The Restatement notes that "most authority is created by implication," as generally the principal does not "specify minutely what the agent is to do." Restatement (Second) of Agency § 7 cmt. c. Powers can be "implied or inferred from the words used, from customs and from the relations of the powers." *Id.* Such authority is what is referred to as "implied authority."

BCRA. *Id.* at 43, 46. They also argue, in the alternative, that the regulation violates *Chevron* step two and "the APA's requirements for a 'reasoned analysis' of the rulemaking issues and evidence." *Id.* at 47.

Again, in reviewing an agency's regulation under step one of the *Chevron* analysis, the Court asks "whether Congress has directly spoken on the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. The question here is whether or not Congress, in enacting BCRA, intended for the term "agent" to include those individuals acting with actual *and* apparent authority. Plaintiffs begin their argument that Congress had such intent by stating that "it is irrational to construe a statute designed to combat the *appearance* of corruption as leaving unregulated the acts of agents exercising *apparent* authority," but offer no elaboration. Pls.' Mem. at 43 (emphasis in original); Pls.' Opp'n at 36 (same). The Court does not find the linguistic similarities between the phrases "appearance of corruption" and "apparent authority" provide any illumination on Congress's intent with respect to the meaning of the word "agent." As Defendant notes, Plaintiffs "do not explain how persons acting with apparent authority have had any special role in creating an appearance of corruption, and plaintiffs point to no evidence before the Commission that agents with apparent, but not

actual, authority have contributed to this perception." Def.'s Opp'n at 36.

Next Plaintiffs contend that the FEC "had consistently defined 'agent' to include those with apparent authority." Pls.' Mem. at 43–44. They cite to a former rule that had defined "agent" in connection with regulations defining independent expenditures to mean

> any person who has actual oral or written authority, either express or implied, to make or to authorize the making of expenditures on behalf of a candidate, or means any person who has been placed in a position within the campaign organization where it would reasonably appear that in the ordinary course of campaign-related activities he or she may authorize expenditures.

11 C.F.R. § 109.1(b)(5) (2001). They argue that given this background, it is clear that "Congress crafted new statutory provisions using 'a well established term,' which strongly suggests its intent for 'the term to be construed in accordance with pre-existing regulatory interpretations.'" Pls.' Mem. at 44 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193–94, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)).[52] However, Plaintiffs have not provided any connection between Congress's use of the term "agent" in Title I of BCRA and the FEC's prior regulation con-

---

52. The Court takes this opportunity to note that Plaintiff also cites to comments made in the FEC's General Counsel's Report of November 10, 1994, as supporting the argument that the FEC had consistently interpreted the term "agent" to include those with apparent authority. Pls.' Mem. at 44 & n. 75. This report was submitted with Plaintiffs' Motion for Summary Judgment as Plaintiffs' Exhibit 156. Defendants object to consideration of Exhibit 156, claiming that the report was "released before the Commission accepted comments on its proposed rulemakings, but was not submitted to the Commission by plaintiffs or anyone else." Def.'s Mot. to Strike at 5. The Court need not resolve this matter as it does not affect the Court's deliberations. First, it is not apparent how the FEC's General Counsel's post-BCRA enactment report can provide any basis for discerning Congress's intent in passing the statute. There is no canon of construction the Court is aware of, and none is cited by the parties, which states that the agency's General Counsel's views carry weight in this area. Second, even if the Court were to consider the General Counsel's views, those views would not persuade the Court that Plaintiffs' version of the meaning of the term "agent" is well established.

struing the term as it related to independent expenditures, nor have they established that the FEC's construction of the term "agent" was well established. The Court does not find the fact that a 2001 regulation defined the term "agent" renders the term "well established." [53] Plaintiffs also rely on the legislative reenactment doctrine. Pls.' Mem at 17 & n. 31, 25, 36, 44. Given the Court's prior discussion of this doctrine, *supra* at 60, and the fact that Plaintiffs have pointed the Court to nothing that indicates that Congress intended to have the FEC's regulatory definition of "agent" apply to Title I of BCRA, the Court finds this argument lacks merit for the purposes of its *Chevron* step one analysis.

Next, Plaintiffs point out that the Supreme Court has held that it is "well established that 'where Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); Pls.' Mem. at 44. However, Plaintiffs provide no basis for the conclusion that the term "agent" has developed a "settled meaning under ... the common law," or that the meaning includes those acting with apparent authority. Plaintiffs point out that the FEC

"*admits* that 'under the common law of agency, an "agent's authority may be actual or apparent.'" " *Id.* at 44–45 (emphasis in original) (quoting Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082). This statement, however, does not support the notion that the common law definition of "agent" necessarily includes those acting with apparent authority. In fact, Black's Law Dictionary provides that the term in its normal parlance does not include those acting with apparent authority, defining "agent" to mean "[o]ne who is authorized to act for or in place of another; a representative." Black's Law Dictionary 64 (7th ed.1999). Moreover, those acting with apparent authority are not in fact agents; they are only treated as such in situations where they appear to be agents to third parties due in part to the "principal's" manifestations to those third parties. Restatement (Second) Agency § 8; *see also Overnite Transp. Co.,* 140 F.3d at 266. Accordingly, the Court concludes that the term "agent" does not have a settled common law meaning that includes those acting with apparent authority.

Plaintiffs also attack the FEC's "illogic[al]" E & J for excluding apparent authority from the definition of "agent," and claim that the definition will undermine Congress's goals in passing BCRA, in their effort to establish that the regulation fails *Chevron* step one. Pls.' Mem. at 45–47.

---

**53.** In *Williams,* the case cited by Plaintiffs in support of this argument, the Supreme Court interpreted the Americans with Disabilities Act's ("ADA") statutory definition of "disability." *Williams,* 534 U.S. at 193, 122 S.Ct. 681. The *Williams* Court noted that "Congress drew the ADA's definition of disability almost verbatim from the definition of 'handicapped individual' in the Rehabilitation Act, and Congress' repetition of a well-established term generally implies that Congress intended the term to be construed in accordance with preexisting regulatory interpretations." *Id.* at 193–94, 122 S.Ct. 681 (citation omitted); *see*

*also id.* at 194, 122 S.Ct. 681 (noting that the ADA included a statutory provision directing that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act ... or the regulations issued by Federal agencies pursuant to such title.' 42 U.S.C. § 12201(a) (1994 ed.)."). There is nothing before the Court that indicates such a relationship between the FEC's former definition of "agent" and the enactment of Title I of BCRA.

The Court, however, finds that these arguments are more appropriately addressed under the second prong of the *Chevron* analysis. *See Orloski*, 795 F.2d at 163–64. Accordingly, having considered Plaintiffs' *Chevron* step one arguments, the Court finds that the FEC's definition of "agent" in 11 C.F.R. § 300.2(b) does not violate *Chevron* step one because it is not clear that Congress intended for the term "agent" to include those acting with apparent authority. *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778.

Turning to the second prong of the *Chevron* analysis, the Court asks whether the Commission's regulation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. This Circuit has held that "the FEC's interpretation of [FECA] should be accorded considerable deference." *Orloski*, 795 F.2d at 164. The Court's task under *Chevron* step two, is not to decide whether or not the Commission's construction is one this Court "would have reached if the question had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Nor is the Court's task to assess the "wisdom of [the FEC's] policy choices." *Id.* at 866, 104 S.Ct. 2778. However, if the FEC's choice "unduly compromises the Act's purposes," it is not "entitled to deference." *Orloski*, 795 F.2d at 164.

As an initial matter, the Court finds that the FEC's definition of the term "agent"

is, at least on its face, a "permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. As noted *supra*, the term "agent" is subject to different interpretations and the FEC's interpretation of the term complies with an acceptable interpretation of the statute. Furthermore, although the Court believes that extending the term to include those acting with apparent authority would not be an abuse of the FEC's authority under FECA, the Commission's construction of the term "agent" is faithful to the literal terms of the statute. The statute speaks only of "agent[s]," and Plaintiffs do not claim that the regulation does not encompass those who are indeed agents of the entities prohibited from involvement with nonfederal money. What Plaintiffs complain of is that the definition of "agent" does not extend to those acting with apparent authority—those who are not actually authorized to engage in the prohibited conduct but who appear to have such authority. Such individuals are therefore not technically "agents" with regard to the activity at issue; it is only by their actions and those of their "principal" that they are deemed to act as agents for purposes of establishing liability. *See* Restatement (Second) of Agency § 8 & cmt. a (2004).[54] While it may be true, as Plaintiffs contend, that apparent authority is easier to establish than actual authority "because it is based on an objective, reasonable person

---

54. The Restatement's comment provides in part:

> If [apparent authority] exists, the third person has the same rights with reference to the principal as where the agent is authorized. In the relation between principal and agent, however, apparent authority differs from authority, in that the one having it may not be a fiduciary, may have no privilege to exercise it and may not even know he has it. Although normally it results from a prior relation of principal and agent, this is not necessarily the case. Further,

one who is authorized to act for the principal makes the latter a party to the transaction whether or not the third person believes the agent to be authorized or is even aware of the existence of the principal. On the other hand, apparent authority exists only with regard to those who believe and have reason to believe that there is authority; there can be no apparent authority created by an undisclosed principal.

Restatement (Second) of Agency § 8 cmt. a (2004).

standard and does not require a third party to prove what actually transpired between principal and agent," Pls.' Mem. at 43, that does not make the FEC's interpretation of the term untenable.[55] Moreover, the term as it is used in the provisions applying to national, state, district and local committees, 2 U.S.C. § 441i(a)-(b), (d), appears in the phrase "agent *acting on behalf*" of the entity, adding further support to the Court's conclusion that the FEC's construction of the term is permissible under the statute.

Plaintiffs contend that the "new regulation ... fail[s] *Chevron* step two" because "excluding agents with apparent authority from the scope of BCRA is unreasonable in light of the language, history, purposes, and objectives of Title I." Pls.' Mem. at 47 (incorporating arguments made under *Chevron* step one). Plaintiffs' main argument in this regard is that "Congress intended for Title I to sweep broadly in order to eliminate the pernicious soft-money system root and branch." Pls.' Mem. at 46. By excluding those acting with apparent authority from the nonfederal money regulations, "principals could evade liability by maintaining a studied ignorance of the activities undertaken by their subordinates." *Id.* at 46–47 (internal quotation marks omitted). Plaintiffs contend that

> so long as they kept their principals sufficiently ignorant of their particular practices—or at least communicated only through winks and nods—agents with apparent authority could exploit their positions to continue soliciting and directing soft money contributions, continue peddling access to their principals, and continue by virtue of their *apparent*

authority to perpetuate the *appearance* if not the reality of corruption.

*Id.* at 47 (emphasis in original). Defendant disputes Plaintiffs' characterization of the impact excluding those acting with apparent authority will have on the campaign finance regime. Def.'s Opp'n at 37. It notes that "[b]ecause the definition includes both 'implied' and 'express' authority, plaintiffs' speculation that the Commission's definition exempts a principal who communicates authority to an agent through 'winks and nods' is premature." *Id.* (citation omitted). Defendant also derides Plaintiffs' argument "that the rule provides insufficient incentive for principals to police their agents," contending that it "ignores the principals' liability for their agents' actions within their express or implied scope of authority." *Id.*

Plaintiffs' argument asks the Court to find that the FEC's definition of "agent" "unduly compromises the Act's purposes" and therefore is not entitled to deference. *Orloski*, 795 F.2d at 164. It is true that Congress in passing Title I aimed at ending the corruption or the appearance of corruption resulting from the involvement of national political committees and federal candidates with nonfederal money, and included several anti-circumvention measures in an effort to ensure that the nonfederal money ban was not evaded. *See McConnell*, 124 S.Ct. at 659–86. However, the Court finds that it cannot conclude that the regulation on its face *unduly* compromises the purposes of the Act. Unlike the Commission's regulations on coordination discussed *supra*, it is not readily apparent that the regulation on its face creates the potential for gross abuse. The Court agrees that a regulation that includ-

---

**55.** Nor does the fact that "[a]pparent authority, when present, often has the effect of reinforcing the legal effect of actual authority when actual authority has been conferred by the principal but is not readily provable by a third party," Pls.' Mem. at 43 n 73 (quoting Restatement (Third) of Agency § 2.03, cmt. c (Tentative Draft Nov. 2, 2001)), make the FEC's definition of "agent" impermissible.

ed within its scope those acting with apparent authority may better implement the statutory scheme of BCRA, and finds the Supreme Court's reasoning in *American Society of Mechanical Engineers, Incorporated v. Hydrolevel Corporation*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (*"ASME"*), gives it pause, but in the end simply finds Plaintiffs' concerns to be too amorphous and speculative at this stage to mandate the reversal of the Commission's regulation. Accordingly, the Court finds that the Commission's regulation survives *Chevron* review.

■ Plaintiffs also contend that the Commission's definition of "agent" violates the APA because the Commission failed to engage in a " 'reasoned analysis' of the rulemaking issues and evidence." Pls.' Mem. at 47. They criticize Defendant's E & J for failing

> to follow the governing analysis set forth in cases like *ASME*; fail[ing] altogether to consider whether exempting agents with apparent authority might perpetuate the appearance of corruption that BCRA was designed to eliminate; fail[ing] to evaluate the potential dangers of 'gross abuse' and circumvention that would be opened by allowing agents with apparent authority to operate just beyond BCRA's reach ...; fail[ing] to explain why it was necessary or appropriate to abandon the broad definition of "agent" that it had followed for the past generation; and fail[ing] to consider whether compliance with BCRA would be enhanced by placing the burden on principals to take reasonable steps to train and monitor *all* of their agents.

*Id.* at 47–48 (emphasis in original). Defendant does not respond to this argument directly. *See* Def.'s Opp'n at 35–37. From what the Court can discern, the closest the Commission comes to responding to this argument is its statement that

"the Commission's consideration of agency principles, as well as First Amendment concerns when candidates speak to supporters, ... explain why the Commission changed its definition when BCRA changed the statutory scheme." *Id.* at 37 (citing *id.* at 22–23, & *id.* at 15 n. 26 (for the proposition that "the legislative reenactment doctrine does not apply here.")).

As the Court has already discussed, although a Court's review of an agency's "reasoned analysis" is quite deferential, an "agency rule [is] arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. Moreover, "although not barred by statute, an agency's action is arbitrary and capricious [if] the agency has not considered certain relevant factors or articulated any rationale for its choice." *Republican Nat'l Comm.*, 76 F.3d at 407 (internal quotation marks omitted). In the case where an agency has "chang[ed] its course[, it] must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Bush–Quayle '92 Primary Comm. v. Federal Election Commission*, 104 F.3d 448, 453 (D.C.Cir.1997) (quoting *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841, 852 (D.C.Cir.1970)); *cf. Democratic Senatorial Campaign Comm.*, 454 U.S. at 37, 102 S.Ct. 38 ("[T]he thoroughness, validity and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling.").

In its E & J, the Commission did engage in a "consideration of agency principles," although the E & J is silent on the matter of "First Amendment concerns when can-

didates speak to supporters."[56] Def.'s Opp'n at 37; Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082. Despite its analysis of "agency principles," the E & J did not "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...." *Bush–Quayle '92 Primary Comm.*, 104 F.3d at 453. The previous definition of "agent" is not discussed, and its only reference is in the summary of BCRA's sponsors' comments. Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082. Therefore, while the agency provided an explanation for why agency principles supported the current definition, it did not make any effort to note the change in its view, let alone explain the advantages of the new definition over the old.

Moreover, the agency did not discuss the danger of circumvention or the appearance of corruption its construction of the term could invite. *See State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem...."). Instead, the Commission, after discussing the precepts of agency law, and concluding that apparent authority is a concept aimed at areas of law not implicated by BCRA, concluded that BCRA's use of agency concepts is "to prevent evasion or avoidance of certain prohibitions and restrictions by individuals who have actual authority and who do act on behalf of their principals. In this light, apparent authority concepts are not necessary to give effect to BCRA." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082. This circular and conclusory analysis does not discuss the potential for abuse or the appearance of corruption that could arise from the exclusion of "apparent agency"

from the definition of "agent." Given BCRA's silence on the matter of "apparent authority," the fact that the Commission had previously included such concepts in defining the term "agent," and Congress's obvious concern over circumvention and the appearance of corruption in enacting Title I of BCRA, the Commission's failure to consider these "relevant factors" is impossible to ignore. *See State Farm*, 463 U.S. at 43, 103 S.Ct. 2856.

In addition, while the agency's discussion of the rule includes an explanation of its concern about holding political parties accountable for actions they never authorized, Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,082–83, its analysis is simply incorrect. The Commission notes that by excluding those acting with apparent authority, "a party committee cannot be held liable for the actions of a rogue or misguided volunteer who purported to act on behalf of the committee, unless the committee's own written or spoken word, or other conduct, caused the volunteer to reasonably believe that the committee desired him or her to so act." *Id.* at 49,083. As noted *supra*, to have apparent authority, the "third party must not only believe that the individual acts on behalf of the principal but, in addition, 'either the *principal* must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief.'" *Overnite Transp. Co.*, 140 F.3d at 266 (quoting Restatement (Second) of Agency § 27 cmt. a (1992)) (emphasis added). Therefore, the Commission's main concern in excluding apparent authority from the definition is not supported by the law of agency, and therefore is not a "rational basis" for the agency's decision. *Bolden*, 848 F.2d at 205.

---

**56.** It is not clear to the Court how this concern is implicated by how the term "agent" is defined by the FEC, and the FEC provides no elaboration on this point. Def.'s Opp'n at 37.

For these reasons the Court must conclude that the Commission's regulation defining the term "agent" to exclude those acting with "apparent authority" is arbitrary and capricious and therefore violates the APA.

### c. Regulation Governing State Party Fundraisers

 BCRA restricts the ability of federal candidates and officeholders to raise, solicit, receive, direct, or spend nonfederal money "in connection with an election for Federal office." 2 U.S.C. § 441i(e), (b)(2)(C). "Notwithstanding [these restrictions], a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party." Id. § 441i(e)(3). The Commission's regulations implementing this exception provide that "[c]andidates and individuals holding Federal office may speak at such events without restriction or regulation." 11 C.F.R. § 300.64(b). The Commission explained its formulation of this regulation in a notice published in the Federal Register.

> This conclusion is compelled by the plain language of the section and the structure of the section within BCRA. The structure of the statute requires the Commission to construe the provision as a total exemption to the solicitation prohibition, applicable to Federal candidates and officeholders, when attending and speaking at party fundraising events, because the statutory section is styled as such. To conclude otherwise would require the Commission to read the restrictions itemized in the general prohibition into a statutory exemption that clearly and unambiguously excludes those restrictions by it [sic] own terms. It would also require the Commission to regulate and potentially restrict what candidates and officeholders say at polit-

ical events, which is contrary to the plain meaning of the statutory exemption and would raise serious constitutional concerns.

Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,108.

Plaintiffs protest that this regulation permits "federal candidates and officeholders to engage in overt and blatant solicitation and direction of soft money in connection with federal elections so long as they do so in the context of what is deemed 'a fundraising event for a State, district or local committee of a political party.'" Pls.' Mem. at 48–49 (quoting 11 C.F.R. § 300.64). This result, Plaintiffs contend, runs "contrary to Congress's clearly expressed intent, represents an unreasonable interpretation of BCRA, and violates the APA in numerous other respects." Id. at 49.

Examining the regulation under Chevron step one, the Court looks to see if Congress's intent on this matter is clear using traditional tools of statutory construction. Chevron, 467 U.S. at 842–43, 104 S.Ct. 2778; Hawke, 211 F.3d at 643. The statutory provision at issue makes clear that while candidates for federal office and federal officeholders may not "solicit" or "direct" nonfederal funds "in connection with an election for Federal office," 2 U.S.C. § 441i(e)(1), such persons are permitted to "attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party," id. § 441i(e)(3). The FEC construed this provision to constitute "an exception from the application of the restriction on solicitation speech in section 441i(e)(1) when a candidate or officeholder appears at a state party fundraiser." Def.'s Mem. at 62. Plaintiffs claim that this is an incorrect interpretation of the plain language of the statute. First, Plain-

tiffs note that nowhere in 2 U.S.C. § 441i(e)(3) did Congress use the word "solicit," "a word Congress knew how to use, as is evident elsewhere in BCRA." Pls.' Mem. at 49. Moreover, the statute merely permits the covered individuals to "speak," "it does not state such a person may 'speak without restriction or regulation.'" *Id.* However, as Defendant observes, "if Congress had wanted to adopt a provision allowing Federal officeholders and candidates to attend, speak, and be featured guests at state party fundraisers but denying them permission to speak about soliciting funds, Congress could have easily done so." Def.'s Opp'n at 41.

Next, Plaintiffs argue that the "'notwithstanding' clause 'signals the drafter's intention that the provisions of the "notwithstanding" section override *conflicting* provisions of any other section.'" Pls.' Mem. at 49 (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)) (emphasis added by Pls.). Plaintiffs contend that Section (e)(3) therefore overrides the "general anti-solicitation ban only to the extent there is a conflict between the two," and that since the "notwithstanding clause" says nothing about solicitation, "the general prohibition controls." *Id.* at 49–50, 113 S.Ct. 1898. In other words, Plaintiffs' position is that the provision merely ensures that attending, speaking at, or being a featured guest at a state political party fundraising event, is not to be considered *per se* solicitation. Plaintiffs note that

> [h]ad Congress intended to allow solicitation, it would have done so explicitly, as it did in both the subsection immediately preceding § 441i(e)(3) and the one immediately following. These provisions confirm that Congress knew how to create exceptions to the general solicitation ban when it so intended. Section 441i(e)(2) allows "solicitation" by a federal officeholder or candidate who is

"also a candidate for a State or local office solely in connection with such election for State or local office," subject to various restrictions, which Section 441i(e)(4) allows a federal officeholder or candidate to make solicitations in certain circumstances and for certain purposes.

Pls.' Opp'n at 37; *see also* Pls.' Mem. at 50.

The Commission responds that the Supreme Court in *Cisneros* also observed that "Courts of Appeals generally have interpreted similar notwithstanding language to supersede all other laws, stating that a clearer statement is difficult to imagine." *Cisneros*, 508 U.S. at 18, 113 S.Ct. 1898 (internal quotation marks and punctuation omitted). "Accordingly, ... the Commission construed the 'notwithstanding' proviso as an exemption that allows candidates to 'speak' about raising money during [designated] fundraising events, despite the general restrictions on fundraising...." Def.'s Opp'n at 40. The Commission also asserts that the inclusion of the "notwithstanding" language demonstrates that "Congress must have seen a conflict between" Section (e)(3) and the general prohibition on nonfederal money solicitation. *Id.* at 41. Moreover, it cites to the cross-references in the statute between the provisions banning certain nonfederal money activities and Section (e)(3) as further "indicat[ion] that state or local party fundraising events are not governed by any such restrictions." *Id.* at 41.

After reviewing the parties' arguments, the Court determines that the provision is ambiguous in that it can be read in more than one way. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *AFL–CIO*, 333 F.3d at 174. Read in the context of the other provisions of the Act, Section (e)(3) can be read to either be a carve-out for unabashed solicitation by federal candidates and officeholders at state, district or local

committee fundraising events, or to simply make clear that merely attending, speaking, or being the featured guest at such an event is not to be construed as constituting solicitation *per se*. While it is true that Congress created carve-outs for its general ban in other provisions of BCRA utilizing the term "solicit" or "solicitation," *see* 2 U.S.C. § 441i(e)(2), (4), these provisions do not conflict with the FEC's reading of Section (e)(3). Moreover, while these provisions may suggest that Section (e)(3) was not meant to be read as a complete carve-out in the context of certain fundraising events, they do not clearly bar such an interpretation. Given this ambiguity, the Court must conclude that the provision survives *Chevron* step one.[57]

Turning to step two of the *Chevron* analysis, Plaintiffs contend that Congress's statutory purpose would be seriously compromised by the Commission's interpretation of the statute. Pls.' Mem. at 50. The Supreme Court explained that Section (e)(3)'s

> restrictions on solicitations are justified as valid anticircumvention measures. Large soft-money donations at a candidate's or officeholder's behest give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder. Though

the candidate may not ultimately control how the funds are spent, the value of the donation to the candidate or officeholder is evident from the fact of the solicitation itself. Without some restriction on solicitations, federal candidates and officeholders could easily avoid FECA's contribution limits by soliciting funds from large donors and restricted sources to like-minded organizations engaging in federal election activities. As the record demonstrates, even before the passage of BCRA, federal candidates and officeholders had already begun soliciting donations to state and local parties, as well as tax-exempt organizations, in order to help their own, as well as their party's, electoral cause.

*McConnell*, 124 S.Ct. at 683. Plaintiffs contend that Senator McCain made Congress's intent clear when he stated on the Senate floor: "The rule here is simple: Federal candidates and officeholders cannot solicit soft money funds, funds that do not comply with Federal contribution limits and source prohibitions, for any party committee—national, State or local." 148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) (statement of Sen. McCain); Pls.' Mem. at 50–51. They note that the potential for abuse from the Commission's regulation is

---

**57.** Plaintiffs cite to a treatise to support their position that Section (e)(3) should be read narrowly. Pls.' Mem. at 50 n. 81. The treatise provides that

> [p]rovisos serve the purpose of restricting the operative effect of statutory language to less than what its scope of operation would be otherwise. They are construed using the same general criteria of decision applied to other kinds of provisions. However, where there is doubt concerning the scope of another provision's operation, the proviso is strictly construed. The reason for this is that the legislative purpose set forth in the purview of an enactment is assumed to express the legislative policy, and only those subjects expressly exempted by the

proviso should be freed from the operation of the statute.

2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:8. While this may be the manner in which the Court should interpret the statute if it were considering the statute in a different context, it does not support Plaintiffs' argument. This is because this rule of construction requires the finding of "doubt concerning the scope of another provision's operation," which necessarily would amount to a finding of ambiguity that would effectively take the matter of the statute's meaning out of the Court's hands under *Chevron* step one review. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

exacerbated by the lack of any definition of what constitutes a "fundraising event for a State, district or local committee of a political party." Thus, nothing prevents a federal candidate or officeholder from calling together a group of wealthy donors, labeling the gathering a "fundraising event for a State, district, or a local committee of a political party," and conducting unrestricted solicitation of soft money at such an event.

Pls.' Mem. at 51 n. 84 (quoting 2 U.S.C. § 441i(e)(3)). Defendant responds that BCRA is not undermined whenever a federal candidate or officeholder solicits nonfederal funds, because "BCRA itself provides for specific, albeit limited, opportunities for such fundraising." Def.'s Opp'n at 42. Defendant is correct that Congress did provide for limited nonfederal fundraising for federal candidates and officeholders, even on behalf of state and local political parties. *See* 2 U.S.C. § 441i(e)(1)(B)(i); *McConnell*, 124 S.Ct. at 682 n. 70.[58] This fact undermines to some extent Senator McCain's statement about the purpose of the statute.

The Court cannot find on the current record that the Commission's regulation on its face "unduly compromises the Act's

purposes" by "creat[ing] the potential for gross abuse." *Orloski*, 795 F.2d at 164, 165. To be sure, the Commission's interpretation likely contravenes what Congress intended when it enacted the provision,[59] as well as what the Court views to be the more natural reading of the statute, but the record, with the exception of Senator McCain's floor statement, is bare on this point. Moreover, while there can be little doubt that this provision creates the potential for abuse, it is unclear whether or not the potential for abuse and the degree to which the regulation compromises the Act reaches the level required by the *Orloski* decision to find that the regulation is entitled to no deference. In this respect, 11 C.F.R. § 300.64(b) differs from the coordinated communication regulation which the Court found does unduly compromise FECA and creates the potential for gross abuse. The coordinated communications regulation, on its face, create an enormous loophole which runs contrary to the entire rationale for the special treatment of coordinated communications. For the state party fundraiser provision, the Court has no basis for making such a conclusion, given the dearth of precedent and guidance from the legislative history.[60]

**58.** The Supreme Court observed that 2 U.S.C. § 441i(e)(1)(B)

tightly constrains the ability of federal candidates and officeholders to solicit or spend nonfederal money in connection with state or local elections. Contributions cannot exceed FECA's analogous hard-money contribution limits or come from prohibited sources. In effect, [the provision] doubles the limits on what individuals can contribute to or at the behest of federal candidates and officeholders, while restricting the use of the additional funds to activities not related to federal elections.

*McConnell*, 124 S.Ct. at 682 n. 70.

**59.** Indeed, the FEC itself initially took the position that Congress's intent in passing Section (e)(3) barred solicitation at the designated fundraising events. In its Notice of Pro-

posed Rulemaking, the Commission, citing Senator McCain's statement, quoted *supra* at 90, concluded: "[t]hus, under the proposed rules, while such individuals may attend, speak, or be a featured guest at a State or local party fundraising event, they cannot solicit funds at any such event." NPRM: Prohibited & Excessive Contributions, 67 Fed. Reg. 35654, 35672 (May 20, 2002).

**60.** Moreover, while the Court shares Plaintiffs' concern that the absence of a definition for the term "fundraising event for a State, district or local committee of a political party" could lead to widespread abuse, the Court cannot base a decision on such concerns. To do so would launch the Court into an area of speculation that would render the matter not ripe for review. *See supra* at 47 (finding no

Accordingly, the Court cannot find that the Commission has unduly compromised FECA's purposes and, since Plaintiffs make no other *Chevron* step two arguments, finds that the regulation survives *Chevron* review.

▮ Plaintiffs make one additional argument, claiming that the Commission's analysis justifying its regulation "violates the standards of reasoned decisionmaking under the APA." Pls.' Mem. at 53. They attack the agency's E & J, contending that the two grounds provided in support of the Commission's regulation do not in fact support its regulation. *Id.* at 51. As noted *supra*, the Commission justified its regulation on two grounds: (1) "it was compelled by the plain language of the section and the structure of the section within BCRA;" and (2) a contrary reading would require the Commission to monitor what candidates and officeholders say at such events which would "raise serious constitutional concerns." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,108. As detailed *supra*, Plaintiffs argue that the Commission's construction of the statute is not "compelled" by the language of the statute. As for the second rationale, Plaintiffs contend that this Court need not grant deference to the Commission's constitutional analysis, and that in any event the justification is inadequate because the FEC "offered no explanation of why monitoring the speech of candidates and officeholders would be more difficult or intrusive at state party fundraising events than in other settings not controlled by the 'total exemption.'" Pls.' Mem. at 52. In response, the FEC explains why its construction of 2 U.S.C. § 441i(e)(3) is "rea-

sonable," but does not address its E & J comment that the interpretation was "compelled" by the terms of the statute. Def.'s Opp'n at 40–42. It is clear from the Court's analysis, *supra*, that the FEC's interpretation is not *mandated* by the terms of the Act. With regard to its second E & J rationale, the FEC notes that it is "charged with balancing … competing public policies and should avoid creating constitutional problems." *Id.* at 42. Nowhere, however, does it address Plaintiffs' argument that such concerns are in any way more vexing in the context of state political party fundraisers than they are outside of such venues where nonfederal money solicitation is almost completely barred.

The Court is therefore not satisfied, based on the FEC's E & J and briefing in this case, that the Commission has "articulated an explanation for its decision that demonstrates its reliance on a variety of relevant factors and represents a reasonable accommodation in light of the facts before the agency." *Arent*, 70 F.3d at 617; *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Consequently, the Court finds the FEC's explanation is unreasonable and therefore violates the APA.[61] First, its E & J conclusion is faulty in reasoning that Plaintiffs' view of the statutory language would "require the Commission to read the re-

ripeness concerns due to the purely legal nature of Plaintiffs' claims); *see also AT&T Corp.*, 349 F.3d at 699.

61. The Court takes this opportunity to acknowledge that the Commission in promul-

gating the regulations implementing BCRA, in particular those related to BCRA Title I, was working under significant time constraints imposed by Congress. *See supra* at 37.

strictions itemized in the general prohibition into a statutory exemption that clearly and unambiguously excludes those restrictions by its own terms." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,108. As discussed *supra,* the statutory provision at issue is ambiguous on the matter, and the presence of the word "speak" does not unambiguously exclude a restriction on "solicit[ation]" or "direct[ion]" of contributions.[62] Moreover, the FEC has not explained how examining speech at fundraising events implicates constitutional concerns that are not present when examining comments made at other venues. In the absence of any further explanation, the Court cannot conclude that the Commission has provided a "reasoned analysis" in support of its regulation, and accordingly the Court must find that 11 C.F.R. § 300.64(b) is arbitrary and capricious.[63]

### d. The "Grandfather" Provision

■ Throughout BCRA's nonfederal money provisions the restrictions on nonfederal money fundraising are extended to "any entity that is directly or indirectly established, financed, maintained, or controlled by" the covered political entity. 2 U.S.C. § 441i. The FEC defined the meaning of "directly or indirectly establish, finance, maintain, or control," in its recent regulations, codified at 11 C.F.R.

§ 300.2(c). Included in its definition is a "safe harbor" which provides:

> On or after November 6, 2002, an entity shall not be deemed to be directly or indirectly established, maintained, or controlled by another entity unless, based on the entities' actions and activities solely after November 6, 2002, they satisfy the requirements of this section. If an entity receives funds from another entity prior to November 6, 2002, and the recipient entity disposes of the funds prior to November 6, 2002, the receipt of such funds prior to November 6, 2002 shall have no bearing on determining whether the recipient entity is financed by the sponsoring entity within the meaning of this section.

11 C.F.R. § 300.2(c)(3). This regulatory provision has been labeled by Plaintiffs as the "Grandfather" provision. In its E & J, the FEC explained that based on the comments it received that it "concluded that BCRA should not be interpreted in a manner that penalizes people for the way they ordered their affairs before the effective date of BCRA. This will help ensure that BCRA is not enforced in a retroactive manner with respect to activities that were legal when performed." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,084.

Plaintiffs challenge the "Grandfather" provision, claiming that it "arbitrarily exclude[s] potentially relevant information

---

**62.** The fact that the Commission originally read 2 U.S.C. § 441i(e)(3) to mandate a contrary result to its ultimate conclusion undermines the clarity of its statutory analysis. *See* NPRM, Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,672.

**63.** Defendant also argues that language in the Supreme Court's decision in *McConnell* supports its construction of the statute. Def.'s Mem. at 62. The Supreme Court noted that Section (e)(3) "preserve[s] the traditional fundraising role of federal officeholders by

providing limited opportunities for federal candidates and officeholders to associate with their state and local colleagues through joint fundraising activities." *McConnell,* 124 S.Ct. at 683. The Court does not read this comment to support Defendant's position. The statement speaks only of federal officeholders' "traditional fundraising role" which according to the Supreme Court involves "associat[ion] with ... state and local colleagues." The Court does not read the word "associate" to equate to "fundraise" or "solicit."

from its review by ... categorically exclud[ing] from consideration any activity or aspect of the party-entity relationship that occurred before November 6, 2002, BCRA's effective date." Pls.' Mem. at 54. This action, according to Plaintiffs, fails *Chevron* and APA review. *Id.*

Under the *Chevron* analysis, the Court first looks to see if Congress's intent is clear from the plain meaning of the statute. *Arent*, 70 F.3d at 615. Plaintiffs argue that the plain meaning of the statute precludes the FEC's construction. Pls.' Mem. at 54. First, they note that the statute applies to "*any entity* that is directly or indirectly established, financed, maintained or controlled" by various political actors. 2 U.S.C. §§ 441i(a)(2), (b)(1), (d), (e)(1) (emphasis added). This "any entity" language, according to Plaintiffs, "forbids the FEC's rule, which construes this provision as applying only to *some* entities, *i.e.*, those where the indicia of affiliation appeared after November 6, 2002." Pls.' Mem. at 54–55. This argument mischaracterizes the scope of the FEC's regulation. The "safe harbor" does not exclude from coverage entities whose "indicia of affiliation appeared [before] November 6, 2002;" rather it excludes from consideration in determining whether or not entities are "affiliated" with the enumerated political actors, those entities' actions and activities that took place prior to November 6, 2002. *See* 11 C.F.R. § 300.2(c)(3); *see also* Def.'s Opp'n at 34. Therefore, the safe harbor does not exclude any entities from the regulation's

coverage; it excludes only the evidence that may be considered when determining if entities are affiliated with certain political actors.[64]

Next, Plaintiffs argue that the statute's "language contains neither the temporal limitation nor any indication that it is only to have prospective effect." Pls.' Mem. at 55. While this is clearly true, Defendant notes that Congress in another provision of BCRA expressly delayed the effective date of BCRA to November 6, 2002, and that this regulation is consistent with the delayed effective date. Def.'s Mem. at 46; Def.'s Opp'n at 34; *see also* 2 U.S.C. § 431 note. Plaintiffs do not respond to this point in their Opposition brief. *See* Pls.' Opp'n at 38–41.[65] Regardless of how one chooses to interpret the effective date provision of BCRA in conjunction with the nonfederal money affiliation clause of Title I, it is clear that Congress did not state one way or the other what information the FEC should consider when determining whether or not an entity is affiliated with political entities for purposes of the nonfederal money prohibitions of Title I of BCRA.

Plaintiffs also argue that "Congress's use of the word 'established'" in the statute, is "an inherently retrospective term that focuses on the formation of the entity," and contend that the use of the word in the statute "confirms that the affiliation inquiry was not intended to be artificially limited in the manner the FEC has prescribed." Pls.' Mem. at 55. The Court

---

**64.** However, Plaintiffs are correct about the practical effect of this rule in one respect. Since the FEC will ignore evidence predating BCRA's effective date, those entities that were "established" prior to November 6, 2002, by covered political entities, are exempted from the nonfederal money restrictions by the regulation, unless they continue to be "financed, maintained, or controlled" by those covered political entities after BCRA's effective date.

*See* 2 U.S.C. § 441i(a)(2); 11 C.F.R. § 300.2(c)(3). The Court discusses this result in light of the statutory language, *infra.*

**65.** They do, however, acknowledge that "Section 441i(a)(2) regulates and 'penalizes' only purely prospective activity: raising, receiving or spending soft money after BCRA's effective date." Pls.' Opp'n at 39.

disagrees. If anything, the language dictates the opposite result. Title I provides that its nonfederal money restrictions "appl[y] to . . . any entity that *is* directly or indirectly *established*" by a covered political actor. *See, e.g.,* 2 U.S.C. § 441i(a)(2) (emphasis added). As Defendant points out, this construction is forward-looking, Defs.' Opp'n at 34, and the Court finds that this language supports the Commission's regulation.[66]

Accordingly, the Court finds that Congress has not "spoken on the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The Court now examines the regulation to determine if it is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. As the Court's analysis *supra* demonstrates, the provisions at issue, when read in conjunction with BCRA's effective date provision, can properly be read to apply only to those entities "established" after November 6, 2002. Plaintiffs, however, contend that the regulation "openly flouts the basic purpose of BCRA as expressed through its structure and legislative history: to close loopholes that had allowed soft money to corrupt federal elections." Pls.' Mem. at 55. They cite to the case of the Leadership Forum, which was established by political party committees on the eve of BCRA's effective date as an example of the entities Plaintiffs claim the national party committees were able to establish using the "Grandfather" provision "loophole," in order to have those entities "rais[e] and

spend[ ] soft money in connection with federal elections." Pls.' Mem. at 56.[67] Defendant argues that "an allegation about one entity is not 'overwhelming evidence' that national party committees have used this provision 'for the purpose of raising and spending soft money in connection with federal elections.' " Def.'s Opp'n at 35 (quoting Pls.' Mem. at 56).

As the Court has explained *supra,* if the FEC's regulation "unduly compromises the Act's purposes" by "creat[ing] the potential for gross abuse," it is entitled to no deference. *Orloski,* 795 F.2d at 164, 165. Here, Plaintiffs have not demonstrated that the regulation creates the potential for gross abuse they claim has resulted from its terms. While it is true that organizations established by political entities covered by Title I of BCRA, *see* 2 U.S.C. §§ 441i(a)(2), (b)(1), (d), (e)(1), prior to November 6, 2002, cannot under the regulation be found to be established by such entities, such organizations still are not permitted to be maintained or controlled by the covered political entities, *see* 11 C.F.R. § 300.2(c)(3). Plaintiffs have not attempted to explain how the existence of organizations, created prior to November 6, 2002, by prohibited political actors, but no longer maintained or controlled by those actors, creates a loophole with the potential for gross abuse that unduly compromises FECA's purposes. This omission is particularly acute here where the loophole is now closed—any group established after November 5, 2002, is denied the regulation's safe harbor.[68] According-

---

**66.** The Court notes that it would be a closer question if the statute read "any entity directly or indirectly established" by a covered entity, in other words, if it omitted the words "that is." *See, e.g.,* 2 U.S.C. § 441i(a)(2).

**67.** Defendant objects to the exhibits submitted to document the existence of this group and the subsequent FEC enforcement proceeding regarding this group, noting that they postdate the administrative record in this case.

Def.'s Mot. to Strike at 3; Def.'s Opp'n at 35. The Court need not rule on this matter, because it finds that even if it were to consider the submission, the evidence would not lead the Court to conclude that the provision fails *Chevron* review. *See infra.*

**68.** These factors, combined with the fact that the potential for gross abuse is not evident from the face of the regulation and the state of the law, distinguishes this regulation from

ly, the Court cannot find that whatever effect the safe harbor has had on the campaign finance regime, that such effect "unduly compromises the Act's purposes" by "creat[ing] the potential for gross abuse." *Orloski*, 795 F.2d at 164, 165. The Court therefore finds that 11 C.F.R. § 300.2(c)(3) meets the requirements of *Chevron* step two.

Finally, Plaintiffs claim that the "Grandfather" provision violates the APA's "reasoned analysis" requirement. Pls.' Mem. at 57. Plaintiffs attack the rationales articulated by the FEC in its E & J for the regulation. *Id.* In its E & J, the Commission provided that the "Grandfather" clause was promulgated so that the regulations would not "penalize[ ] people for the way they ordered their affairs before the effective date of BCRA," and BCRA would "not be enforced with respect to activities that were legal when performed." Prohibited & Excessive Contributions, 67 Fed. Reg. at 49,084. Plaintiffs contend that these rationales are not rational when the remainder of the regulation is examined. Pls.' Mem. at 57. They note that

> [u]nder the [regulation's] affiliation inquiry ... no one factor or group of factors is dispositive in determining whether an entity is subject to the soft-money prohibitions of [2 U.S.C. § 441i]. Contrary to the FEC's justification, there is thus *no need for a categorical exclusion* of pre-BCRA evidence of affiliation. Without such an exclusion, entities established or maintained by party committees before November 6, 2002 will not necessarily be deemed affiliated *because* of that pre-BCRA activity; nor, however, will they necessarily be deemed unaffiliated *despite* that activity. And where such an entity wishes to establish that its relationship with the party committee has ended, the FEC

regulations afford a mechanism specifically for that purpose.

*Id.* (emphasis in original); *see also id.* at 57 n. 93 (noting that 11 C.F.R. § 300.2(c)(4) contains a mechanism by which an entity can seek a determination from the FEC as to whether or not it is considered to be affiliated under the regulation).

A review of 11 C.F.R. § 300.2(c)(2) confirms that whether an entity is established, financed or controlled by a covered political actor, is to be determined by examining "the context of the overall relationship between the sponsor and the entity to determine whether the presence of any factor or factors is evidence that the sponsor directly or indirectly established, finances, maintains, or controls the entity." 11 C.F.R. § 300.2(c)(2). The regulation goes on to provide a non-exhaustive list of factors to consider when conducting the "affiliation" inquiry. *Id.* As an initial matter, the Court notes that, as the factors themselves suggest, the "context of the overall relationship approach" applies more readily when determining a finance, maintenance, or control affiliation, as opposed to an establishment relationship which is considerably more straightforward. *See id.* Moreover, it is unclear to the Court how the FEC could, in the absence of the "Grandfather" provision, find an entity which was clearly established by a political actor covered by 2 U.S.C. § 441i not to be "established" by that actor, regardless of the outcome of any multi-factor test. Accordingly, in the context of the statute's application to entities "established" by covered political actors, Plaintiffs are incorrect that pre-November 6, 2002, information would not be dispositive in assessing such an entity's affiliation under the Act. As for the other types of "affiliation," al-

those regarding coordinated communications, discussed *supra* at 62–64.

though Plaintiffs are correct that under the terms of the entire regulation no single factor is dispositive in making the "affiliation" inquiry, 11 C.F.R. § 300.2(c)(2), that is not to say that consideration of pre-November 6, 2002, activities would not, as the FEC maintains, "penalize[ ] people for the way they ordered their affairs before the effective date of BCRA." The fact that an entity before BCRA was clearly controlled by a political party committee, could tip the scales in favor of finding "affiliation" when conducting an overall assessment of the ties between the entity and the political party committee. Accordingly, the Court cannot find that the Commission failed to provide a reasoned analysis for its regulation. *Bolden*, 848 F.2d at 205 (courts "must affirm if a rational basis for the agency's decision exists."); *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Therefore, the Court concludes that 11 C.F.R. § 300.2(c)(3) survives *Chevron* and "reasoned analysis" review.

### e. Regulations on "Federal Election Activity"

Congress, in enacting BCRA, sought to prevent circumvention of its ban on national political parties' involvement with non-federal money by prohibiting "state and local party committees from using such funds for activities that affect federal elections." *McConnell*, 124 S.Ct. at 654–55. Congress identified activities having such an effect in a statutory provision entitled "Federal election activity," which provides

(A) In general.—
The term "Federal election activity" means—
(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly

scheduled Federal election is held and ends on the date of the election;

(ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);

(iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

(iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(B) Excluded activity.—
The term "Federal election activity" does not include an amount expended or disbursed by a State, district, or local committee of a political party for—

(i) a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);

(ii) a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity described in subparagraph (A);

(iii) the costs of a State, district, or local political convention; and

(iv) the costs of grassroots campaign materials, including buttons, bumper

stickers, and yard signs, that name or depict only a candidate for State or local office.

2 U.S.C. § 431(20). Plaintiffs challenge numerous regulations promulgated to implement this statutory provision, which the Court addresses in turn.

### i. Voter Registration Activity

■ Included in "Federal election activity" is "voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election." 2 U.S.C. § 431(20)(A)(i). The Commission's regulation defining the term "voter registration activity" includes the requirement that the activity "assist" in the registration of voters. 11 C.F.R. § 100.24(a)(2).[69] Plaintiffs assert that this requirement impermissibly narrows the definition of "voter registration activity" because it excludes from its reach encouragement that does not constitute actual assistance. Pls.' Mem. at 61. Defendant acknowledges that its regulation "clearly require[s] something more than merely encouraging registering to vote." Def.'s Mem. at 27 (internal quotation marks omitted).

Turning to the first prong of the *Chevron* analysis, the Court asks whether Congress has directly spoken on this issue. Congress did not define the term "voter registration activity" in the Act. Still, Plaintiffs claim that excluding the encouragement of persons to register to vote "flies in the face of common usage, and thus the canons of construction." Pls.' Mem. at 61 (citing *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C.Cir.1984) for its holding that "unless contrary indications are present, a court can assume that Congress intended the common usage of the term[s] to apply"). In support of their position that encouraging people to vote is a commonly understood aspect of "voter registration activity," Plaintiffs cite to this Court's opinion in *McConnell*, which in discussing BCRA's focus on get-out-the-vote and voter registration activities, noted that "it is clear that efforts to *encourage* a particular political party's partisans to the polls, will assist *all* of that party's candidates on the ballot, state, local and federal alike." *McConnell*, 251 F.Supp.2d at 702 (Kollar-Kotelly, J.) (second emphasis in original). They also cite to an FEC regulation, entitled "Voter registration and get-out-the-vote activities" which provides that "cost[s] incurred for activity designed to *encourage* individuals to register to vote or to vote is not an expenditure if no effort is or has been made to determine the party or candidate preference of individuals before encouraging them to register to vote or vote . . . ," 11 C.F.R. § 100.133 (emphasis added), as well as one which characterizes voter registration and get-out-the vote drives as those "that *urge* the general public to register," 11 C.F.R. § 106.5(a)(2)(iv) (emphasis added). Finally, Plaintiffs point out that the FEC in an Advisory Opinion, wrote that " '[r]egistration' and 'get-out-the-vote drive' are terms of art used in campaign or election parlance. Those terms generally connote efforts to increase the number of persons who register to vote and once registered, to maximize the number of eligible voters

---

**69.** The regulation provides in full:

(2) Voter registration activity means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

11 C.F.R. § 100.24(a)(2).

who go to the polls." Pls.' Ex. 152 (FEC Advisory Op.1980–64).[70]

Defendant responds that 11 C.F.R. § 100.133 is a regulation permitting the use of nonfederal money to encourage people to vote. Def.'s Opp'n at 26 (also discussing 11 C.F.R. § 114.4). The Commission therefore concludes that "even if a 'common usage' could be gleaned from [this] pre-existing regulation[ ], [it] stand[s] for the proposition that general civic encouragements are not commonly viewed as attempting to influence the outcome of an election." *Id.* The Commission, however, ignores 11 C.F.R. § 106.5(2)(iv), which requires allocation of federal and nonfederal funds for "[g]eneric voter drives including ... voter registration ... drives, or any other activities that urge the general public to register," done in connection with federal and non-federal elections. 11 C.F.R. § 106.5(2)(iv).[71] This regulation obviously stands for the opposite proposition.

Returning to the statute, the Court notes that it is possible to read the term "voter registration activity" to encompass those activities that actually register persons to vote, as opposed to those that only encourage persons to do so without more. *See AFL–CIO*, 333 F.3d at 174. Moreover, the Court cannot find based on the record presented that the "common usage" of the term "voter registration activity" necessarily includes the latter type of activities. While it appears that the FEC has viewed voter registration as including encouraging persons to vote, its view may be based on its understanding of the term as a "term[ ] of art used in campaign or election parlance," not based on its common usage. Pls.' Ex. 152 (FEC Advisory Op.1980–64). Accordingly, the Court does not find that the "common usage" canon of construction reveals Congress's specific intent on this matter.[72]

Plaintiffs also point the Court to the "absurd results" of the Commission's construction. Pls.' Mem. at 62. They note that the Commission's regulations as they currently exist permit "corporations and labor unions [to] finance certain ... voter registration activities, which are broadly defined to encompass any activities at any time that encourage individuals to vote," but that those activities "conducted by state parties" are defined "to encompass only activities that include some type of affirmative assistance ...." *Id.* (citing 11 C.F.R. §§ 100.133, 114.4(c)-(d)). Plaintiffs conclude that "Congress could not possibly have intended such a disparate result." *Id.* Defendant counters that the regulations define the terms differently, but do not contradict each other. Def.'s Opp'n at 25. The regulations covering activities by corporations and labor unions implement the exception found in 2 U.S.C. § 441b permitting those entities to engage in "nonpartisan registration ... campaigns."

---

**70.** To the extent that Plaintiffs attempt to make a legislative reenactment argument, *see* Pls.' Mem. at 62–63 (discussing Congress's understanding of the term in light of the FEC's use of it in its regulations), given the absence of any indication that Congress relied on the Commission's past treatment of the term and the Court's discussion of the legislative reenactment doctrine *supra* at 60, the Court rejects the argument.

**71.** Interestingly, this provision, which predates BCRA but is still found in the current

Code of Federal Regulations, applies to national party committees, which BCRA was supposed to "take out of the soft-money business." *McConnell*, 124 S.Ct. at 654; *see also* 2 U.S.C. § 441i(a)(1).

**72.** The Court also notes that there is some ambiguity in the regulation. For example, merely informing someone of where they may register to vote could fall within the scope of the regulation. *See* 11 C.F.R. § 100.24(a)(2).

2 U.S.C. § 441b(b)(2)(B). Accordingly, the regulations "must affirmatively describe the mere encouragement of citizens to register to vote to make clear that such activity is permissible with corporate or union funds." Def.'s Opp'n at 26. The regulation currently under consideration, however, functions as a spending restriction, and therefore "define[s] only the narrower range of activity that clearly *is* intended to influence federal elections." *Id.* (emphasis in original). Although the Court believes that 2 U.S.C. § 431(20) encompasses activities regardless of the intent of those involved, reflecting Congress's determination that regardless of intent the enumerated activities influence federal elections, *see McConnell*, 124 S.Ct. at 674, the Court is satisfied that the different regulatory provisions are not in conflict. In any event, the Court finds that Plaintiffs' argument does not reveal Congress's intent on the matter at hand. Accordingly, the Court finds that the regulation survives *Chevron* step one.

Turning to step two of the *Chevron* analysis, the Court asks whether the agency's interpretation of the statute is a permissible one. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Based on the Court's analysis of the statute, *supra*, it is clear that while the Commission's construction may not functionally maximize Congress's purposes, it is not an impermissible construction of the statute. As for whether the construction unduly compromises the Act's purposes, the Court cannot say that it does. Plaintiffs contend that Congress enacted BCRA's state and local party nonfederal money rules with the purpose to prevent circumvention of the national party committee nonfederal money ban by regulating state and local party spending when such spending impacts federal elections. Pls.' Mem. at 69. While this is certainly the general purpose of the nonfederal money restrictions placed on state

and local political party committees, the Court cannot say at this stage that this purpose is "unduly compromise[d]" by the Commission's regulation. *Orloski*, 795 F.2d at 164. Determining whether or not the Act's purposes are compromised and the extent of the compromise requires an understanding of the regulation's parameters. As the Court has already noted, *see supra* note 72, the exact parameters of the Commission's regulation are subject to interpretation. *See also* Def.'s Opp'n at 25 (arguing that the "assist" requirement "is quite broad"). While it is clear that mere encouragement does not fall within the scope of the regulation, it is possible that encouragement coupled with a direction of how one might register could constitute "assist[ance]" under the provision. Such an interpretation could remedy what might otherwise be a regulation that "unduly compromises the Act." *Orloski*, 795 F.2d at 164. Without more guidance on the true scope of the regulation, the Court concludes that it cannot, without violating the ripeness doctrine, determine whether the regulation fails *Chevron* step two review. *See AT&T*, 349 F.3d at 699.

 Finally, Plaintiffs argue that the Commission violated the APA in promulgating this regulation when it "failed to provide notice in its NPRM that it was contemplating adopting rules that would limit 'voter registration'" in the manner they object to in the final rule. Pls.' Mem. at 70. They raise this argument in response to a number of the "Federal election activity" regulations promulgated by the Commission. *See id.*

The APA requires that NPRMs include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

An agency satisfies this notice requirement if the final rule is a "logical out-

growth" of the proposed rule. In other words, we consider whether the party, *ex ante,* should have anticipated that such a requirement might be imposed in determining whether adequate notice was given in a notice of proposed rulemaking.

In most cases, if the agency alters its course in response to the comments it receives, little purpose would be served by a second round of comment. Thus, the "logical outgrowth" test normally is applied to consider whether a new round of notice and comment would provide the *first* opportunity for interested parties to offer comments that could persuade the agency to modify its rule. *Ariz. Pub. Serv. Co. v. Environmental Protection Agency,* 211 F.3d 1280, 1299 (D.C.Cir.2000) (internal quotation marks, citations and alterations omitted). "The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft rule." *Anne Arundel County, MD v. U.S. Environmental Protection Agency,* 963 F.2d 412, 418 (D.C.Cir.1992) (internal quotation marks and alterations omitted).

Plaintiffs claim, in conclusory fashion, that the final rule is "not a 'logical outgrowth' of the Commission's draft rules, but rather 'surprisingly distant' from what the Commission initially proposed, in violation of the APA's notice requirement." Pls.' Mem. at 70 (quoting *Ariz. Pub. Serv.,* 211 F.3d at 1299). Plaintiffs do not raise this argument in their Opposition brief. *See* Pls.' Opp'n at 49. The Commission claims, in similarly concise fashion, that the "logical outgrowth" test is met "because the Commission explicitly asked whether there should be exceptions for such activities .... " Def.'s Opp'n at 27 n. 47. A review of the Commission's NPRM reveals no such solicitation of comments on this provision. NPRM: Prohibited & Excessive Contributions; Non–Federal Funds or Soft Money, 67 Fed.Reg. 35,654, 35,636 (May 20, 2002). Nor does the NPRM provide any notice so that interested parties "reasonably could have anticipated the final rulemaking from the draft rule." *Anne Arundel County,* 963 F.2d at 418. In fact, the NPRM is almost completely silent on the provision. *See* NPRM: Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,656 (noting only that its proposed rule excludes "special elections"). There is simply no indication provided that the Commission would seek to limit the term "voter registration." [73] *See id.; see also id.* at 35,674 (providing text of proposed rule).[74] Accordingly, the Court finds that the Commission violated the APA's notice requirements in promulgating 11 C.F.R. § 100.24(a)(2).

### ii. *Get–Out–the–Vote Activity*

 The Commission's regulation defining the term "get-out-the vote activity" includes the requirement that the activity "assist" voters "in engaging in the act of voting." *Id.* § 100.24(a)(3). The get-out-the vote ("GOTV") regulation also provides that GOTV activity includes "[p]roviding to individual voters, within 72

---

**73.** Indeed, the Commission does not indicate any comments it received on this matter in its briefing or its E & J. *See* Def.'s Mem. at 25–27; Def.'s Opp'n at 24–27; Prohibited & Excessive Contributions, 67 Fed.Reg. at 49067.

**74.** The Commission's proposed rule was as follows:

> Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term "election" does not include any special election
>
> NPRM: Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,674.

hours of an election, information such as the date of the election, the times when polling places are open, and the location of particular polling places." *Id.* The GOTV regulation also excludes from its parameters communications "by an association or similar group of candidates for State or local office or of individuals holding State or local office if such communication refers only to one or more State or local candidates." [75]

Plaintiffs raise some of the same arguments in challenging the FEC's GOTV definition that they did in challenging the FEC's "voter registration activity" definition. They object to the fact that the GOTV definition is limited to activities that " 'assist' would-be voters," contending that efforts that encourage would-be voters to get out to vote should also be covered by the definition. Pls.' Mem. at 61. They also object to what they perceive to be the FEC's effort "to engraft in certain circumstances a 72–hour rule onto the definition of 'GOTV,' " claiming such a requirement "presumptively limit[s] much of the reach of the GOTV provision to conduct occurring within the *last three days* of the election" campaign. *Id.* at 65 (emphasis in original). They also protest the provision's exclusion of GOTV activities by "an association or similar group of candidates for State or local office or of individuals

holding State or local office," arguing that "Congress provided the Commission with no authority to adopt such an exemption— and the exemption is, in fact, in direct contravention of legislative intent." *Id.* at 66. Plaintiffs maintain that this exclusion will "invite just the sort of circumvention that BCRA sought to prevent," because "[p]arties and candidates can easily conduct GOTV . . . activities through associations of state or local candidates (such as the Democratic or Republican Governors Association), avoid mention of federal candidates on the ballot, and mobilize voters to the polls." *Id.* at 67.

Commencing the *Chevron* step one analysis, the Court observes that Congress does not appear to have defined "get-out-the-vote activity." 2 U.S.C. § 431(20). Plaintiffs argue that under the "common usage" canon of construction, GOTV includes encouraging persons to vote, citing to the same sources for support as they did for the same argument they made challenging the "voter registration activities" definition. Pls.' Mem. at 61–62 (relying on *McConnell*, 251 F.Supp.2d at 702 (Kollar–Kotelly, J.)); Pls.' Ex. 152 (FEC Advisory Op.1980–64); 11 C.F.R. §§ 100.133, 106.5(a)(2)(iv); *see also supra* at 98 (discussing this argument in the context of voter registration activities).[76] The

---

**75.** The regulation provides in full:

(3) Get-out-the-vote activity means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. *Get-out-the-vote activity shall not include any communication by an association or similar group of candidates for State or local office or of individuals holding State or local office if such communication refers only to one or more State or local candidates.* Get-out-the-vote activity includes, but is not limited to:
(i) Providing to individual voters, within 72 hours of an election, information such as the date of the election, the times when

polling places are open, and the location of particular polling places; and
(ii) *Offering to transport or actually transporting voters to the polls.*
11 C.F.R. § 100.24(a)(3).

**76.** To the extent that Plaintiffs attempt to make a legislative reenactment argument, *see* Pls.' Mem. at 62–63 (discussing Congress's understanding of the term in light of the FEC's use of it in its regulations), given the absence of any indication that Congress relied on the Commission's past treatment of the term and the Court's discussion of the legislative reenactment doctrine *supra* at 60, the Court rejects the argument.

Court finds, as it did for "voter registration activities," *supra* at 99, that the sources provided have not established that the "common usage" of GOTV includes mere encouragement of people to vote. The phrase itself is subject to different readings. It could mean, as Plaintiffs' believe it does, any activity that is intended to get people to go out and vote, including encouraging them to do so. Another reading of GOTV is that it encompasses activities that actually physically gets people to the polls.[77] Given the ambiguity inherent in the term GOTV, the Court must find that Congress has not spoken directly on this issue and hence this aspect of the regulation survives review under *Chevron* step one.[78]

Turning to the 72–hour provision of the regulation, the Court observes that the regulation provides that *one example* of GOTV activity is "[p]roviding to individual voters, within 72 hours of an election, information such as the date of the election, the times when polling places are open, and the location of particular polling places." 11 C.F.R. § 100.24(a)(3). The regulation makes clear that the examples it provides are non-exhaustive. *Id.* Nonetheless, Plaintiffs view this illustration as a "temporal component" that exempts such activities outside of the 72–hour window from regulation. Pls.' Mem. at 65–66. Defendant disagrees, contending that Plaintiffs are

incorrect when they suggest that 11 C.F.R. [§ ] 100.24 excludes from the definition of GOTV all activity that takes place more than 72 hours before an election. Although certain activity within 72 hours is specified as included within the definition, that specification is preceded by the clause, "Get-out-the-vote activity includes, but is not limited to."

Def.'s Opp'n at 25 n. 44 (citation omitted). Given the plain reading of the provision, and the Commission's insistence that the plain reading reflects its view of the provision's scope, the Court finds that at this stage Plaintiffs' concerns regarding the 72–hour language do not represent a live Case or Controversy.[79]

Turning to the exemption for certain "associations," Plaintiffs contend that there is "no authority" for the Commission's adoption of this exemption. Pls. Mem. at 66. It is true that nothing on the face of the statute suggests that an exemption may be drawn. *See* 2 U.S.C. § 431(20)(A)(ii). The FEC's E & J does not claim any statutory or legislative history basis for its creation of the exemption; rather, it notes the absence of legislative history and the implications of the plain reading of the text as supportive of its position.

The Commission included this exclusion because it finds it implausible that Congress intended to federalize State and local election activity to such an extent

**77.** The Court acknowledges that in political circles GOTV has a broader meaning than this latter reading of the phrase as the Commission's other regulations recognize. *See, e.g.,* 11 C.F.R. § 106.5(a)(2)(iv). However, given the fact that Plaintiffs have not provided the Court a sufficient basis to conclude that GOTV in common parlance includes mere encouragement, the Court is forced to examine the term as it appears on its face.

**78.** Plaintiffs also raise the same "absurd results" argument they did with respect to the

"voter registration activities" regulation. Pls.' Mem. at 62. For the reasons set forth *supra* at 99, the Court rejects the argument in this context as well.

**79.** Plaintiffs articulate their concern that "the text of the regulation" does not "elucidate what, if any, activity conducted outside the 72–hour window *would* be considered GOTV activity." Pls.' Mem. at 65 n. 115 (emphasis in original). This uncertainty highlights the fact that this challenge is not ripe for review. *See AT&T,* 349 F.3d at 699–700.

without any mention of the issue during the floor debate for BCRA. BCRA makes voter identification a subset of Federal election activity, and the regulatory implications of engaging in Federal election activity are significant. For the Commission to exercise its discretion so as to sweep within Federal regulation candidates for city council, or the local school board, who join together to identify potential voters for their own candidacies, the Commission would require more explicit instruction from Congress. Prohibited & Excessive Contributions, 47 Fed.Reg. at 49,070. This statement in essence concedes that the text of BCRA does not provide for such an exemption; the Commission justifies its position by stating that Congress could not have meant what it actually said. The Court's task under *Chevron* step one is to ask whether Congress has directly spoken on the question at issue. Congress clearly intended that "get-out-the-vote activity ... conducted in connection with an election in which a candidate for Federal office appears on the ballot" be 1 classified as "Federal election activity." 2 U.S.C. § 431(20)(A)(ii). To the extent that the Commission evokes federalism concerns to support its view, the Court observes that the Supreme Court rejected the federalism challenge mounted against BCRA. *McConnell,* 124 S.Ct. at 685. The Commission's argument

that Congress was sensitive to federalism concerns in enacting BCRA, pointing to its exception on state and local candidates' funding of communications that "is in connection with an election for such State or local office and refers only" to candidates for state or local office,[80] lacks merit. Def.'s Opp'n at 30–31. While this provision clearly demonstrates Congress's concern with "potential intrusion into state affairs," the fact that it included such a provision with regard to "communications" but did not provide any such exemption for voter identification activities suggests that Congress did not intend to limit the scope of the statutory provision in such a manner. *See TRW Inc. v. Andrews,* 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)); *see also Cole,* 571 F.2d at 597. The Court therefore must conclude that Congress has spoken directly on this question, and that the Commission's exemption for "association[s] or similar group[s] of candidates for State or local office or of individuals holding State or local office" runs contrary to Congress's clearly expressed intent and cannot stand.[81]

---

80. 2 U.S.C. § 441i(f).

81. Defendant points out that since FECA contains an "empowering provision" providing that the FEC may "make ... such rules ... as may be necessary to carry out the provisions of this Act," 2 U.S.C. § 437d(a)(8), "the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling statute," *Mourning v. Family Publ'ns Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (internal quotation marks omitted). Def.'s Mem. at 30. The Commission argues that since 2 U.S.C. § 441i(f) permits

"state and local candidates and their agents to fund a 'public communication' under 2 U.S.C. [§ ] 431(20)(B)(iii)—another category of 'federal election activity'—entirely with non-federal funds so long as the communication refers only to state and local candidates," the FEC's "decision to include a similar limitation in its definition of the broad and ambiguous phrase 'get-out-the-vote activities' to avoid a similarly unnecessary intrusion into activities directed at state and local elections is surely 'reasonably related to the purposes of the enabling legislation.'" *Id.* (quoting *Mourning,* 411 U.S. at 369, 93 S.Ct. 1652).

The Court now examines the regulation's restriction of GOTV activities to those that "assist" voters under *Chevron* step two, asking whether the agency's interpretation of the statute is a permissible one. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. As the Court found *supra*, the term GOTV can be read in different ways, and based on that analysis the Court finds that although the Commission's construction may not functionally maximize Congress's purposes, it is not a facially impermissible construction of the statute.

Turning to the *Orloski* analysis under *Chevron* step two, the Court cannot say that the regulation unduly compromises the Act's purposes. Plaintiffs raise the same argument they did for their challenge to the voter registration activity provision. They contend that Congress enacted BCRA's state and local party nonfederal money provisions with the purpose of preventing circumvention of the national political party committee nonfederal money ban, and state that this purpose is compromised by the regulation. Pls.' Mem. at 69. While this is certainly the general purpose of the nonfederal money restrictions placed on state and local political party committees, the Court cannot say at this stage that this purpose is "unduly compromise[d]" by the Commission's regulation. *Orloski*, 795 F.2d at 164. As it found for the "voter registration activi-

ties" regulation, the Court finds ambiguity as to what acts are encompassed by the regulation. As noted *supra*, determining whether or not the Act's purposes are compromised and the extent of the compromise requires an understanding of the regulation's parameters. The regulation's phrase "assist [registered voters] in engaging in the act of voting" is susceptible to broad and narrow readings. *See* Def.'s Opp'n at 25 (arguing that the "assist" requirement "is quite broad"). The Commission has made clear that providing a person with the date of the election constitutes GOTV activity if it occurs within 72 hours of an election. 11 C.F.R. § 100.24(a)(3). However, as noted *supra*, it is unclear how the Commission will treat such activity taking place more than 72 hours before an election. Therefore, depending on how the Commission enforces this regulation, it is quite possible that the regulation will not "unduly compromise[ ] the Act," *Orloski*, 795 F.2d at 164, although the reverse is also a possibility. At this juncture, however, the Court cannot make this determination. *See AT&T*, 349 F.3d at 699–700.

Having found that the regulation survives *Chevron* review, the Court now turns to Plaintiffs' APA arguments. Plaintiffs raise the identical concise argument outlined in the Court's discussion of "voter

The Court has already addressed *supra* the matter of how Congress's creation of some exclusions can preclude the implication of non-enumerated exclusions. *See also TRW, Inc.*, 534 U.S. at 28, 122 S.Ct. 441. The Court notes that while Defendant claims that its additional exclusion is "reasonably related to the purposes of the enabling legislation," it suggests that Congress's purpose in passing the "Federal election activity" provision was to avoid treading on purely state and local electoral activity. While BCRA does indeed demonstrate Congress's concern with "federalizing" purely state and local electoral activity, the purpose behind defining "Federal elec-

tion activity" was to prevent circumvention of BCRA's nonfederal money ban on the national political parties. To equate Congress's purpose in passing provisions excluding state and local committees from using nonfederal funds on "Federal election activity" with an exception to that general rule is simply untenable and in fact suggests the opposite result to that which Defendant seeks. Moreover, Defendant provides no citation to a case that suggests that a regulation may be salvaged if it is "reasonably related to the purposes of the enabling statute" even if it fails *Chevron* step one. Def.'s Mem. at 30; Def.'s Opp'n at 30–31.

registration activities" *supra* at 101, that in promulgating its GOTV regulation the Commission violated the APA's notice requirements. Pls.' Mem. at 70. A review of the Commission's NPRM reveals that the Commission's proposed regulation defining GOTV read as follows:

Federal election activity means ....

The following activities conducted in connection with an election in which one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(iii) Get-out-the-vote activity. Examples of get-out-the-vote activity include transporting voters to the polls, contacting voters on election day or shortly before to encourage voting but without referring to any clearly identified candidate for Federal office, and distributing printed slate cards, sample ballots, palm cards, or other printed listing(s) of three or more candidates for any public office

NPRM: Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,674. In the NPRM, the Commission solicited comments on: "whether there should be a *de minimis* level of GOTV activities related to Federal elections that would nonetheless not render these activities 'Federal election activities' under BCRA;" whether "additional examples of GOTV activity" should be included in the final version of the rule; "whether printed slate cards, sample ballots, and palm cards should properly be considered GOTV activities or 'public communications;'" and whether "slate cards, sample ballots, and printed listings of three or more candidates [should be] exempted from the Act's defi-

nitions of 'contribution' and 'expenditure.'" *Id.* at 35,656.

After reviewing the draft rule and the Commission's solicitation of comments, the Court cannot conclude that "interested parties reasonably could have anticipated the final rulemaking from the draft rule." *Anne Arundel County*, 963 F.2d at 418 (internal alteration omitted). The Commission's proposed rule did not limit the definition of the term "get-out-the-vote activity," providing only examples of what constitutes "get-out-the-vote activity," and its NPRM solicited comments about whether *additional* activities should be added to those enumerated in the proposed rule. *See* NPRM: Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,674, 35,656. The Court therefore cannot find, and the Commission does not explain, how commenters "*ex ante*, should have anticipated that such a requirement might be imposed ...." *Ariz. Pub. Serv.*, 211 F.3d at 1299 (internal quotation marks omitted).

Defendant does note that the Commission did solicit comments on whether or not a *de minimis* exemption should be adopted for GOTV activities; however, it does not argue in its briefs that this construction of the statute was an exercise of the FEC's inherent authority to create such an exemption, or even argue that the change in the provision is in fact *de minimis*. Def.'s Mem. at 27 n. 47. Moreover, its change to the proposed rule did not create an exemption; rather it changed the entire rule. The Court therefore rejects the FEC's argument that its solicitation of comments regarding a *de minimis* exemption makes the final rule a "logical outgrowth" of the proposed rule.[82] The

82. The Commission cites to comments submitted by the Michigan Democratic Party as raising issues that led to its final rule. Defs.' Opp'n at 27 n. 47. A review of these com-

ments reveals no discussion of changing the definition of GOTV, or providing a *de minimis* exemption. *See* Administrative Record at 05676 (discussing removing some of the enu-

Court therefore finds that the Commission's regulation defining GOTV activities violates the APA.

### iii. Voter Identification

 Congress identified "voter identification" as a "Federal election activity" if it is "conducted in connection with an election in which a candidate for Federal office appears on the ballot...." 2 U.S.C. § 431(20)(A)(ii); *McConnell,* 124 S.Ct. at 675. The Commission has defined "voter identification" to mean

> creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. This paragraph shall not apply to an association or similar group of candidates for State or local office or of individuals holding State or local office if the association or group engages in voter identification that refers only to one or more State or local candidates.

11 C.F.R. § 100.24(a)(4). Plaintiffs complain that this definition "excludes a core voter identification activity—the purchase of voter lists." Pls.' Mem. at 63.[83]

The Court begins by considering whether Congress "has directly spoken on the precise question[s] at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Congress included "voter identification" as a Federal election activity, but did not define the

term. *See* 2 U.S.C. § 431(20)(A)(ii). Plaintiffs claim that by excluding the acquisition of voter lists, the FEC has "exclude[d] a core voter identification activity." Pls.' Mem. at 63. Defendant notes that Plaintiffs have cited no support for their contention that voter list acquisition is a core voter identification activity. Def.'s Opp'n at 28. This is true, but this Court in using traditional tools of statutory interpretation to discern Congress's intent "may consider the common usage of the term. Indeed, unless contrary indications are present, a court can assume that Congress intended the common usage of the term to apply." *Inner City Broad. Corp. v. Sanders,* 733 F.2d 154, 158 (D.C.Cir. 1984) (citation omitted). It is readily apparent to the Court that "voter identification" means acts taken to identify potential voters. Acquiring a list of voters would appear to be the basic form of this activity. However, even when "statutory language ... appears superficially clear," "statutory design and pertinent legislative history may often shed new light on congressional intent." *Browner,* 57 F.3d at 1127 (internal quotation marks omitted). Defendant, citing to its E & J, argues that acquisition of voter lists does not constitute "voter identification" as it was intended to be read under Title I of BCRA. There the FEC explained:

> The Commission recognizes that even during the period when a Federal candidate appears on the ballot, the act of

merated activities from the definition). Defendant also cites to comments made by the Michigan Democratic Party's chair at the public hearings held on the regulation. Defs.' Opp'n at 27 n. 47. The Commission does not explain how comments made after the Commission's notice would have allowed interested parties to have "anticipated the final rulemaking from the draft rule." *Anne Arundel County,* 963 F.2d at 418 (internal alteration omitted).

**83.** Plaintiffs also contest the Commission's exclusion of voter identification activities conducted "by an association or similar group of candidates for State or local office or of individuals holding State or local office if such communication refers only to one or more State or local candidates." Pls.' Mem. at 66–67. The Court finds this exclusion violates *Chevron* step one for reasons provided *supra* in its discussion of the Commission's regulations defining GOTV activity. *See supra* at 103.

acquiring a voter list in and of itself does not constitute voter identification. Committees have a number of reasons for acquiring voter lists, including fundraising and off-year party building activities. Such activity, on its face, does not constitute "voter identification" with respect to the statute, as there lacks a nexus between the activity and the statutory language that contemplates activity "in connection with an election in which a candidate appears on the ballot."

Prohibited & Excessive Expenditures, 67 Fed.Reg. at 49,069; Def.'s Mem. at 32 (stating that Plaintiffs' version of the term "would overreach, requiring the use of Federal funds for activity unrelated to Federal elections, such as fundraising in connection with local elections"). The Commission points out that its conclusion that voter lists are acquired for non-voter identification purposes is supported by the administrative record. Def.'s Mem. at 31 (citing Prohibited & Excessive Expenditures, 67 Fed.Reg. at 49,069). Many of the commenters urged the Commission to adopt a definition of "voter identification" limited to activities that are designed to discern political preferences in voting or likelihood of voting. Prohibited & Excessive Expenditures, 67 Fed.Reg. at 49,069 (noting comments from "[a] consortium of non-profit groups," a state party committee, several national party committees, and labor organizations).

The Court agrees that one may obtain a voter list and not be engaged in an activity aimed at identifying voters. But whatever the intent, inherent in the acquisition of such a list is the identification of voters. While a literal reading of the term "voter identification" may or may not have unintended consequences,[84] the Court has been

provided no evidence that *Congress intended* to exclude certain forms of activities that identify voters when it used the term "voter identification." Given this state of affairs, the Court finds that this aspect of the Commission's regulation fails *Chevron* step one review.

Accordingly, the Court finds that the Commission's definition of "voter identification" fails *Chevron* step one.

### iv. Generic Campaign Activity

 Congress also deemed "Federal election activity" to include "generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot ...." 2 U.S.C. § 431(20)(A)(ii). Congress defined the phrase "generic campaign activity" to mean "a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate." *Id.* § 431(21). The Commission's regulation has defined the phrase as follows: "a public communication that promotes or opposes a political party and does not promote or oppose a clearly identified Federal candidate or a non-Federal candidate." 11 C.F.R. § 100.25. Plaintiffs complain that the Commission's regulation impermissibly narrows the scope of the phrase by limiting it to activities that constitute "public communications," a term of art defined by BCRA and the Commission's regulations. Pls.' Mem. at 64; 2 U.S.C. § 431(22); 11 C.F.R. § 100.26; *see also supra* at 64 (discussion of "public communication" regulation). Plaintiffs point out that in so doing, the Commission has "excluded a broad range of important campaign activity, including most Internet communications and mailing and phone banks directed to fewer than 500 people. It thus opened a sub-

---

84. The Court observes that in support of their views of Congressional intent, Defendant points to Congress's attempts at narrowly tailoring its restrictions, while Plaintiffs rely on BCRA's purpose of preventing circumvention of the Act's nonfederal money prohibitions.

stantial loophole never authorized by Congress." Pls.' Mem. at 65.

Turning to step one of the *Chevron* inquiry, the Court examines whether Congress has spoken directly on this question. Plaintiffs argue that had Congress intended to limit the definition of "generic campaign activity" to "public communication[s]," it would not have treated each term as a distinct concept, providing each with a separate definition. Pls.' Mem. at 64; 2 U.S.C. §§ 431(21)-(22). They contend that "had Congress intended to narrow the reach of 'generic campaign activity' in the manner the Commission adopted, it could easily have done so—and would have done so." *Id.* Defendant responds that there is nothing in the Act that "specifies which particular state political party activities should be considered 'campaign activity' and which should not," and that the Commission's regulation aims to "resolve that ambiguity." Def.'s Mem. at 33. The Commission notes that "plaintiffs do not point to any language in BCRA evincing congressional intent to include or exclude any particular activity as 'generic campaign activity.'" *Id.* at 34. The Court agrees with Defendant. Congress in defining "generic campaign activity" included the undefined term "campaign activity," the scope of which is subject to differing views. The Court therefore finds that the term is ambiguous, and that the regulation survives *Chevron* step one. *See AFL–CIO,* 333 F.3d at 174.

Turning to *Chevron* step two, the Court asks whether the Commission's construction of the statute is permissible. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. The question for the Court at this stage is not whether it views the construction as appropriate, but "whether the [Commission's] view that it is appropriate in the context of this particular program is a reasonable one." *Id.* at 845, 104 S.Ct. 2778. The

Commission argues that its construction ensures that a political party's internal communications are not captured by the definition, and "avoids regulation of small scale party activities that are not designed to garner support·for, or opposition to, the party and focuses instead on the types of generic party activities that, in the Commission's experience, political parties typically use to influence elections." Def.'s Mem. at 33–34. The FEC also contends that "it is difficult to envision how a campaign activity could effectively promote or oppose a political party without it taking the form of a public communication." *Id.* at 34 (quoting Prohibited & Excessive Communications, 67 Fed.Reg. at 49,071). As for the exclusion of limited mailings and phone banks, the Commission argues that it has the authority to implement *de minimis* exemptions, and that these exclusions are ones Congress included in the Act. *Id.* at 35. The Commission does not discuss the exclusion of the Internet in its discussion of the *de minimis* exemption doctrine.

Implicit in the Commission's argument that its construction is reasonable is that all campaign activity that is defined should be included in the definition of "generic campaign activity" unless it is *de minimis* campaign activity. The activities the Commission has deemed *de minimis* are those Plaintiffs assert should be included in the regulation. Therefore, it is necessary to examine whether or not the exceptions created by the Commission are appropriate.

This Circuit has explained that "[c]ategorical exemptions may ... be permissible as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered *de minimis.*" *Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C.Cir. 1979); *see also Environmental Def. Fund*

*v. Environmental Protection Agency,* 82 F.3d 451, 466 (D.C.Cir.1996) ("*EDF* ") (explaining the *Alabama Power* decision). The basis for this doctrine is the view that "the law does not concern itself with trifling matters." *Id.* The doctrine, however, is not to be used "to depart from the statute, but rather ... [is] to be used in implementing the legislative design." *Id.* "In this respect, the principle is a cousin of the doctrine that, notwithstanding the 'plain meaning' of a statute, a court must look beyond the words to the purpose of the act where the literal terms lead to 'absurd or futile results.'" *Id.* at 360 n. 89 (quoting *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)).

When determining whether such an exemption is warranted, a court must assess[ ][the] particular circumstances, and the agency ... bear[s] the burden of making the required showing." *Id.* at 360. While this Circuit has observed that "[u]nless Congress has been extraordinarily rigid, there is likely a basis for an implication of *de minimis* authority to provide exemption when the burdens of regulation yield a gain of trivial or no value," it has cautioned that this

> implied authority is not available for a situation where the regulatory function does provide benefits, in the sense of furthering regulatory objectives, but the agency concludes that the acknowledged benefits are exceeded by the costs. For such a situation any implied authority to make cost-benefit decisions must be based not on a general doctrine but on a fair reading of the specific statute, its aims and legislative history.

*Id.* at 360–61.

Defendant defends its exemptions, arguing that Congress wrote these exemptions into the Act, thereby indicating that such activities may be excluded from regulation because they do not create the appearance of corruption. Def.'s Mem. at 35. The Commission argues that it "simply limited generic campaign activity in the same manner that Congress limited 'public communications' in 2 U.S.C. [§ ] 431(23) and (24), and it could hardly be found unreasonable for the Commission to incorporate into 11 C.F.R. [§ ] 100.25 a *de minimis* exception originated by Congress itself." *Id.* The Court discerns several problems with Defendant's argument. First, the definition of "generic campaign activity" is connected to Congress's efforts to prevent circumvention of its campaign finance laws as much as it is to preventing the appearance of corruption. More importantly, Congress in enacting a statute may, within the Constitution's bounds, shape its contours however it deems appropriate; the FEC does not have the same flexibility. The fact that Congress included exemptions from its definition of "public communication," does not mean that the exemptions are *de minimis,* or that it intended for the same exemptions to be incorporated in other parts of the statute. Finally, Congress never explicitly excluded the Internet from coverage under its "public communication" definition, and Defendant provides no argument as to how excluding Internet communications entirely, which Plaintiff points out "might reach millions of potential voters," Pls.' Opp'n at 47, is a *de minimis* exemption. The Court therefore must conclude that Defendant has failed to meet its burden of justifying its "*de minimis* exemption."

Defendant raises one additional argument in defending its construction of "generic campaign activity." It argues that Plaintiffs' construction would create

> an anomaly where small phone banks that make no mention of any federal candidate are regulated as "Federal election activity" while those that pro-

mote, support, attack or oppose a clearly identified federal candidate are not. There is no language in BCRA or other evidence that suggests that Congress allowed the use of soft money for such candidate-specific communications but required the Commission to permit only federal and Levin funds to be used for more general communications solely concerning a political party. Thus, applying the same cutoff to "generic campaign activity" is a reasonable policy choice about where to draw the line on intruding into state election activities. Def.'s Opp'n at 29 (citing 2 U.S.C. § 431(20)(A)(iii) [85]).[86] This argument has more merit. It would indeed be anomalous for Congress to have placed greater strictures on activities that promote political parties than on activities that support

or attack a candidate. Given the ambiguity in the statutory provision, the Court finds that Commission's "view that [this construction] is appropriate in the context of this particular program is a reasonable one." *Chevron*, 467 U.S. at 845, 104 S.Ct. 2778.[87] However, this conclusion can only be reached with respect to the Commission's exclusion of small phone banks and mailings. Congress did not exclude Internet communications from its definition of "public communication"—the FEC did. *See* 2 U.S.C. § 431(22)-(24). This fact prevents the FEC's lone meritorious justification for its definition of "generic campaign activity" from applying to Internet communications.[88] In its *Chevron* step one analysis, the Court noted that "campaign activity" is an ambiguous term. However, if a form of activity can be "campaign activi-

---

**85.** This provision provides that Federal election activity includes

a *public communication* that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)

2 U.S.C. § 431(20)(A)(iii) (emphasis added). The Act defines "public communication to exclude telephone banks making less than 500 calls in a 30–day period as well as mailings that do not exceed 500 pieces in a 30–day period." *Id.* § 431(22)-(24).

**86.** Defendant raises this argument for the first time in its Opposition brief. Plaintiff did not ask for leave to respond to the argument.

**87.** Plaintiffs do not appear to raise an *Orloski* argument in their attack on this provision. *See* Pls.' Mem. at 64–65, 68–69 (not arguing that the "generic campaign activity" regulation undermines the Act's purposes). The Court notes that given the Commission's argument regarding the interaction between 2 U.S.C. § 431(20)(A)(ii) and 2 U.S.C. § 431(20)(A)(iii), this would be a difficult argument to substantiate.

**88.** The Court observes that in making its anomalous result argument the FEC did not reference Internet communications. *See* Def.'s Opp'n at 29. The Court also notes that in general, the FEC did not address the exclusion of the Internet in its briefing concerning its definition of "generic campaign activity." The Commission did address the appropriateness of excluding Internet communications from its definition of "public communication" and claims that discussion applies to the current analysis. Def.'s Mem. at 34 n. 11. The Court disagrees. As noted *supra*, "generic campaign activity" and "public communication" are two distinct concepts defined by Congress in separate provisions of BCRA. The Court in examining the current regulation must determine whether or not the exclusion of Internet communications from the definition of "generic campaign activity" is a permissible construction of the statute. Since the statutory provision at issue speaks only of "campaign activity," and not of "public communications," the Commission's justification for excluding Internet communications from the latter is not necessarily transferrable to the former. A review of the Commission's defense of the exclusion from its definition of "public communication" bears this point out. *See* Def.'s Mem. at 35–40.

ty"—and it is clear to the Court that Internet communications can constitute "campaign activity"—the Court sees no basis for the wholesale exclusion of that form of activity from the definition of "generic campaign activity" under the terms of the statute. *See* 2 U.S.C. § 431(21); *see also* Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,071 ("A number of commenters argued that the Internet provides a low cost way for parties ... to disseminate their message widely ...."). Accordingly, the Court finds the wholesale exclusion of the Internet from the definition of "generic campaign activity" to be an impermissible construction of the Act.

█ Plaintiffs also contend that the Commission failed to provide adequate notice that "it might limit 'generic campaign activity' to 'public communications,' in violation of the APA. Pls.' Mem. at 70. In its NPRM, the Commission proposed to define "generic campaign activity" as follows: "Generic campaign activity means a campaign activity that promotes or opposes a political party and does not promote or oppose a Federal candidate or a non-Federal candidate." NPRM: Prohibited & Excessive Contributions, 67 Fed.Reg. at 35,675. The Commission sought comments "on the extent, if any, to which the exclusions for exempt activities in 11 C.F.R. [§ ] 100.7(b)(9), (15), (17) and 100.8(b)(8), (10), and (16), should apply to the definition of 'generic campaign activity.'" *Id.* at 35,657. These exclusions, however, had nothing to do with defining the term "campaign activity" as "public communication."[89] The NPRM is devoid of any mention of altering the definition of "generic campaign activity" except for potentially adding certain specific exclusions. The Court cannot fathom how an interested party "could have anticipated the final rulemaking from the draft rule." *Anne Arundel County*, 963 F.2d at 418. Defendant does not attempt to explain how any party could have anticipated this final rule, and provides no indication that any party submitted comments on this matter. Def.'s Opp'n at 27 n. 70; *see also* Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,071 (discussing the new rule but

**89.** The then-existing regulation codified at 11 C.F.R. § 100.7 provided the scope and definitions for the term "Contribution." 11 C.F.R. § 100.7 (2001). It included exclusions for numerous types of "payments, services or other things of value." *Id.* § 100.7(b). Included in these exclusions were spending by state and local committees of political parties for: (1) "printed slate card[s], sample ballot[s], palm card[s] or any other printed listing(s) of three or more candidates for public office for which an election is held in the State in which the committee is organized," *id.* § 100.7(b)(9); (2) certain "campaign materials ... used by such committee[s] in connection with volunteer activities on behalf of any nominee(s) of such party," *id.* § 100.7(b)(15); and (3) certain "voter registration and get-out-the-vote activities conducted by such committee on behalf on the Presidential and Vice–Presidential nominee(s) of that party," *id.* § 100.7(b)(17).

The then-existing regulation codified at 11 C.F.R. § 100.8 provided the scope and defini-

tions for the term "Expenditure." *Id.* § 100.8 (2001). It included exclusions for numerous types of "payments, gifts or other things of value." *Id.* § 100.8(b). Included in these exclusions were: (1) "[t]he sale of any food or beverage by a vendor ... for use in a candidate's campaign, or for use by a political committee of a political party, at a charge less than the normal or comparable charge," subject to certain qualifications, *id.* § 100.8(b)(8); (2) "[t]he payment by a State or local committee of a political party of the costs" related to "printed slate card, sample ballot, palm card, or other printed listing(s) of three or more candidates for any public office for which an election is held in the State in which the committee is organized," *id.* § 100.8(b)(10); and (3) "[t]he payment by a state or local committee of a political party of the costs of campaign materials ... used by such committee in connection with volunteer activities," subject to certain conditions, *id.* § 100.8(b)(16).

making no reference to comments). Accordingly, the Court must find that Defendant violated the APA's notice requirements in its rulemaking related to the definition of "generic campaign activity."

### v. *Employees of State, District of Local Political Party Committees*

▮ Congress included within the scope of "Federal election activity" "services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election." 2 U.S.C. § 431(20)(A)(iv). The Supreme Court described this provision as a "prophylactic rule" that prevents a political party from using "soft money to pay for the equivalent of a full-time employee engaged in federal electioneering, by the simple expedient of dividing the federal workload among multiple employees." *McConnell*, 124 S.Ct. at 676. The Commission promulgated a regulation after the passage of BCRA addressing salaries and wages. The regulation provides:

> Salaries and wages for employees who spend more than 25% of their compensated time in a given month on Federal election activity or activities in connection with a Federal election must not be allocated between or among Federal, non-Federal, and Levin accounts. Only Federal funds may be used. Salaries and wages for employees who spend 25% or less of their compensated time in a given month on Federal election activity or activities in connection with a Federal election shall be paid from funds that comply with State law.

11 C.F.R. § 300.33(c)(2). According to Plaintiffs, this regulation "indirectly" undermines the definition of "Federal election activity." Pls.' Mem. at 67. Plaintiffs contend that Congress passed 2 U.S.C. § 431(20)(A)(iv) with the understanding "that, under longstanding Commission regulations, employees spending less than 25 percent of their time on Federal election activities would be subject to allocation rules." *Id.* at 67–68.[90] Plaintiffs say that this change is not supported by BCRA, and "invite[s] circumvention of the state party soft money rules" because political parties can now "arrange their affairs so that employees spend up to 24 percent of their time on Federal election activity, yet fund their salaries entirely with soft money." *Id.* at 68.

The Court begins its analysis by examining whether Congress has "directly spoken on the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. It is clear that in light of BCRA's purposes, Plaintiffs' view that employees spending less than 25 percent of their compensated time on Federal election activity should be paid from funds allocated between federal and nonfederal funds is consistent with the statutory scheme. The Court, however, only looks to see if Congress has directly indicated its intent at this stage of the analysis. The only indication of Congress's intent put before the Court on this matter is 2 U.S.C. § 431(20)(A)(iv). Since that provision speaks only to how state, district or local political party committees should fund the activities of their employees who spend *more* than 25 percent of their paid time on Federal election activities, the Court has no basis for concluding that Congress directly spoke on the question of how state and local parties should

---

**90.** Defendant acknowledges that this was the regime in place pre-BCRA. Def.'s Mem. at 57

(citing 11 C.F.R. § 106.5(a)(2) (2001)).

fund the activities of their employees who spend *less* than 25 percent of their compensated time on Federal election activities.[91]

This fact also precludes the Court from finding that the Commission's construction of the statute is facially impermissible under *Chevron* step two. Plaintiffs, however, raise an *Orloski* argument, claiming that the Commission's regulation would invite circumvention of the state party nonfederal money rules. Pls.' Mem. at 68. Defendant responds that "it is unlikely that State parties will engage in such inefficient and disruptive employee practices in the heat of a campaign. However, if plaintiffs' fears arise, they may petition the Commission to change the rule or Congress can amend the Act." Def.'s Opp'n at 32. As noted *supra*, Plaintiffs' approach is clearly more consistent with Congress's overall scheme of requiring Federal election activities to be paid for with federal funds. The question for the Court, however, is whether the Commission's regulation "unduly compromises the Act's purposes...." *Orloski*, 795 F.2d at 164. It is clear to the Court that it does compromise the Act's purposes of preventing circumvention of its national party committee nonfederal money ban and stemming the flow of nonfederal money *into* activities that impact federal elections. As the Supreme Court observed, 2 U.S.C. § 441i(b) "prevents donors from contributing nonfederal funds to state and local party committees to help finance 'Federal election activity.'" *McConnell*, 124 S.Ct. at 671. Moreover, the Supreme Court recognized that the 25 percent rule passed by Congress was an effort to prevent circumvention of this rule by state and local parties "dividing the

federal workload among multiple employees." *Id.* at 676. In the absence of restrictions on those employees spending less than 25 percent of their time on Federal election activity, there is nothing to prevent this circumvention from occurring, albeit among more employees. It is clear that this change to the regulation "create[s] the potential for gross abuse," *Orloski*, 795 F.2d at 165, and therefore cannot stand.

### f. "Levin Amendment" Regulations

The so-called Levin Amendment to BCRA, codified at 2 U.S.C. § 441i(b)(2), "carves out an exception to [BCRA's] general rule" that donors are prohibited "from contributing nonfederal funds to state and local party committees to help finance 'Federal election activity.'" *McConnell*, 124 S.Ct. at 671. The general rule's purpose is to "prevent[] the wholesale shift of soft-money influence from national to state party committees by prohibiting state and local party committees from using such funds for activities that affect federal elections." *Id.* at 654–55. The Levin Amendment "allows state and local party committees to pay for certain types of federal election activity with an allocated ratio of hard money and 'Levin funds'—that is, funds raised within an annual limit of $10,000 per person," with certain restrictions. *Id.* at 671–72. Plaintiffs challenge three aspects of the Commission's regulations related to the Levin amendment. Pls.' Mem. at 70–71. The Court addresses each in turn.

### i. "De Minimis" Exemption

■■■ The Commission, in promulgating its rules regulating Levin funds, provided that

---

**91.** To the extent Plaintiffs have raised a legislative reenactment argument, the Court finds that the absence of any indication that Congress relied on the Commission's past treatment of the term and the Court's discussion of the legislative reenactment doctrine *supra* at 60, mandates the rejection of the argument.

The disbursements for allocable Federal election activity that exceed in the aggregate $5,000 in a calendar year may be paid for entirely with Federal funds or may be allocated between Federal funds and Levin funds according to 11 CFR [§ ] 300.33. Disbursements for Federal election activity that may be allocated and that aggregate $5,000 or less in a calendar year may be paid for entirely with Federal funds, entirely with Levin funds, or may be allocated between Federal funds and Levin funds according to 11 CFR [§ ] 300.33.

11 C.F.R. § 300.32(c)(4). Plaintiffs argue that this regulation undermines BCRA's requirement that state, district and local political party committees spend federal funds on "Federal election activity" except as permitted by the Levin Amendment provisions. Pls.' Mem. at 70–71 (citing 2 U.S.C. § 441i(b)(1)-(2)). They note that the Levin Amendment's exception to the requirement that these committees use only federal funds to fund their "Federal election activities" "on its face applies *only* to the extent that covered expenditures or disbursements 'are allocated (under regulations prescribed by the Commission) among' federal funds and Levin funds." *Id.* at 71 (quoting 2 U.S.C. § 441i(b)(2)) (emphasis in original). Therefore, the fact that the regulation permits expenditures on "Federal election activity" that aggregate $5,000 or less in a calendar year to be

made with purely Levin funds, according to Plaintiffs, "rewrites the statute." *Id.*[92]

FECA bars the spending of nonfederal funds by state, district or local committees of political parties on "Federal election activity," except as provided for by the Levin Amendment. 2 U.S.C. § 441i(b)(1). The Levin Amendment permits state, district or local committees of political parties to spend "Levin" funds on certain "Federal election activit[ies]," provided that the spending is allocated between Levin and federal funds. *Id.* § 441i(b)(2). Therefore, Plaintiffs are correct that Congress has spoken clearly on the issue at hand.[93] Levin funds are clearly permitted to be spent on the enumerated federal election activities only when allocated with federal funds. Notwithstanding this fact, the FEC contends that its regulation is a permissible *de minimis* exemption. Def.'s Mem. at 54–56. Plaintiffs dispute that such an exemption is permitted in this instance. Pls.' Opp'n at 50.

The Commission relies on its E & J in justifying 11 C.F.R. § 300.32(c)(4). Def.'s Mem. at 54–55. In its E & J, the FEC laid out its reasons for adopting the $5,000 exemption:

First, the Commission notes that the reporting requirements for Federal election activity contain an exception for activity below $5,000 in the aggregate in a calendar year. *See* 2 U.S.C. [§ ] 434(e)(2)(A). While that exception ap-

---

92. In their opening brief, Plaintiffs argue that the FEC's regulations "allow the first $5,000 of Federal election activity to be paid for *entirely* with Levin funds—*i.e.* with no allocation at all." Pls.' Mem. at 71 (emphasis in original) (citing 11 C.F.R. § 300.32(c)(4)). Defendant notes that this is an incorrect summary of the provision, observing that "[t]he application of the regulation turns on whether a committee spends an 'aggregate' of $5,000 on Federal election activities during a calendar year; disbursements exceeding $5,000 in the aggregate must be allocated." Def.'s

Mem. at 55–56. Plaintiffs do not respond to this point in their Opposition brief, though they assert that they "stand on their previous arguments...." *See* Pls.' Opp'n at 50. A review of the regulation makes clear that the FEC is correct on this point. *See* 11 C.F.R. § 300.32(c)(4).

93. Defendant does not address the *Chevron* step one analysis. *See* Def.'s Mem. at 54–56; Def.'s Opp'n at 32.

plies to aggregate receipts and disbursements, rather than just aggregate disbursements, it does suggest that Congress did not take a rigid approach to low levels of Federal election activity. Second, the Commission is particularly sensitive to the nature of the Federal election activity to which this provision applies: Grassroots activities for which references to Federal candidates are prohibited. There is a far weaker nexus between Federal candidates and this category of Federal election activity than other types of Federal election activity for which Levin funds are prohibited. Finally, the Commission notes that $5,000 is *only half* of what any single donor may donate (subject to State law) to each and every State, district, and local party committee under 2 U.S.C. [§ ] 441i(b)(2), so there is no danger that allowing a committee to use entirely Levin funds for allocable Federal election activity that aggregates $5,000 or less in a calendar year will somehow lead to circumvention of the amount limitations set forth in 2 U.S.C. [§ ] 441i(b)(2).

Prohibited & Excessive Contributions, 47 Fed.Reg. at 49,097. In its briefing, the Commission adds that the "regulation is designed simply to reduce unnecessary Federal regulatory burdens on party committees that spend only a *de minimis* amount on Federal election activities." Def.'s Mem. at 55.[94]

Examining the Commission's proffered rationales, the Court observes that since Congress did not provide for this exemp-

tion, the question is whether or not Congress has "been 'extraordinarily rigid' in drafting the statute" so that the FEC was entitled to exercise its inherent authority. *Envtl. Def. Fund* ("*EDF*"), 82 F.3d at 466 (quoting *Alabama Power,* 636 F.2d at 360); *see also supra* at 109 (discussing the standard for reviewing *de minimis* exemptions). The only "rigidity" argument the FEC makes is that FECA's reporting provisions require the reporting of "all receipts and disbursements" for "Federal election activit[ies]," "unless the aggregate amount of such receipts and disbursements during the calendar year is less than $5,000." Def.'s Mem. at 55 (quoting 2 U.S.C. § 434(e)(2)(A)). The Court does not find that this provision has any bearing on Congress's rigidity with respect to the expenditure of Levin funds on "Federal election activity." As an initial matter, as this Circuit has noted, "a *de minimis* exemption cannot stand if it is contrary to the express terms of the statute." *EDF,* 82 F.3d at 466; *see also Alabama Power,* 636 F.2d at 360 ("The ability ... to exempt *de minimis* situations from a statutory command is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design."); *cf. EDF,* 82 F.3d at 467 (noting that a court is to treat an agency's justification for its *de minimis* exemption with the same deference it should accord its statutory interpretation under *Chevron* step two); The Court has already found that Congress clearly expressed its intent in BCRA's statutory language that all "Federal election activity" pursued by

---

94. The Court notes that this argument is in essence a conclusion that the benefits of enforcing the law against such entities is outweighed by the costs. This Circuit has rejected such reasoning as justifying *de minimis* exemptions. *See Public Citizen v. FTC,* 869 F.2d 1541, 1557 (D.C.Cir.1989) ("The authority to create these exceptions does *not* extend

to a situation where the regulatory function does provide benefits, in the sense of furthering the regulatory objectives, *but the agency concludes that the acknowledged benefits are exceeded by the costs.*") (quoting *Alabama Power,* 636 F.2d at 360–61) (emphasis added by *Public Citizen* court).

state, local and district political party committees is to be paid for using federal funds, except for certain circumstances where such committees may use an "allocated" ratio of federal and Levin funds. 2 U.S.C. § 441i(b)(1)-(2). While it is true that "the literal meaning of a statute need not be followed where the precise terms lead to absurd or futile results, or where failure to allow a *de minimis* exemption is contrary to the primary legislative goal," *EDF*, 82 F.3d at 466 (quoting *State of Ohio v. U.S. Environmental Protection Agency*, 997 F.2d 1520, 1535 (D.C.Cir.1993)), the FEC, which has the burden on this matter, has failed to demonstrate that such effects would result in the absence of its *de minimis* exemption. A review of this Circuit's caselaw reveals only two cases where a *de minimis* exemption has been upheld,[95] one finding the absence of the exemption would lead to "absurd or futile results," *State of Ohio*, 997 F.2d at 1535, while the other found the exemption comported with the statute's purposes, *EDF*, 82 F.3d at 466.[96] The Court does not find that Defendant has established that either rationale justifies the *de minimis* exemption for the present regulation.

Accordingly, the Court finds that 11 C.F.R. § 300.32(c)(4) runs contrary to Congress's intent, and therefore violates *Chevron* step one.

### ii. Funds Permitted to be Used for Raising "Levin" Funds

■ BCRA's nonfederal money provisions include restrictions on the manner in which national, state, district and local committees, as well as certain entities and individuals affiliated with such committees,

may raise funds which are to be used for "Federal election activit[ies]." BCRA provides that

> An amount spent by a person described in subsection (a) or (b) of this section to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations prohibitions, and reporting requirements of this Act.

2 U.S.C. § 441i(c). The FEC's regulation implementing this statutory provision reads as follows:

> State, district, and local party committees that raise Levin funds to be used, in whole or in part, for Federal election activity must pay the direct costs of such fundraising with *either* Federal or Levin funds. The direct costs of a fundraising program or event include expenses for the solicitation of funds and for the planning and administration of actual fundraising programs and events.

11 C.F.R. § 300.32(a)(4) (emphasis added). Plaintiffs challenge this regulation, contending that it "permit[s] state, district, and local parties to use Levin funds to pay for the costs of raising more Levin funds, in clear contravention of" 2 U.S.C. § 441i(c). Pls.' Mem. at 71. As noted *supra*, Section 441i(c) provides that only funds "subject to the limitations, prohibitions, and reporting requirements of this Act," can be used to raise money that is used to fund "federal election activity." There is no dispute among the parties that this provision applies to the raising of Levin funds, the only question is whether or not permitting the use of Levin funds to

---

95. The only such case provided by Defendant is *EDF*.

96. The Court notes that both of these cases also held that the statutory language was not

so rigid as to foreclose the agency's *de minimis* exemption. *See EDF*, 82 F.3d at 465–67; *State of Ohio*, 997 F.2d at 1534–36.

raise Levin funds is permitted under the Act.

Under *Chevron* step one, the Court looks to see if Congress has "directly spoken" on this precise matter. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Plaintiffs maintain that 2 U.S.C. § 441i(c) clearly mandates that only federal funds be used to raise Levin funds. Pls.' Mem. at 71 n. 122; Am. Compl. ¶ 71b. Defendant disagrees. As Defendant points out, Levin funds *"are* subject to the limitations and prohibitions found in the Act at 2 U.S.C. § 441i(b)(2), and to the reporting requirements found in the Act at 2 U.S.C. § 434(e)(2)(A)," thus placing them within the class of funds the statute approves for use in raising Levin funds. Def.'s Mem. at 52–53 (emphasis in original); *see also id.* at 53 n. 21. Defendant also contends that other statutory provisions support its reading of the statute. *Id.* at 53. Section 441i(b)(2)(A) permits state, district and local political party committees to use nonfederal funds in connection with voter registration, voter identification, get-out-the-vote-activity, and generic campaign activity that coincides with an election where a federal candidate is on the ballot, subject to certain restrictions. 2 U.S.C. § 441i(b)(2)(A). Included within these restrictions is the requirement that such committees pay for such activity with an allocated ratio of two types of funds. *Id.*

The first is to "consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii))." 2 U.S.C. § 441i(b)(2)(A)(i). Subparagraph (B)(iii) describes Levin funds. *Id.* § 441i(b)(2)(B)(iii). Therefore, the plain reading of this provision makes clear that Levin funds are funds "subject to [FECA's] limitations, prohibitions, and reporting requirements."[97] The second type of funds must consist solely of "other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection)." *Id.* § 441i(b)(2)(A)(ii). Since the requirements related to Levin funds are found in the same subsection, this provision reinforces the point that Levin funds are "subject to the limitations, prohibitions, and reporting requirements of this Act."

Plaintiffs respond to this argument by stating that the Commission's reading is "contrary to the most natural reading of 2 U.S.C. § 441i(c)," as well as "clear legislative history ... demonstrating that Congress intended to require parties to use hard money to raise Levin funds." Pls.' Opp'n at 50.[98] In support of their position, Plaintiffs cite to an exhibit placed in the legislative record by Senator Feingold during the Senate's consideration of BCRA.[99]

---

**97.** The Commission in its E & J notes that this reading is "somewhat incomplete, in that ... the reporting requirements for Levin activity ... are found in a different section of the Act (2 U.S.C. [§ ] 434(e))," but notes that the language is "nonetheless a recognition that Levin funds are subject to the requirements of the Act." Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,096; *see also id.* at 49,095–96 (providing further discussion supporting the Commission's statutory interpretation). Plaintiffs do not contend that the Commission's reading of this provision is incorrect, or that Levin funds were not intended

to be excluded from 2 U.S.C. § 441i(b)(2)(A)(i).

**98.** Plaintiffs do not directly attack the Commission's statutory construction argument.

**99.** Plaintiffs also rely on a conclusion reached by the FEC's General Counsel articulated at the Commission's Open Meeting on the regulations. *Id.* at 50 n. 71. The FEC objects to the Court's consideration of transcripts from its Open Meetings, claiming that they are not properly part of the administrative record. Def.'s Mot. to Strike at 10. Irrespective of the propriety of reviewing such matters, the

*Id.* at 50 n. 71. On March 18, 2002, Senator Feingold opened debate on BCRA, and submitted into the record "a section-by-section analysis of the bill," which provided that BCRA § 323(c), codified at 2 U.S.C. § 441i(c), "[r]equires national, state, and local parties to use hard money to raise money that will be used on Federal election activities, as defined by the bill." 148 Cong. Rec. S1992 (daily ed. Mar. 18, 2002) (Exhibit No. 1). While, as noted *supra,* remarks "of the sponsor of the language ultimately enacted are an authoritative guide to the statute's construction," *Bell,* 456 U.S. at 526–27, 102 S.Ct. 1912,

> legislative intention, without more, is not legislation. The issue here is not how Congress expected or intended the [Commission] to behave, but how it *re-*

*quired* [it] to behave, through the only means by which it can (as far as the courts are concerned, at least) require anything—the enactment of legislation. Our focus, in other words, must be upon the text . . . .

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,* 746 F.2d 855, 859–60 (D.C.Cir. 1984) (internal quotation marks and citations omitted) (emphasis in original), *cert. denied sub nom, Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985).[100] A single comment, even by a chief sponsor of the legislation, cannot override the clear text of the statute. *See Cole v. Harris,* 571 F.2d 590, 597 (D.C.Cir.1977)[101]. There-

---

Court finds that the FEC's General Counsel's view on the appropriate interpretation of this provision of BCRA is irrelevant for the purposes of step one *Chevron* review. The Court knows of no canon of statutory construction that finds post-enactment comments by agency counsel probative of *Congress's* specific intent in passing a particular law.

**100.** *See also Bread Political Action Comm. v. Federal Election Commission,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) ("[A]bsent a clearly expressed legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive.") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)); *Tex. Mun. Power Agency v. Environmental Protection Agency,* 89 F.3d 858, 875 (D.C.Cir. 1996) ("[J]udges must exercise extreme caution before concluding that a statement made in floor debate . . . may be taken as statutory gospel, in light of the endemic interplay, in Congress, of political and legislative considerations likely unrelated to the interpretative tasks of a court.") (internal quotation marks omitted); *Sanders,* 733 F.2d at 158 ("Where the [statute's] words are . . . plainly spoken . . ., resort to legislative history is appropriate only in rare instances. Indeed, it may even be mischievous, since legislative history should not be used to create an 'ambiguity'

that reflects intermediate congressional debate rather than the actual congressional resolution.").

**101.** The Court recognizes that "[r]eference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.' " *Browner,* 57 F.3d at 1127 (D.C.Cir.1995) (internal quotation marks omitted). This lone comment, however, does not persuade the Court that it should ignore the plain text of the statute passed by Congress. *See First Nat'l Bank & Trust v. Nat'l Credit Union,* 90 F.3d 525, 530 (D.C.Cir.1996) (suggesting that a "show stopper" in the legislative history is required before a court may ignore what appears to be clear statutory text). This is so even though Plaintiffs' view on the provision may represent the conventional wisdom on the matter. *See McConnell,* 251 F.Supp.2d at 290 (Henderson, J.) ("BCRA requires every political party committee . . . to use federal money to raise any money that will be used, in turn, on 'Federal election activity.' "); *id.* at 844 (Leon, J.) ("[O]nly federal money can be used to raise federal or Levin funds."). But even if it did, the Court's analysis *supra,* makes it is clear that the Commission's interpretation of the statute is a permissible one. Given this fact and the fact that Plaintiffs raise no arguments in addition to those outlined *supra, see*

fore, the Court concludes that the FEC's regulation captures the "unambiguously expressed intent of Congress," and ends the Court's inquiry. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

### iii. Failure to Include Safeguards and Accounting Procedures

■ As noted *supra*, BCRA permits state, district and local political party committees to spend nonfederal funds on certain "[F]ederal election activit[ies]" subject to several restrictions and requirements, including that the spending be allocated to include proportional amounts of federal and Levin funds. 2 U.S.C. § 441i(b)(2)(A). The statute expressly delegates to the FEC the authority to determine the allocation rules. *Id.* The Commission's allocation rules are codified at 11 C.F.R. § 300.33. Plaintiffs challenge a different regulation, which delineates the types of accounts state, district and local party committee must keep if they are to partake in "Federal election activit[ies]." *Id.* § 300.30(c). The regulation provides three options such committees may employ, including establishing

> two separate accounts in depositories as follows:
>
> (i) One or more Federal accounts, and;
>
> (ii) An account that must function as both a Non–Federal account and a Levin account. If such an account is used, the State, district, and local party must

demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that whenever such organization makes a disbursement for activities undertaken pursuant to 11 CFR [§ ] 300.32(b), that organization had received sufficient contributions or Levin funds to make such disbursement.

*Id.* § 300.30(c)(3).[102] Plaintiffs contend that this regulation "fail[s] to establish effective safeguards and accounting procedures for the handling of funds by state, district and local committees in order to ensure compliance with BCRA." Pls.' Mem. at 71. In particular, they protest the fact that political party committees are permitted to "commingle unregulated soft money funds with Levin funds in a single account," and claim that the FEC "compound[ed] this commingling problem by failing to require standard accounting practices." *Id.* This regime, Plaintiffs claim, is "history repeating itself," raising "the same kinds of problems that led Judge Flannery to condemn the Commission's allocation regime seventeen years ago." *Id.* at 71 & n. 123 (citing *Common Cause v. Federal Election Commission*, 692 F.Supp. 1391, 1396 (D.D.C.1987)). This constitutes Plaintiffs' entire argument on this matter. *See* Pls.' Mem. at 71 & n. 123; Pls.' Opp'n at 50 (no discussion of the matter). From what the Court can dis-

---

Pls.' Mem. at 70–71; Pls.' Opp'n at 50, and the fact that Plaintiffs provide no basis for finding that this regulation unduly compromises FECA's purposes, the Court finds in the alternative that 11 C.F.R. § 300.32(a)(4) survives *Chevron* step two analysis. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Plaintiffs do not contend in their briefing that this regulation violates the APA. *See* Pls.' Mem. at 70–71; Pls.' Opp'n at 50.

**102.** The FEC justified the regulation in its E & J, explaining that it

recognizes that some States already require multiple accounts, while a few may prohibit more than one account for all activity. Most importantly, the Commission is very aware of, and concerned about, the complexities of FECA as amended by BCRA, and wants to provide party organizations with procedural flexibility to facilitate compliance with the substantive conditions and restrictions arising from the Levin Amendment.

Prohibited & Excessive Contributions, 67 Fed. Reg. at 49,093.

cern from their brief argument, Plaintiffs are not raising a *Chevron* step one challenge, nor do they contend that the Commission's construction of the statute is impermissible under *Chevron* step two, or that the Commission's rulemaking is arbitrary and capricious under the APA. Rather, it appears that Plaintiffs are arguing that the regulation undermines FECA's purposes, thereby violating *Chevron* step two. *See Orloski*, 795 F.2d at 164.

As an initial matter, Judge Thomas Flannery's decision in *Common Cause* had nothing to do with commingling of federal and nonfederal funds in single accounts. Rather, Judge Flannery was faced with a challenge to the FEC's regulation which permitted "state and local political committees ... to spend money from both their federal and non-federal accounts to finance [campaign materials used for volunteer activities, voter registration, and get-out-the-vote activities], allocating 'on a reasonable basis.'" *Common Cause*, 692 F.Supp. at 1394 (quoting 11 C.F.R. § 106.1(e) (1976)). Judge Flannery, noting that "any improper allocation of nonfederal funds by a state committee would be a violation of FECA," and that "the Commission provides no guidance whatsoever on what allocation methods a state or local committee may use," concluded that "the potential for abuse, intended or no[t], is obvious." *Id.* at 1396. The regulation was therefore deemed to warrant no deference and "set aside." *Id.* As noted *supra*, Plaintiffs do not challenge the *allocation* regulations, found at 11 C.F.R. § 300.33; rather, they challenge the fact that 11 C.F.R. § 300.30(c)(3) permits funds to be commingled and fails to require standard accounting practices.[103] The Court therefore does

not find *Common Cause* applicable on this matter. *See* Def.'s Opp'n at 32 & n. 51.

A review of the regulation does not reveal any *Chevron* infirmity. BCRA is silent on how state, district and local political parties should maintain their federal, nonfederal, and Levin funds. The question for the Court then is whether or not 11 C.F.R. § 300.30(c)(3) represents "a reasonable choice within the gap left open by Congress." *Chevron*, 467 U.S. at 866, 104 S.Ct. 2778. The regulation makes clear that despite the fact that Levin and federal funds may be commingled, the state, district or local political party "must demonstrate through a reasonable accounting method approved by the Commission ... that whenever such organization makes a disbursement for activities [requiring Levin funds], that organization had received sufficient contributions or Levin funds to make such disbursement." 11 C.F.R. § 300.30(c)(3). The Court has been given no basis for concluding that the FEC's approved accounting methods are suspect or will allow political parties opting for the complained-of form of accounting to evade FECA's restrictions. Accordingly, there is no basis for finding that the regulation violates FECA's purposes, and therefore no basis for invalidating the regulation.

### g. Definition of State Party Committees

▮ In an effort to prevent circumvention of the nonfederal money restrictions BCRA imposes on national political party committees, BCRA imposes restrictions on how "State, district, and local committees" may spend nonfederal money on certain "Federal election activities." 2 U.S.C.

---

**103.** Defendant observes that Plaintiffs' argument "rests upon its flawed conflation of rules governing the accounting of mixed federal and non-Federal funds, and rules governing how such funds can be spent, but the

increased use of soft money that led to BCRA's enactment was not caused by accounting rules." Def.'s Opp'n at 32 n. 51 (emphasis in original).

§ 441i(b); *McConnell,* 124 S.Ct. at 654–55. FECA defines "State committee" as "the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission." 2 U.S.C. § 431(15). FECA does not define the terms "district committee" or "local committee." Plaintiffs object to the fact that the FEC's regulations define these different committees as being "part of the official party structure." Pls.' Mem. at 72; 11 C.F.R. § 100.14. They argue that this "limitation [is] not found in the statute," nor is it "found in the FEC's longstanding . . . definition of 'state committee' for purposes of FECA, and the FEC offered no explanation for the change in course." Pls.' Mem. at 72; *see also id.* at 72 n. 124 (comparing 11 C.F.R. § 100.14(a) (2001) with 11 C.F.R. § 100.14(a) (2003), the latter adding the phrase "part of the official party structure").[104]

While Plaintiffs are correct that the statute does not require that the definitions of these committees include that they be "part of the official party structure," the statute does not directly preclude the inclusion of such a requirement in the definition either. *See* 2 U.S.C. § 431(15); *id.* § 441i(b). Accordingly, the Court finds that Congress has not spoken directly on this matter and therefore the Commission's regulation does not violate *Chevron* step one.[105]

Turning to *Chevron* step two, the Court finds that the Commission's regulation is a permissible construction of the Act. As Defendant points out, the only statutory guidance for any of the definitions provides that "State committees" are those "responsible for the day-to-day operation of" that party at the state level "by virtue of the bylaws of a political party." 2 U.S.C. § 431(15); Def.'s Mem. at 22. Defendant argues that "[i]t is difficult to imagine how a committee" could meet these criteria "without being part of the 'official party structure.' Moreover, it is plainly reasonable for the Commission to use similar criteria in defining 'district' or 'local' committee, as Congress used to define 'State committee.'" Def.'s Mem. at 22. Defendant also explains that it chose this requirement because it "is an important safeguard," ensuring that "the party is not responsible for unofficial groups calling themselves 'Democrats' or 'Republicans,' even though they are not an actual component of the party itself." *Id.* The Court sees no basis for disagreeing with Defendant's conclusion, and Plaintiffs have not responded to this argument.[106]

Plaintiffs express concern that "[t]he new, formalistic definition allows 'informal' or 'unofficial' committees to be established by state party entities that would be able to spend unregulated soft money on functions previously performed by the formal party apparatus, thereby opening up another avenue for circumvention of BCRA." Pls.' Mem. at 72. The Court interprets

---

**104.** Plaintiffs assert that the FEC's "longstanding" definition of "state committee" "still exist[s]." Pls.' Mem. at 72. It is clear to the Court that this is not so. *See* 11 C.F.R. § 100.14(a) (2003).

**105.** To the extent that Plaintiffs, by arguing that the FEC changed its "longstanding" definition, intended to raise the legislative reenactment doctrine, the Court finds that the absence of any indication that Congress relied

on the Commission's past treatment of the term and the Court's discussion of the legislative reenactment doctrine *supra* at 60, mandates the rejection of the argument.

**106.** Plaintiffs, citing "space constraints," have elected "to stand on their previous arguments" on this provision found in their Amended Complaint and Opening Brief. Pls.' Opp'n at 50.

this argument to allege that the Commission's definitions "unduly compromise[ ] the Act's purposes." *Orloski,* 795 F.2d at 164. Defendant responds that this concern is addressed by the Commission's revised regulation defining the term "subordinate committee." Def.'s Opp'n at 33.[107] Plaintiffs do not respond to this point. *See* Pls.' Mem. at 72; Pls.' Opp'n at 50. Given the dearth of briefing, and the fact that it is not readily apparent how the "official party structure" language might undermine BCRA's purposes in light of the language found in the definition of "subordinate committee," the Court cannot find on the present record that 11 C.F.R. § 100.14 on its face unduly compromises FECA's purposes. Given this conclusion, as well as the Court's finding that the Commission's construction of the statute is permissible, the Court finds that the Commission's regulation survives *Chevron* step two.

■ Plaintiffs also suggest that 11 C.F.R. § 100.14 violates the APA because the Commission "offered no explanation for" changing its definition of "state committee." Pls.' Mem. at 72. As discussed *supra,* in the case where an agency has "chang[ed] its course[, it] must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Bush–Quayle '92 Primary Comm.,* 104 F.3d at 453 (quoting *Greater Boston Television Corp.,* 444 F.2d at 852). The Commission in its Notice of Proposed Rulemaking acknowledged that it already had regulations defining the term "State committee." NPRM: Prohibited & Excessive Contributions, 67 Fed. Reg. at 35,662. In its Notice, the Commission noted that the addition of "part of the official party structure" would "create a parallel with the current 11 CFR [§ ] 100.5(e)(4), and would allow the proposed amended regulation to cover those States in which party committee status is a matter of State law and those in which it is a matter of party by-laws." *Id.* The Commission, in a separate regulation, defines "Party committee" as "a political committee which represents a political party and is part of the official party structure at the national, State or local level." 11 C.F.R. § 100.5(e)(4). In its E & J, the Commission explained that its addition of the language "part of the official party structure" was

> an important safeguard, ensuring that BCRA's provisions sweep only as far as necessary to accomplish its ends. The Commission also believes that its definition of "subordinate committee of a State, district or local committee," which includes any organization that is directly or indirectly established, financed, maintained or controlled by the State, district, or local committee fully addresses the sponsor's regulatory concerns in this area.

Prohibited & Excessive Contributions, 67 Fed.Reg. at 49,065. The Court finds that this discussion meets the deferential "reasoned analysis" test. The agency has "examined the relevant data and articulated a

---

**107.** The Commission's definition provides that

> Subordinate committee of a State, district, or local committee means any organization that at the level of city, county, neighborhood, ward, district, precinct, or any other subdivision of a State or any organization

under the control or direction of the State committee, and is directly or indirectly established, financed, maintained, or controlled by the State, district, or local committee.

11 C.F.R. § 100.14(c).

satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Republican Nat'l Comm.,* 76 F.3d at 407 (internal quotation marks omitted). Its analysis has enabled the Court "to see what major issues of policy were ventilated ... and why the agency reacted to them as it did." *Id.* (quoting *Public Citizen, Inc. v. FAA,* 988 F.2d 186, 197 (D.C.Cir.1993)) (ellipsis in original). Although the Commission could have provided a more thorough explanation, the Court finds that its analysis is "tolerably terse." *Bush–Quayle '92 Primary Comm.,* 104 F.3d at 453. The Court also finds that "a rational basis for the agency's decision exists." *Bolden,* 848 F.2d at 205. Accordingly, the Court finds that 11 C.F.R. § 100.14 is not arbitrary and capricious, and therefore upholds the regulation.

### 3. Challenges to the FEC's "Electioneering Communications" Regulations

In Title II of BCRA, Congress responded to the ineffectiveness of the *Buckley* "magic words" test[108] "to combat real or apparent corruption," *McConnell,* 124 S.Ct. at 689, by enacting restrictions on "electioneering communications." An "electioneering communication" is (1) a broadcast, (2) referring to a clearly identified candidate for federal office, (3) aired within 30 days of a primary election or 60 days of a general election, (4) that is targeted to the electorate of the candidate mentioned. 2 U.S.C. § 434(f)(3). Plaintiffs raise two challenges to the FEC's regulations implementing the "electioneer-

ing communications" provisions of BCRA. The Court addresses each in turn.

#### a. Exemption for Section 501(c)(3) Broadcast Advertisements

▅ Included in BCRA's "electioneering communications" provisions were exceptions to its definition of the term. 2 U.S.C. § 434(f)(3)(B). BCRA provides that

[t]he term "electioneering communication" does not include—

(i) a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate;

(ii) a communication which constitutes an expenditure or an independent expenditure under this Act;

(iii) a communication which constitutes a candidate debate or forum conducted pursuant to regulations adopted by the Commission, or which solely promotes such a debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(iv) any other communication exempted under such regulations as the Commission may promulgate (consistent with the requirements of this paragraph) to ensure the appropriate implementation of this paragraph, except that under any such regulation a communication may not be exempted if it meets the requirements of this paragraph and is described in section 431(20)(A)(iii)[109] of this title.

---

**108.** The Court briefly discusses the "magic words" test *supra* at note 26.

**109.** As noted *supra,* 2 U.S.C. § 431(20)(A)(iii) includes in the definition of "Federal election activity"

a public communication that refers to a clearly identified candidate for Federal of-

fice (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)

2 U.S.C. § 431(20)(A)(iii).

*Id.* In implementing this provision of BCRA, the FEC promulgated a regulation providing that "*Electioneering communication* does not include any communication that: .... Is paid for by any organization operating under section 501(c)(3) [110] of the Internal Revenue Code of 1986. Nothing in this section shall be deemed to supersede the requirements of the Internal Revenue Code for securing or maintaining 501(c)(3) status." 11 C.F.R. § 100.29(c)(6). Plaintiffs challenge this exception on numerous grounds.

Commencing the *Chevron* analysis, the Court asks "whether Congress has directly spoken on the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. BCRA's exception (iv) to its "electioneering communication" definition permits the Commission to promulgate additional exemptions from the "electioneering communication" regulation with the caveat "that under any such regulation a communication may not be exempted if it" is a

> public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or at-

tacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)

2 U.S.C. §§ 434(f)(3)(B)(iv), 431(20)(A)(iii). Plaintiffs observe that "[o]n its face, the regulation does *nothing* to ensure that ads which promote or oppose a federal candidate are not run by Section 501(c)(3) groups." Pls.' Mem. at 77 (emphasis in original). Defendant responds that the tax code prohibits Section 501(c)(3) organizations from engaging in electoral advocacy, and therefore implicit in its exemption for 501(c)(3) organizations is that such organizations will not engage in such communications. Def.'s Opp'n at 50.[111] The Commission explained that "[s]hould the Internal Revenue Service [ ("IRS") ] determine, under its own standards for enforcing the tax code, that an organization has acted outside its 501(c)(3) status, the organization would be open to complaints that it has violated Title II of BCRA." Electioneering Communications, 67 Fed.Reg. 65,190, 65,200 (Oct. 23, 2002). The tax code prohibits Section 501(c)(3) organizations from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of

---

**110.** This provision of the tax code provides that among those entities exempt from federal taxes are

[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), *and*

*which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.*

26 U.S.C. § 501(c)(3) (emphasis added).

**111.** Defendant also contends that since "[t]here is no mention in BCRA Title II of Section 501(c)(3) organizations ... Congress has not spoken directly to 'the precise question at issue' under *Chevron.*" Def.'s Mem. at 68. While it is certainly true that Congress made no mention of Section 501(c)(3) organizations in these provisions of BCRA, that does not mean that it has not spoken on whether or not Defendant's blanket exemption of their communications is permitted.

(or in opposition to) any candidate for public office."

Plaintiffs concede that "Section 501(c)(3) of the tax code contains a broadly stated prohibition on 'intervention' in a political campaign," but argues that "this prohibition is *not* co-extensive with the language or purposes of Title II–A of BCRA and, even if it were, the Commission would not have the discretion to franchise out to the IRS its own responsibility to implement and enforce BCRA." Pls.' Opp'n at 52–53 (emphasis in original).[112] Moreover, they point out that the Commission itself has sought comment in the context of another rulemaking regarding how it should "interpret the Internal Revenue Service's Technical Advice Memorandum 89–36–002, 1989 WL 596078 (Sept. 8, 1989), which per-

mitted a 501(c)(3) organization to make advertisements that 'support or oppose a candidate in an election campaign,' without losing its 501(c)(3) status for intervening in a political campaign." Political Committee Status, 69 Fed.Reg. 11,736, 11,742 (Mar. 11, 2004). Pls.' Opp'n at 52 n. 78.[113]

It is clear that the validity of the Commission's regulation depends on whether or not the tax laws and regulations, as well as their enforcement, effectively prevent Section 501(c)(3) groups from issuing "public communications" that promote or oppose a candidate for federal office. It is the FEC, not the IRS, that is charged with enforcing FECA. The Commission claims in its E & J that it "is not delegating enforcement of the electioneering commu-

---

**112.** Plaintiffs also attempt to make a legislative history argument, citing to comments by BCRA's co-sponsors. Specifically, they cite to Plaintiff Shays's comments on the floor of the House of Representatives, addressing the provision providing authority to the FEC to create exemptions from BCRA's "electioneering communication" definition. Plaintiff Shays stated that "we do not intend that [2 U.S.C. § 434(f)(3)(B)(iv)] be used by the FEC to create any per se exemption from the definition of 'electioneering communications' for speech by Section 501(c)(3) charities." 148 Cong. Rec. H411 (daily ed. Feb. 13, 2002) (statement of Rep. Shays). Plaintiff Meehan made the exact same statement. 148 Cong. Rec. E179 (Feb. 15, 2002, containing remarks of Feb. 13, 2002) (statement by Rep. Meehan). Plaintiffs also note that the next month in the Senate, Senator Feingold "endorsed" Representative Shays's "discussion" of the provision, and Senator McCain "agreed" with Senator Feingold that Representative Shays's "statements express our intent in this bill quite well." 148 Cong. Rec. S2143 (daily ed. Mar. 20, 2002) (statements by Sens. Feingold & McCain). While these comments clearly indicate the intent of BCRA's *framers* that the Commission not adopt a *per se* exemption for Section 501(c)(3) organizations, that does not necessarily mean that *Congress* had that same intent. As this Circuit has stated,

legislative intention, without more, is not legislation. The issue here is not how Con-

gress expected or intended the [Commission] to behave, but how it *required* [it] to behave, through the only means by which it can (as far as the courts are concerned, at least) require anything—the enactment of legislation. Our focus, in other words, must be upon the text . . . .

*Donovan*, 746 F.2d at 860–61 (internal quotation marks and citations omitted) (emphasis in original); *see also Sanders*, 733 F.2d at 158 ("Where the [statute's] words are . . . plainly spoken . . ., resort to legislative history is appropriate only in rare instances. Indeed, it may even be mischievous, since legislative history should not be used to create an 'ambiguity' that reflects intermediate congressional debate rather than the actual congressional resolution."). The most the Court can say about these statements is that they reflect the manner in which BCRA's primary sponsors intended the provision to be interpreted; the statements provide the Court with little basis for finding that the sponsors' views represent Congress's intent in enacting the provision.

**113.** Plaintiffs submitted this document as Exhibit 196 with their Opposition brief. Defendant does not object to consideration of the document. *See* Def.'s Opp'n to Pls.' Supplemental Mot. Regarding Consideration of Exhibits (objecting only to Plaintiffs' Exhibits 185–86, 188–89).

nication provisions to the [IRS]. Rather the Commission anticipates that the [IRS] will continue to review the activities of 501(c)(3) organizations to make sure those organizations comply with the tax code, without reference to Title II of BCRA." Electioneering Communications, 67 Fed. Reg. at 65,200. However, in the very next sentence, the Commission acknowledges that its enforcement of this exemption is dependent on the IRS enforcing the tax laws: "Should the [IRS] determine, under its own standards for enforcing the tax code, that the organization has acted outside its 501(c)(3) status, the organization would be open to complaints that it has violated or is violating Title II of BCRA." *Id.* (emphasis added). It is clear then that a prerequisite to the FEC enforcing its exemption is the completion of enforcement action by the IRS pursuant to "its own standards for enforcing the tax code." This is troubling, given the fact, as acknowledged by the Commission, *see supra,* that the IRS in the past has not viewed Section 501(c)(3)'s ban on political activities to encompass activities that are so considered under FECA. However, as the Commission noted in its E & J, *id,* the Act

provides that "[i]n prescribing such rules, regulations, and forms under this section, the Commission and the Internal Revenue Service shall consult and work together to promulgate rules, regulations, and forms which are mutually consistent." 2 U.S.C. § 438(f); Electioneering Communications, 67 Fed.Reg. at 65,200. It is therefore not clear to the Court whether or not the IRS will conform its views on political activity under the tax laws to those regulated in the realm of campaign finance law. Accordingly, the Court finds the record unclear as to whether the Commission's regulation, by relying on the IRS's views on "participat[ion] in, or interven[tion] in ... any political campaign on behalf of (or in opposition to) any candidate for public office," 26 U.S.C. § 501(c)(3), meets the requirements set forth by Congress in 2 U.S.C. § 434(f)(3)(B). The Court finds that this lack of clarity precludes it from determining whether or not the regulation fails *Chevron* review.[114]

This concern also leads the Court to conclude that the Commission failed to conduct a "reasoned analysis" and therefore the regulation violates the APA. A

114. The FEC points to rulemaking comments submitted by Plaintiffs and their BCRA co-sponsors in its briefing in support of its position. Def.'s Mem. at 64. Plaintiffs stated in their comments to the Commission that

while the issue[ ] of ... ads created by 501(c)(3) charities were raised during the drafting of Title II, Congress did not create statutory exemptions for these types of ads. Before doing so, the Commission must be convinced that such ads have been run in the past during the preelection windows and that exempting them will not create opportunities for evasion of the statute.

Administrative Record 06724–25 (Def.'s Attach. 7). The Commission claims that this constitutes an "implicit acknowledgment that the FEC had the discretion to create such an exemption." Def.'s Mem. at 68. The Court finds it somewhat surprising that the Commission, after repeatedly urging the Court to

ignore the comments of BCRA's co-sponsors, made on the floors of the United States House of Representatives and Senate on the eve of BCRA's passage, now asks the Court to look at their post-enactment comments for implicit authorization for the regulation it promulgated. Putting aside this inconsistency, the Court knows of no canon of construction that looks to post-enactment comments to determine Congressional intent, or holds that post-enactment comments, even by co-sponsors of legislation, override the clear text of enacted legislation. *See, e.g., Donovan,* 746 F.2d at 859–60 (D.C.Cir.1984); *Bread Political Action Comm.,* 455 U.S. at 580, 102 S.Ct. 1235 ("[A]bsent a *clearly expressed* legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive.") (quoting *Consumer Prod. Safety Comm'n,* 447 U.S. at 108, 100 S.Ct. 2051) (emphasis added).

128

review of the E & J reveals that the Commission commented that "Section 501(c)(3) organizations are barred as a matter of law from being involved in partisan political activity," and noted that it would follow IRS enforcement of the tax laws. Electioneering Communications, 67 Fed.Reg. at 65,200. Absent from its explanation, however, is any discussion of the compatibility of the IRS's enforcement of the ban on political activity of Section 501(c)(3) groups and FECA's requirements; specifically, the FEC did not discuss whether or not the IRS viewed as political activity "public communications" that support or oppose a candidate as those concepts are understood under this nation's campaign finance laws. Moreover, the FEC did not note that tax laws permit Section 501(c)(3) organizations to engage in limited lobbying activities, or discuss the risk, if any, that such activities could run afoul of 2 U.S.C. § 434(f)(3)(B)(iv). See 26 U.S.C. § 501(c)(3), (h). Nor did the Commission address the implications of allowing the IRS to take the lead in campaign finance law enforcement. It is clear from its E & J that if a Section 501(c)(3) organization does make a "public communication" that supports or opposes a candidate, the FEC would do nothing until the IRS investigated and decided whether or not the organization violated the tax laws. The effectiveness of this sort of enforcement should have been at least mentioned. In short, the Commission did not fully address whether the tax code does preclude Section 501(c)(3) organizations from making the "public communications" FECA requires be regulated, and how its delegation of the first response to potential violations to the IRS would impact enforcement of the campaign finance laws. In this way, the Court finds that the agency has "entirely failed to consider ... important aspect[s] of the problem," which renders its

rule arbitrary and capricious. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; *see also Republican Nat'l Comm.*, 76 F.3d at 407.

### b. Exclusion of Unpaid Broadcast Communications from Definition of "Electioneering Communications"

The Commission's "electioneering communication" regulations require that to constitute an "electioneering communication" the communication must be "publicly distributed." 11 C.F.R. § 100.29(a)(2). The Commission has defined "publicly distributed" to mean "aired, broadcast, cablecast or otherwise disseminated *for a fee* through the facilities of a television station, radio station, cable television system, or satellite system." *Id.* § 100.29(b)(3)(i) (emphasis added). Plaintiffs object to the "for a fee" requirement, contending that it

exclude[s] any pre-election reference to a candidate that is aired without charge, such as public service announcements, any program run on a public access cable channel or any other ad that a local broadcaster chooses for whatever reason to air without charge (*e.g.*, friendship, ideological reasons, desire to curry favor with a powerful incumbent, etc.).

Pls.' Mem. at 81.

BCRA does not discuss the financing of "electioneering communications." Def.'s Mem. at 63; *see also* 2 U.S.C. § 434(f)(3). Defendant therefore contends that Congress has not spoken directly on "the precise question at issue." *Id.* (quoting *Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778). The Court cannot agree. As noted *supra*, Congress in enacting BCRA provided that certain communications were not to be considered "electioneering communications." 2 U.S.C. § 434(f)(3)(B)(i)-(iii). It also included a provision delegating authority to the FEC to create exemptions for communications,

but limited the Commission's authority by expressly prohibiting from exemption "public communications" "that promote[ ] or support[ ] a candidate for [federal] office, or attacks or opposes a candidate for [federal] office." *Id.* § 434(f)(3)(B)(iv), 431(20)(A)(iii). While it is not clear whether Congress had a view on whether payment for broadcasts should affect whether or not a communication should be considered an "electioneering communication," [115] it is clear that Congress intended to create certain exceptions to the "electioneering communication" provision and permit the FEC to create exemptions. However, those exemptions were not to exclude from regulation "public communications" that promote or oppose a candidate for office. Here the FEC has exempted from regulation *all* communications, regardless of their content, provided that a fee is not paid for their broadcast.[116] This cannot be squared with the plain meaning of BCRA's text.[117] Accordingly, the Court finds that the Commis-

sion's "for a fee" requirement violates *Chevron* step one.

### D. Remedy

█ The Court has found a number of the Commission's regulations violate either *Chevron* review or the APA. Plaintiffs request in their Amended Complaint that this Court "enjoin the FEC from enforcing the unlawful Title I and Title II regulations until such time a they are corrected to comply with Congress's intent in passing BCRA and otherwise comply with law." Am. Compl. ¶ 104.B. Accompanying Plaintiffs' Motion for Summary Judgment is a proposed order which suggests that the Court order "that the Commission shall, within fifteen (15) days from the date of this Order, commence proceedings to promulgate new regulations that remedy the defects in the ... regulations ...," and order

> that the Commission shall, within (30) days from the date of this Order, report to the Court on its progress in issuing the interim regulations ordered above

---

**115.** Congress's silence on the matter suggests to the Court that it considered this factor irrelevant.

**116.** The Commission itself has acknowledged that communications broadcast without a fee can and have in the past had political and electoral purposes. In its "electioneering communications" rulemaking, the FEC rejected a proposal that all public service announcements ("PSAs") should be exempted from the "electioneering communication" regulations. Electioneering Communications, 67 Fed.Reg. at 65,202. The Commission noted that "generally" PSAs are broadcast without a fee, but that sometimes broadcasters do charge a fee for such communications. *Id.* It made clear that PSAs broadcast without a fee are not considered "electioneering communications." *Id.* However, after noting comments indicating that PSAs have in the past been used for electoral purposes, the FEC concluded that paid-for PSAs "are appropriately subject to the electioneering communications provisions in BCRA." *Id.*

**117.** The FEC points to rulemaking comments submitted by Plaintiffs and their BCRA co-sponsors in its briefing. Def.'s Mem. at 64. Plaintiffs stated in their comments to the Commission that

> while the issues of Public Service Announcements ... were raised during the drafting of Title II, Congress did not create statutory exemptions for these types of ads. Before doing so, the Commission must be convinced that such ads have been run in the past during the preelection windows and that exempting them will not create opportunities for evasion of the statute.

Administrative Record 06724–25 (Def.'s Attach. 7). The Commission claims that this constitutes an "implicit acknowledgement that the FEC had the discretion to create such an exemption." Def.'s Mem. at 64. For the same reasons set forth *supra* at note 114, the Court rejects this argument.

and in conducting proceedings to promulgate new regulations that comply with this Order and the accompanying Memorandum Opinion, and that the Commission shall continue to report to the Court at such intervals to be established by the Court.

Pls.' Proposed Order at 2. Plaintiffs also suggest that the Court retain jurisdiction over the case "to ensure the Commission's timely and sufficient compliance...." *Id.*; *see also* Pls.' Mem. at 89–90 & n. 90. Defendant objects to Plaintiffs' request "for such extraordinary relief." Def.'s Opp'n at 58 n. 86. As this Court recently noted,

> "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." Accordingly, it is up to the agency to determine how to proceed next—not for the Court to decide or monitor.

*Hawaii Longline Ass'n v. National Marine Fisheries Serv.*, 281 F.Supp.2d 1, 38 (D.D.C.2003) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C.Cir.1999)) (internal citation omitted). Consequently, the Court does not believe that there is a basis for granting Plaintiffs' request for relief, and shall remand the case to the Commission for further action consistent with this opinion.

## III: CONCLUSION

After reviewing the parties' briefing, the administrative record, and the relevant law, the Court shall grant-in-part and deny-in-part Plaintiffs' Motion for Summary Judgment and grant-in-part and deny-in-part Defendant's Motion for Summary Judgment.[118] The Court concludes that the following regulations fail *Chevron* review or violate the APA and are therefore remanded back to the Commission for further action consistent with this Memorandum Opinion and accompanying Order: 11 C.F.R. § 109.21(c) (coordination content regulations), including 11 C.F.R. § 109.21(c)(iv) (provision excluding the Internet from coordination communication regulations), *see supra* at 56, 64; 11 C.F.R. § 109.3 (coordination definition of "agent"), *see supra* at 71; 11 C.F.R. § 300.2(m) (definition of "solicit"), *see supra* at 73; 11 C.F.R. § 300.2(n) (definition of "direct"), *see supra* at 73; 11 C.F.R. § 300.2(b) (non-federal money definition of "agent"), *see supra* at 73; 11 C.F.R. § 300.64(b) (state party fundraiser provision), *see supra* at 88; 11 C.F.R. § 100.24(a)(2) (definition of "voter registration activity"), *see supra* at 98; 11 C.F.R. § 100.24(a)(3) (definition of "get-out-the-vote activity"), *see supra* at 101; 11 C.F.R. § 100.24(a)(4) (definition of "voter identification"), *see supra* at 107; 11 C.F.R. § 100.25 (definition of "generic campaign activity"), *see supra* at 108; 11 C.F.R. § 300.33(c)(2) (provision regarding state, district and local employees), *see supra* at 113; 11 C.F.R. § 300.32(c)(4) (*de minimis* Levin Amendment exemption), *see supra* at 117; 11 C.F.R. § 100.29(c)(6) (exemption for Section 501(c)(3) organizations from electioneering communication regulations), *see supra* at 124; and 11 C.F.R. § 100.29(b)(3)(i) ("for a fee" electioneering communication requirement), *see supra* at 128. The following regulations survive the Court's *Chevron* and APA review: 11 C.F.R. § 300.2(c)(3) (the "Grandfather" provision), *see supra* at 93; 11 C.F.R. § 300.32(a)(4) (the "Levin fund"

---

118. The Court has not specifically addressed certain arguments raised by the parties in this Memorandum Opinion, finding after reviewing them that it was unnecessary to reach them.

fundraising regulation), *see supra* at 117; 11 C.F.R. § 300.30(c)(3) (regulation regarding accounting procedures), *see supra* at 120; and 11 C.F.R. § 100.14 (regulation defining "State committee," "district committee" and "local committee"), *see supra* at 121.

An Order accompanies this Memorandum Opinion.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 18th day of September, 2004, hereby

**ORDERED** that Defendant Federal Election Commission's Motion for Summary Judgment is GRANTED–IN–PART and DENIED–IN–PART; it is further

**ORDERED** that Plaintiffs Christopher Shays and Martin Meehan's Motion for Summary Judgment is GRANTED–IN–PART and DENIED–IN–PART; it is further

**ORDERED** that Plaintiffs Christopher Shays and Martin Meehan's Motion Regarding Consideration of Exhibits is GRANTED–IN–PART and DENIED–IN–PART; it is further

**ORDERED** that Defendant Federal Election Commission's Motion to Strike Plaintiffs' Exhibits is DENIED; it is further

**ORDERED** that Plaintiffs' Supplemental Motion Regarding Consideration of Exhibits is DENIED; it is further

**ORDERED** that this case is remanded to the Federal Election Commission for further action consistent with this Order and the accompanying Memorandum Opinion; and it is further

**ORDERED** that the Motions for Leave to File *Amicus Curiae* briefs filed by Alliance for Justice, the Michigan Democratic Party and Michigan Republican Party, and OMB Watch are GRANTED.

**SO ORDERED.**